1                  IN THE UNITED STATES DISTRICT COURT

2                     FOR THE DISTRICT OF COLORADO

3    Civil Action No. 16-cv-2052-JLK

4    BLUERADIOS, INC.,

5          Plaintiff,

6          vs.

7    KOPIN CORPORATION, INC.,

8          Defendant.

9    ----------------------------------------------------------------

10                      REPORTER'S TRANSCRIPT

11                      Jury Trial, Vol. 2

12   ----------------------------------------------------------------

13         Proceedings before the HONORABLE JOHN L. KANE, Judge,
     United States District Court for the District of Colorado,
14   commencing on the 21st day of March, 2024, in Courtroom A802,
     United States Courthouse, Denver, Colorado.

15

16                           APPEARANCES
     For the Plaintiff:
17   STANLEY M. GIBSON and LENA STREISAND, Jeffer Mangels Butler &
     Marmaro LLP, 1900 Avenue of the Stars, 7th Floor, Los Angeles,
18   CA 90067

19   DAVID B. SESERMAN, Seserman Law LLC, 3900 East Mexico Avenue,
     Suite 300, Denver, CO 80210

20

21   For the Defendant:
     JOSHUA M. DALTON, KANDIS C. GIBSON, HARVEY BARTLE IV, and JULIE
22   S. GOLDEMBERG, Morgan Lewis & Bockius LLP, One Federal Street,
     Boston, MA 02110

23

24
     Reported by KEVIN P. CARLIN, RMR, CRR, 901 19th Street, Room
25   A259, Denver, CO 80294, (303)335-2358

        Proceedings reported by mechanical stenography; transcription
                        produced via computer.

16-cv-2052-JLK    Jury Trial    03-21-2024

1                          I N D E X

2  Opening Statement By Mr. Gibson . . . . . . . . . . . .207

3  Opening Statement By Mr. Dalton . . . . . . . . . . . .245

4

5  PLAINTIFF'S WITNESSES                                PAGE

6  MARK KRAMER
        Direct Examination By Mr. Gibson . . . . . . . . .288
7

8

9  Reporter's Certificate  . . . . . . . . . . . . . . . .331

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

16-cv-2052-JLK    Jury Trial    03-21-2024

1                    P R O C E E D I N G S

2        (Proceedings commenced at 9:02 a.m.)

3            THE COURT:  The jury is here, and I don't want to take

4    up a whole lot of time, but I will tell you what I've done.  And

5    we're here to note -- resolve objections to the jury

6    instructions and the verdict form that were made yesterday.

7            It was clear that instruction 3.16 was the focus of the

8    majority of counsel's objections.  I have reviewed both parties'

9    preferred language and largely agree with Kopin's instructional

10   language.  As I suggested yesterday, I found the Cognat,

11   C-O-G-N-A-T [sic], case cited by Kopin to be persuasive.  With

12   that in mind, I've drawn a distinction between trade secrets

13   that are directly related and those that are not.  See generally

14   the Cognat versus Ellsworth decision as reported at 224 Pacific

15   3d. 1039 at 1046, decided by the Colorado Court of Appeals in

16   2009 and affirmed in 259 Pacific 3d. 497 in 2011.

17           This is a factual determination, and it will be for the

18   jury to determine which trade secrets if any are related to one

19   another.  Assuming the statute of limitations criteria are

20   proven by a preponderance by Kopin, trade secret

21   misappropriation that occurred after August 12, 2013, is not

22   recoverable unless the trade secrets that are misappropriated

23   are not related to trade secrets that were misappropriated

24   before August 12, 2013.  I have removed the reference to, quote,

25   directly, close quote, preceding the word related, close quote.

16-cv-2052-JLK    Jury Trial    03-21-2024

1        I have also drawn a distinction between the contractual

2    obligations that allegedly bind Kopin.  The difference between

3    breaches of single or out-of-date specific contract duties and

4    recurring contract duties is now reflected in instruction 3.16,

5    outlining the conditions in which the statute of limitations

6    apply.  It is similarly reflected in the verdict form, question

7    eight, under claim one.

8        I find that *Neuromonitoring Associates versus Centura*

9    *Health Corporation* controls, and that BlueRadios' earlier

10   proposed language regarding, quote, continuous accrual, does not

11   reflect Colorado law as it applies in this case.  See that at

12   351 Pacific 3d. 6466 at 492, Colorado Court of Appeals from

13   2012.

14       I clarify my reinsertion of the paragraph on the

15   doctrine of equitable tolling.  At the final trial prep

16   conference on Monday, in response to Kopin's point that the

17   instruction at that time referred erroneously and extraneously

18   to policy reasons underlying the doctrine, I expressed agreement

19   and then indicated I would delete the paragraph.  My apologies.

20   I meant to indicate and I would delete -- that I would delete

21   that solitary phrase.  As counsel can see, the problematic

22   language regarding fairness is no longer present.

23       With regard to jury instruction 3.7, claim one,

24   awarding damages, disgorgement, disgorgement is an equitable

25   remedy, an extraordinary remedy for breach of contract only I

16-cv-2052-JLK    Jury Trial    03-21-2024

1  can apply.  As I have stated previously, I will make a

2  determination after trial taking into account the advisory

3  findings of the jury.

4        Although the process of determining disgorgement

5  damages is largely the same as the process for determining

6  unjust enrichment damages, and that may explain why the terms

7  are often conflated in trade secret misappropriation context,

8  unjust enrichment damages are a conceptually and legally

9  distinct remedy.

10       The Colorado Uniform Trades Act and the Defend Trade

11 Secrets Act both provide for unjust enrichment as a

12 statutorily-authorized remedy.  In that regard, you can see the

13 jury instructions and verdict form, Cartel Asset Management

14 versus Ocwen Corporation, case number 1:01-cv-01644, by my

15 colleague, Judge Blackburn, and that's electronic case filing

16 number 813-1, 813-3.  And that's -- the date of that decision is

17 September 24, 2010.  In that case, the jury awarded $6 million

18 in unjust enrichment damages for trade secret misappropriation.

19       Accordingly, I have clarified that disgorgement damages

20 for claim one, BlueRadios' claim for breach of contract are

21 advisory for me.  General damages for breach of contract, like

22 unjust enrichment damages for trade secret misappropriation, are

23 within the purview of the jury to determine.

24       Yesterday -- with regard to the verdict forms,

25 yesterday Kopin objected again to how the initial questions

Kevin P. Carlin, RMR, CRR

16-cv-2052-JLK    Jury Trial    03-21-2024

1    under claims three and four describe trade secrets.  I'm

2    overruling this objection because I find that as written, it

3    instructs the jurors to identify the same specific information

4    across the definitional criteria for trade secrets.  A jury can

5    capably determine this information as a subset of all

6    information in the categories indicated, or depending upon how

7    plaintiff characterizes the information itself, equivalent to

8    the categories themselves.

9          This morning, BlueRadios proposed an additional

10   question concerning figures incorporated into patents that

11   BlueRadios alleges it should be recognized as co-owner of.  I

12   accepted the proposed question into the verdict form, and

13   included it, and BlueRadios should understand it is their

14   responsibility to explain with sufficient clarity what these

15   figures mean to the jury.

16         Lastly, I have also made some minor changes to clear up

17   some non-substantive language, and I doubt seriously that

18   counsel will take issue with any of these modest edits.  They're

19   style and not substance.

20         So, those are the orders, and we will take a recess

21   until I have a complete set for each one of the jurors.  You

22   already have them, as I understand it.  Yes, sir?

23          MR. BARTLE:  Your Honor, Harvey Bartle on behalf of

24   Kopin.  I don't want to delay anything.  I just want, to the

25   extent that we have additional objections, we just want to

159

                16-cv-2052-JLK    Jury Trial    03-21-2024

 1  reserve them.

 2          THE COURT:  Your objections are preserved.

 3          MR. BARTLE:  Thank you, Your Honor.  We will raise

 4  them at a later date.

 5          THE COURT:  Okay.

 6          MR. BARTLE:  Thank you.

 7          MR. GIBSON:  And I assume that applies to both sides?

 8  I did have just a question on some of the language on the

 9  verdict form.  I don't know if we can wait to do that until

10  later, or if Your Honor needs to do that now?

11          THE COURT:  Well, tell me what it is now, and I will

12  have a chance to look at it at the recess.

13          MR. GIBSON:  So, on the breach of contract claim, we

14  have the general damages then followed by the disgorgement

15  damages.  I would assume that the breach of the implied covenant

16  of good faith and fair dealing should have the same format, but

17  we're doing it differently for that claim.  I would think they

18  should be the same.

19          THE COURT:  It's a question of format and not of

20  substance; is that correct?

21          MR. GIBSON:  Well, it's -- we only have a general

22  damages claim under the breach of the implied covenant, and I

23  think there should be a disgorgement damages section under that

24  claim.

25          THE COURT:  Okay.  Let's -- I'm not going to do it

                    Kevin P. Carlin, RMR, CRR

16-cv-2052-JLK    Jury Trial    03-21-2024

1    now, but I don't mind doing -- changing it later.

2           MR. GIBSON:  Understood, Your Honor.  I just wanted to

3    bring that to the Court's attention.

4           THE COURT:  We're going for quite a while, so if you

5    can come up with whatever changes you want and submit them,

6    today or tomorrow.

7           MR. GIBSON:  We will do that, Your Honor.  We had one

8    other additional suggestion which would apply to page 11.  We

9    will put that in, Your Honor.  Thank you.

10           THE COURT:  We will take a recess until the copying is

11    done, and then start the trial.

12           (Recess at 9:11 a.m., until 9:54 a.m.)

13           (Jury in at 9:54 a.m.)

14           THE COURT:  Ladies and gentlemen, first of all, good

15    morning.  And secondly, I wish to apologize for keeping you

16    late, and this delay.  The reason for that is that I want to

17    have the instructions that you have and have now been finalized,

18    and you have them in these notebooks to go through the trial.

19           There was an old fashioned way that's still used in

20    some courts where they wait until the very end and then give

21    them to you right as you're going to deliberate, and you don't

22    have the opportunity to look at the instructions and see how

23    they relate to what's happening in the court.  So, there was

24    some last minute changes that were necessary, and I thought that

25    we would be earlier and not keep you waiting.

Kevin P. Carlin, RMR, CRR

16-cv-2052-JLK    Jury Trial    03-21-2024

1    We've been here earlier than you were to get this done,

2    but just the cost -- the time that it takes to make all these

3    copies and to make sure that everything is in order took us

4    longer.  And that's my responsibility, and I'm sorry for that.

5    I do value your time, and I am not taking it lightly, nor are

6    the attorneys in the case.

7    I want to point out something else.  We've done our

8    best job with -- it's my responsibility, and with the

9    considerable input from the attorneys in the case, and from my

10    staff to come out with instructions so that you can become

11    acquainted within three weeks to what took seven years to do,

12    and that's kind of an uphill battle.

13    I have these instructions, and I may change some of

14    them, because during the course of the trial, if I see that I

15    forgot to put one in or I have misstated and want to correct

16    what's there.  But if I do that, I will tell you.  But it's my

17    responsibility, and at the end of the trial, I hope that there

18    aren't any changes, and that you have what's here at the

19    beginning.  But if I make a mistake, I will tell you, and we'll

20    take out the incorrect instruction and give you a new one.  If I

21    do, I can tell you right now, it's not going to be a matter of

22    earthshaking importance.  It's not going to be a titanic kind of

23    change that takes place.  It might be a word here or a word

24    there.  But if it's wrong, I will correct it, and I apologize

25    for that.

16-cv-2052-JLK    Jury Trial    03-21-2024

1          I will try as hard as I can now to keep things running

2     with the train on time, so if there is a delay, and unless

3     somebody needs to take a break, we will go until noon, and we

4     will come back at 1:30.  But what we're going to do is I'm going

5     to go over these instructions with you first.  Then the

6     attorneys will make opening statements.  And I don't want to

7     interrupt them.  So, we will see where the timing is so that

8     they have the chance to make uninterrupted opening statements.

9     And after that, we will begin with the first witness and the

10    testimony and get on to the actual trial itself.

11          In that regard, if you would go to your jury

12    instructions, I will go over them briefly with you.  And the

13    first instruction is a statement of what the case is about and

14    how the case is structured.  I think we've covered that, and so

15    I'm not going to repeat it now.  But you have it, and you can go

16    over it at any time you want on your own.

17          Let's go, though, to page six, which is instruction

18    1.1, and I will start there.  I've covered some of this with you

19    already.  So, forgive me for the repetition.

20          In any trial, there are in effect two judges.  I am one

21    of the judges.  You are the other.  I am the judge of the law.

22    You as jurors are judges of the facts.  It is my duty to direct

23    the trial and decide what evidence is proper for you to

24    consider.  When I reject evidence, I am saying that evidence may

25    not legally be considered by you.  I am not telling you what is

163

16-cv-2052-JLK    Jury Trial    03-21-2024

1    true or not true.

2           In explaining the law that you must follow, I will

3    first give you some general instructions that apply in every

4    case.  Then I will give you some specific laws that apply in

5    this case.  And finally, I will explain the procedures you

6    should follow when deciding your verdicts.

7           These instructions will be given -- they're for your

8    use throughout trial.  As judges of the facts, you must

9    determine the facts from the evidence presented.  The evidence

10   consists of the testimony of witnesses, documents, and other

11   things allowed into the record as exhibits, and any facts to

12   which BlueRadios and Kopin agree or I say must be accepted as

13   true.

14          In that regard, there are certain things that just

15   don't require proof, that's if I take judicial notice of it, but

16   it doesn't relate to the merits of the case.  It would be

17   something like such and such a date occurred on a given day of

18   the week or a day of the week in the past occurred on such a

19   date.  Anything that is a matter of public record that I can

20   take judicial notice of so that we don't have to have the

21   weather bureau come in here and testify to those matters.

22          And that's -- when I say that, if I tell you to accept

23   something as true, it will only be that.  Or the other thing is

24   if the parties stipulate to a fact.  So that we don't have to

25   call in witnesses to prove something which is not in dispute,

16-cv-2052-JLK    Jury Trial    03-21-2024

1    and there's nothing for you to determine other than that that's

2    a fact that's going to be needed in your deliberations.

3         So, if -- there are stipulated facts.  An example is

4    the corporate structure and the corporate existence of both

5    companies is -- both parties have stipulated to.  So, we don't

6    have to present charters of incorporation and so forth to do

7    that.  That's the kind of thing I would be telling you, and I

8    don't want you to think that I'm going to be telling you what

9    facts you should accept, because that's the last thing in the

10   world I want to do.

11        Okay.  You are to consider all the evidence received in

12   this trial, and only that evidence.  It will be up to you to

13   decide what evidence to believe and how much of any witness'

14   testimony to accept or reject.

15        At times during the trial, a lawyer may object to a

16   question asked by another lawyer or to an answer by a witness.

17   This means the lawyer is requesting that I make a decision on a

18   specific law.  Do not conclude anything from any objections or

19   my rulings on the objections.  When I sustain an objection, I am

20   ruling that the evidence cannot be presented or considered.

21   When you hear that I have overruled an objection, I am allowing

22   that evidence to be presented or considered.  If I sustain an

23   objection to a question, the witness may not answer.

24        Do not attempt to guess what answer might have been

25   given if I had allowed the answer.  If I overrule the objection,

Kevin P. Carlin, RMR, CRR

16-cv-2052-JLK    Jury Trial    03-21-2024

1    the witness will be allowed to answer the question, and you

2    should treat it as any other answer.  If I tell you not to

3    consider a particular statement, you may not refer to that

4    statement in your discussions.

5            When I say, quote, admitted into evidence, or, quote,

6    received into evidence, I mean that the statement or exhibit may

7    be considered by you in making the decisions you must make at

8    the end of the case.  I am not indicating in any way that you

9    must accept it, but only that you may consider it.  If I tell

10   you to consider a particular piece of evidence for a specific

11   purpose, you may consider it only for that purpose.

12           I may have to interrupt the trial at times to confer

13   with the attorneys about the law that should apply.  We may talk

14   briefly at the bench, but if our discussion takes more time, I

15   will excuse you from the courtroom.  I will try to avoid such

16   interruptions whenever possible, but please be patient, even if

17   the trial seems to be moving slowly, because our talks can often

18   save time in the end.

19           During the course of the trial, I may ask a question of

20   a witness or an attorney.  If I do, that does not mean I have

21   any opinion about the facts in the case.  I am only trying to

22   bring out facts that you may consider.

23           From time to time during the trial, I may also direct

24   your attention to one of these instructions.  That will happen

25   certainly when the first expert witness is called.  There's an

16-cv-2052-JLK     Jury Trial     03-21-2024

1    instruction on expert witnesses, and we will stop, and I will

2    explain to you then what the expert is doing, because it differs

3    from what other witnesses do.

4         Ordinarily, the attorneys will show you all the

5    legally-allowed evidence that is necessary for you to reach your

6    verdicts.  However, in rare situations, a juror may have a

7    question that is very important for considering a necessary

8    element of the case.  In that situation, the juror may write out

9    a question and give it to the courtroom deputy at the next

10   recess.  I will then consider that question with the lawyers.

11   If it is a proper and necessary question, it will be asked.  If

12   it is not, I will tell you why, and explain why you cannot

13   consider what the answer to the question might be.

14        Please remember that responding to your notes takes

15   time and effort.  I usually have to talk the issue over with the

16   attorneys, consider their arguments, and decide the correct

17   answer.  In some cases, we might have to do additional research.

18        If you would like to take notes during the trial, you

19   may.  On the other hand, you do not have to take notes.  If you

20   decide to take notes, be careful not to get so involved in note

21   taking that you become distracted.  Remember that your notes

22   will not necessarily reflect exactly what was said, so you

23   should only use your notes as memory aides.  You should not rely

24   on your notes over the independent memory of the evidence.

25        You should also not be unduly influenced by the notes

16-cv-2052-JLK    Jury Trial    03-21-2024

1   of other jurors.  If you do take notes, I leave them -- leave

2   them in the jury room at night, and do not discuss their

3   contents until I send you to decide the verdict at the end of

4   the trial.

5          Although the court reporter is making stenographic

6   notes of everything that is said, you will not have a

7   typewritten copy of the testimony to use during your

8   discussions.  Any exhibits admitted at trial, though, will be

9   available to you at that time.  You may not discuss the evidence

10  in the case with each other until you have gone to the jury room

11  to make your decision at the end of the trial.  It is important

12  that you wait until all the evidence is presented and you have

13  again heard my instructions before you discuss the case with

14  each other.  In other words, keep an open mind, and form no

15  opinions until you can consider all the evidence and the

16  instructions together.

17         During the trial, you will receive all the evidence you

18  legally may consider to decide the case.  Gathering any

19  information on your own that you think might be helpful in this

20  case is against the law and violates your oath.  Do not do any

21  outside reading on this case, even including dictionaries or a

22  Bible.  Do not attempt to visit any places mentioned in the

23  case, and do not in any other way try to learn about the case

24  outside the courtroom.

25         Part of my job is to protect you from outside

16-cv-2052-JLK    Jury Trial    03-21-2024

1    influences.  Your job is to limit your decisions to what happens

2    in this courtroom.  I wish I did not have to spend so much time

3    on this topic, but recent events around the United States and

4    recent technologies require me to point out that some common

5    practices and habits many of you enjoy are strictly forbidden

6    for you as jurors.

7            You may not under any circumstances have your cell

8    phones, iPhones, smartphones, or the like on when court is in

9    session.  Whether you are here or away from the court during

10   recess, you may not Google, tweet, text message, blog post, or

11   anything else with those gadgets about anything to do with this

12   case.  If anyone does, it could cause a mistrial, meaning all of

13   our efforts will have been wasted, and we will have to start all

14   over again with a new trial before a new jury.

15           If you were to cause a mistrial by violating these

16   orders, you could have to pay all the costs of this trial and

17   perhaps be punished for contempt of court.

18           What you may do is advise anyone who needs to know,

19   such as family members, employers, employees, schools, teachers,

20   or daycare providers that you are a juror in a case and the

21   judge has ordered you not to discuss it until you have reached a

22   verdict and been discharged from the case.  At that point, you

23   will be free to discuss this case or search for any information

24   about it to your heart's delight.

25           Fairness to all concerned requires that all of us

16-cv-2052-JLK    Jury Trial    03-21-2024

1    connected with this case deal with the same information and with

2    nothing other than the same information.  The reason for this is

3    that justice requires a full and public understanding of the

4    basis for any verdict.  If you follow these instructions, no one

5    has the right to challenge your decisions, and any criticism of

6    your service as a juror will not be tolerated.

7         You are the -- as jurors, you are the judges of the

8    facts, but in figuring out what actually happened, it is your

9    sworn duty to follow all the law as I explained to you.  You may

10   not ignore or give special attention to one instruction or

11   question the wisdom or correctness of any rule I tell you about.

12   You must not substitute or follow your own idea or opinion to

13   what the law is or should be.  It is your duty to apply the law

14   as I explain it to you regardless of the result.

15        In your discussions, you must make sure that no one

16   else on the jury ignores the instructions or attempts to decide

17   the case on anything other than the law that is given to you by

18   me and the evidence that has been presented in this trial.  You

19   must remember that we are all committed to equal justice under

20   the law.  Matters of race, religious belief, color, nationality,

21   gender, and sexual orientation have no place in this process.

22   To the best of your ability, you are to judge others as you

23   would want others to judge you under the law I give you.  The

24   very heart of justice is that all apply the same law to the same

25   evidence and leave our personal desires out of it.

170

16-cv-2052-JLK    Jury Trial    03-21-2024

1        You should not read into these instructions or anything

2    else I say or do as a suggestion as to what your verdict should

3    be.  That is entirely up to you.  It is your duty to raise

4    your -- to base your verdict only on the evidence without

5    prejudice or sympathy.  All persons are equal before the law

6    regardless of race, national origin, gender, citizenship,

7    whether the party is a corporation or not.  I tell you that all

8    parties are equal before the law to remind you that you must

9    base any decision in this case on the facts and not outside

10   factors such as corporate status.  That is the promise you make

11   and the oath you take.

12        Instruction regarding evidence, generally speaking, on

13   page 13.  You must make your decision based only on the evidence

14   that you see and hear in the court.  Do not let rumors, guesses,

15   or anything else that you may have seen or heard outside of

16   court influence your decision in any way.  You and you alone are

17   the judges of the facts.  You will hear the evidence, decide

18   what the facts are, and then apply those facts to the law I give

19   you.  That is how you will reach your verdict.

20        You will decide what the facts are from the evidence

21   that the parties will present to you during the trial.  That

22   evidence will include the sworn testimony of witnesses on both

23   direct and cross examination, documents, and other things

24   received into evidence as exhibits, and any facts on which the

25   lawyers agree -- those are called stipulations -- or which I may

16-cv-2052-JLK    Jury Trial    03-21-2024

1    instruct you to accept as true, and those are the judicial

2    notice things I mentioned earlier.

3            The following things are not evidence, and you must not

4    consider them as evidence in deciding the facts of the case.

5    One, the fact that BlueRadios filed this lawsuit is not evidence

6    that Kopin violated the law.  Similarly, the fact that Kopin

7    denies BlueRadios' allegations is not evidence that it did not

8    violate the law.  Both the complaint and the denial are merely

9    the formal way in which the case is brought to court for you to

10   decide.

11           Two, statements and arguments by lawyers are not

12   evidence.  The lawyers are not witnesses.  What they say in

13   their opening statements, closing arguments, and at other times

14   is intended to help you interpret the evidence, but it is not

15   evidence.  If the facts as you remember them differ from the way

16   the lawyers have stated them, your memory of the facts controls.

17           Questions and objections by the lawyers are not

18   evidence.  Lawyers have a duty to their clients to object when

19   they believe a question is improper under the rules of evidence.

20   You should not be influenced by the objection or by my ruling on

21   it.  The lawyers may highlight parts of some exhibits.  While

22   the exhibit is evidence, the highlights are not.  It is for you

23   to determine the significance of the highlighted parts.

24           Testimony that I do not allow or that I instruct you to

25   disregard is not evidence, and must not be considered by you.

Kevin P. Carlin, RMR, CRR

16-cv-2052-JLK    Jury Trial    03-21-2024

1   Anything you may see or hear when the court is not in session is

2   not evidence, even if you see or hear what is done or said by

3   one of the parties or by one of the witnesses.

4           During the trial, I may not let you hear the answers to

5   some of the questions that lawyers ask.  I may also rule that

6   you cannot see some of the exhibits that the lawyers want you to

7   see, and sometimes I may order you to ignore things that you saw

8   or heard.  I may, quote, strike things from the record, which

9   means you cannot consider that piece of evidence.  Do not even

10  think about it.  Do not guess what a witness might have said or

11  what an exhibit might have shown.  These things are not

12  evidence, and you are bound by your oath not to let them

13  influence your decision in any way.

14          Generally speaking, there are two types of evidence.

15  One is direct evidence, and the other is circumstantial

16  evidence.  Direct evidence is evidence that proves a fact

17  directly.  For example, where a witness testifies to what he or

18  she saw, heard, or observed, that is direct evidence.

19  Circumstantial evidence is evidence that intends to prove a fact

20  by proof of other facts.

21          To give a simple example, suppose that when you came

22  into the courthouse today, the sun was shining, and it was a

23  nice day, but the courtroom blinds were drawn and you could not

24  look outside.  Then later, as you were sitting here, someone

25  walked in with a dripping wet umbrella, and soon after someone

16-cv-2052-JLK    Jury Trial    03-21-2024

1    walked in with a dripping wet raincoat.  Now, you cannot look

2    outside the courtroom, and you cannot see whether or not it is

3    raining, so you have no direct evidence of that fact, but the

4    combined facts about the umbrella and the raincoat make it

5    reasonable for you to infer that it had begun raining.

6            An inference is a conclusion that reason and common

7    sense may lead you to make based on facts which have been

8    proved.  While you must consider only the evidence in the case,

9    you can make reasonable inferences from the testimony and

10   exhibits, inferences you think are justified by common

11   experience.

12           The law makes no distinction between direct and

13   circumstantial evidence.  Circumstantial evidence is of no less

14   value than direct evidence, and you may consider either or both

15   and may give them such weight as you conclude you should.

16           It may be necessary for me to talk to the lawyers about

17   an issue of law out of your hearing.  The purpose of these

18   conferences is to decide how certain legal matters are to be

19   treated.  We will not be discussing factual matters.  Sometimes

20   we will talk briefly at the bench, but if some of these

21   conferences take more time, I will excuse you from the

22   courtroom.  I will try to avoid such interruptions whenever

23   possible, but please be patient even if the trial seems to be

24   moving slowly, because conferences often actually save time in

25   the end.

Kevin P. Carlin, RMR, CRR

16-cv-2052-JLK    Jury Trial    03-21-2024

1          The lawyers and I will do what we can to limit the

2    number and length of these conferences.  Now, I've instructed

3    you, and the law says that all these instructions are important,

4    and they certainly are.  And not one of them is more important

5    or less important than the others.  Having said that, we're now

6    going to credibility of witnesses, and this instruction, I

7    think, is very helpful to you, because it points out how to

8    determine what you believe and don't believe in a court of law.

9    So, it's no more important, but it's one that relates directly

10   to the work you're doing, is what I'm trying to say.

11          In deciding the facts of this case, you will have to

12   decide which witnesses to believe and which witnesses not to

13   believe.  You are the only judges of the credibility or, quote,

14   believability, of each witness and the weight to be given to the

15   witness' testimony.  You should think about the testimony of

16   each witness you hear and decide whether you believe all or part

17   of what each witness has to say, and how important that

18   testimony is.

19          In making that decision, I suggest you ask yourself a

20   few questions.  Did the witness seem to be honest?  Did the

21   witness have any reason not to tell the truth?  Did the witness

22   have a personal interest in the outcome of this case?  Did the

23   witness have any relationship with either BlueRadios or Kopin?

24   Did the witness have a good memory?  Did the witness clearly see

25   or hear the things about which he or she testified?  Did the

16-cv-2052-JLK    Jury Trial    03-21-2024

1    witness have the opportunity and ability to understand the

2    questions clearly and answer them directly?  Did the witness'

3    testimony differ from the testimony of other witnesses?

4        When weighing the conflicting testimony, you should

5    consider whether the conflict has to do with a significant fact

6    or with an unimportant detail.  As you should keep in mind that

7    an innocent failure to remember is not uncommon.  If you believe

8    a witness has willfully lied regarding any material fact, you

9    have the right to disregard all or any part of that witness'

10   testimony.

11       In reaching a conclusion on a particular point or a

12   verdict in this case, do not make any decisions simply because

13   there were more witnesses on one side than on the other.  If

14   after consideration of all the evidence in the case, you hold

15   greater belief in the accuracy and reliability of one witness,

16   the testimony of that single witness is sufficient to prove any

17   fact, and can justify a verdict even if a number of other

18   witnesses testified to the contrary.

19       If a party or a representative of a party testifies,

20   that testimony should be weighed and its credibility evaluated

21   in the same way as that of any other witness.

22       This is one I mentioned earlier to you about expert

23   witnesses.  Witnesses are generally limited to testifying about

24   what they saw, heard, felt, or other matters relating to the

25   five senses.  In some situations, however, scientific,

16-cv-2052-JLK    Jury Trial    03-21-2024

1    technical, or other specialized knowledge may assist you in

2    understanding the evidence or in finding a fact to be true or

3    not true.

4         A witness who has special knowledge, skill, experience,

5    training, or education may testify and state his or her opinion

6    based on that background.  When a witness is qualified to

7    express an opinion based on his or her expertise, that witness'

8    background is relevant to the credibility of such opinion.

9         You do not have to accept expert opinions.  You should

10    consider opinion testimony just as you consider your testimony

11    in this trial.  Give opinion testimony as much weight as you

12    think it deserves, considering the education and experience of

13    the witness, the reasons given for the opinion, and other

14    evidence in the trial.

15         You will notice that difference when a nonexpert

16    witness is called.  You will get some background information to

17    identify them as a person, but when an expert is called, you

18    will get even more than that, showing the degrees, the

19    experience, and the merit badges they have collected along the

20    way, because it's the quality of their testimony that makes

21    their opinion worth or not worth paying attention to.  So, we go

22    into more background with experts than we do with other

23    witnesses, and you will notice that right away.

24         Okay.  The next is defining preponderance of the

25    evidence.  It's an awkward term.  I always think of an elephant

16-cv-2052-JLK    Jury Trial    03-21-2024

1    stomping through the place as a preponderance, but anyway, to be

2    entitled to a favorable verdict, BlueRadios must meet its burden

3    of proof.  In this case, there are two standards to determine

4    whether that burden has been met.  The first standard is proof

5    by a preponderance of the evidence.  This is the standard for

6    evaluating four of the claims by BlueRadios, all claims except

7    the claim for correction of patent inventorship.

8            To prove something, quote, by a preponderance of the

9    evidence means that no matter who produces the evidence, when

10   you consider a claim of BlueRadios in light of all the facts,

11   you believe that BlueRadios' claim is more likely true than not

12   true.  On the other hand, Kopin raises several affirmative

13   defenses.  If BlueRadios meets its burden of proof, Kopin will

14   be liable unless Kopin proves by a preponderance of the evidence

15   that an affirmative defense applies.

16           To put it differently, imagine a scale, and at least

17   one round of weighing per claim.  In the first round, if you

18   were to put the value of all the evidence in favor of finding

19   BlueRadios should succeed on its claim, and the value of the all

20   the evidence against doing so on the opposite side of the scale,

21   BlueRadios would have to make the scale tip in favor of finding

22   its success.

23           If BlueRadios fails to meet this burden, your verdict

24   must be for Kopin.  If BlueRadios meets its burden, there may be

25   a second figurative round of weighing.  Here, if you were to

Kevin P. Carlin, RMR, CRR

16-cv-2052-JLK    Jury Trial    03-21-2024

1    weigh the value of all the evidence that Kopin has a valid

2    defense against the value of the evidence it does not, Kopin

3    must make the scale tip in favor of a defense applying.  If

4    Kopin succeeds, your verdict must be for Kopin.  If it fails,

5    your verdict must be for BlueRadios.

6         In evaluating whether the parties have met their

7    burdens under claims or defenses, you should also know that the

8    law does not require parties to call as witnesses all persons

9    who may have been involved in the case or who may appear to have

10   some knowledge of the issues brought up in this trial, nor does

11   the law require parties to present as exhibits all papers or

12   other things mentioned in the evidence in the case.

13        It's different with claim five.  That's this

14   instruction number 1.9 on page 22.  The second standard for

15   assessing a burden of proof is by, quote, clear and convincing

16   evidence.  BlueRadios has the burden of proving its patent

17   inventorship claims by clear and convincing evidence.  Evidence

18   is clear and convincing if, considering all the evidence, you

19   firmly believe the truth of the factual contentions to be highly

20   probable.  This standard is higher than proof by a preponderance

21   of the evidence, and is lower than that of beyond a reasonable

22   doubt.

23        Charts or summaries that are not received in evidence

24   are known as demonstratives, while charts and summaries that are

25   received in evidence are exhibits.  The only purpose of a

16-cv-2052-JLK    Jury Trial    03-21-2024

1    demonstrative chart or summary is to help explain the evidence

2    in the case.  The demonstrative is not evidence itself and does

3    not prove any fact.  Some charts or summaries, however, are

4    evidence because they accurately and reliably summarize complex

5    or voluminous evidence in a manner that may assist you in

6    understanding that evidence.  Such a summary or chart exhibit is

7    only as valid and reliable as the underlying evidence it

8    summarizes, and is not independent evidence on its subject

9    matter.

10            Before the trial in this case, the Court held a

11    conference with the lawyers for both of the parties.  At this

12    conference, the parties entered into certain stipulations of

13    fact, which means the parties agree that the following facts can

14    be taken as true without further proof.

15            One, BlueRadios is a corporation under -- organized

16    under the laws of the State of Colorado, with its principal

17    place of business in Colorado.

18            Two, Kopin is a corporation organized under the laws of

19    the State of Delaware, with its principal place of business in

20    Massachusetts.

21            Three, Mark Kramer is the CEO and founder of

22    BlueRadios.

23            Four, on February 12, 2007, Kopin and BlueRadios

24    entered into a confidential disclosure agreement.

25            Five, Kopin and BlueRadios entered into a contract

180

16-cv-2052-JLK    Jury Trial    03-21-2024

1    dated June 5, 2007, and a contract addendum dated October 22nd,

2    2008.

3            During the trial, certain evidence is admitted for a

4    limited purpose.  You may consider that evidence only for that

5    purpose, and for no other.

6            With the previous instructions in mind, we now return

7    to the specific claims brought by BlueRadios against Kopin.  In

8    evaluating the claims, you must decide whether BlueRadios has

9    proved each element either, quote, by a preponderance of the

10   evidence where applicable, or by, quote, clear and convincing

11   evidence where applicable.  This is known as proving liability.

12   I will advise you as to the correct burden of proof for each

13   claim.  If you find that BlueRadios has proven each element of

14   its claims and that Kopin has failed to prove its affirmative

15   defenses so that Kopin is liable, you must determine the amount

16   and type of damages BlueRadios is owed.

17           Claim one, a breach of contract is the failure to

18   perform a contractual promise when performance is due.  A

19   material breach occurs when a party fails to substantially

20   perform or substantially comply with the essential elements of a

21   contract.

22           A breach is not material if the other party receives

23   substantially what it contracted for.  In determining whether a

24   breach is material, you may consider the nature of the promised

25   performance, the purpose of the contract, and whether any

16-cv-2052-JLK    Jury Trial    03-21-2024

1    defects in performance have defeated the purpose of the

2    contract.

3          A material breach by one party excuses performance by

4    the other party to the contract.  A party substantially performs

5    or substantially complies with the terms of a contract when the

6    party performs the essential obligations under the contract, and

7    the other party receives substantially what it contracted for.

8          To determine whether the party has substantially

9    performed or substantially complied with the essential

10   obligations under the contract, you may consider the nature of

11   the promised performance, the purpose of the contract, and

12   whether any defects in performance have defeated the purpose of

13   the contract.

14         For BlueRadios to recover from Kopin on its claim for

15   breach of contract, you must find that BlueRadios proved the

16   following by a preponderance of the evidence.  One, that Kopin

17   entered into a contract and addendum with BlueRadios to do one

18   or more of the following:  A, pay BlueRadios royalties on

19   Kopin's sale and/or licensed sale of Golden-i units, parts, and

20   technology; B, keep BlueRadios' confidential technology

21   developments and know-how confidential; C, name BlueRadios'

22   employees as inventors on patents that protect Golden-i

23   technology; D, assign BlueRadios sole ownership of patents that

24   incorporate BlueRadios technology; and/or E, assign BlueRadios

25   co-ownership of patents that incorporate Golden-i technology.

16-cv-2052-JLK    Jury Trial    03-21-2024

1          Two, that Kopin failed to substantially perform one or

2     more of the above that the contract and/or addendum required.

3          Three, BlueRadios substantially performed its

4     obligations under the contract.

5          If you find that BlueRadios proved these elements by a

6     preponderance of the evidence, and that Kopin has not proved its

7     affirmative defenses apply by a preponderance of the evidence,

8     you must find Kopin liable for breach of contract.

9          Contracts hold parties to their agreements, literal and

10    implied.  Interpreting contracts can be a complex task,

11    sometimes requiring you to resolve a dispute between the parties

12    over what certain terms mean.  Quote, project deliverables for

13    the parties' contract include matters BlueRadios worked on for

14    the Golden-i project, including schematics, build materials,

15    Gerber files, block diagrams, theory of operations, source code,

16    application programming interface, called API, and cell phone

17    interface prototype techniques and procedures, the gen 1.0 PCBs

18    and the gen 2.0 PCBs software and firmware modification for

19    noise cancellation and head-tracking features, and BlueRadios'

20    precontract technology.  The parties also dispute the amount of

21    royalties owed to BlueRadios under section seven of the parties'

22    contract.

23         There are several potentially relevant sources of

24    information that can help you determine how a contract should be

25    interpreted.  The first is evidence of the parties' intent.  The

16-cv-2052-JLK    Jury Trial    03-21-2024

1   statements or conducts of the parties before any dispute arose

2   between them is an indication of what the parties intended at

3   the time they entered into the contract.  To determine what the

4   parties intended the terms of the contract to mean, you may also

5   consider the language of the written agreement, the parties'

6   negotiations of the contract, any earlier dealings between the

7   parties, any reasonable expectations the parties may have had

8   because of the promises or conduct of the other party, and any

9   other facts or circumstances that existed at the time that the

10  contract was formed.

11          An additional related source of information for how to

12  interpret the contract may be the parties' conduct after the

13  contract was created but before any disagreement between the

14  parties arose.  Another source of information may be to consider

15  the entire agreement with any attachments.  You should consider

16  the agreement as a whole and not view clauses or phrases in

17  isolation.  As to the exact language of the contract, words or

18  phrases not defined in a contract should be given their plain,

19  ordinary, and generally-accepted meaning.  When a contract uses

20  words or phrases for a trade or technical field, those words or

21  phrases should be given their usual meaning in that trade or

22  technical field.

23          As I will discuss more fully later, patent ownership is

24  contested in this case.  Related to that point is an employment

25  agreement, a separate contract involving an individual named

16-cv-2052-JLK    Jury Trial    03-21-2024

1    Chris Parkinson.  Who Mr. Parkinson worked for may impact which

2    party is the proper owner of a specific patent.  Kopin argues

3    that both Chris Parkinson's employment agreement with BlueRadios

4    and the proprietary information and inventions agreement Chris

5    Parkinson signed with BlueRadios are illusory agreements, and

6    not legally enforceable contracts.

7          Where extrinsic evidence shows that the parties did not

8    intend that a contract be binding, and where they have

9    previously agreed that their written promise would not bind

10   them, such a contract is illusory and lacks any legal effect.

11   To establish that the agreement between BlueRadios and

12   Mr. Parkinson are, quote, illusory, Kopin must prove that for

13   each agreement it is more likely than not, one, that before

14   signing the agreement, Mr. Parkinson and BlueRadios came to an

15   agreement that the parties would not be bound by the terms of

16   the agreement; two, when they signed the agreement, BlueRadios

17   did not intend for BlueRadios or Mr. Parkinson to be bound by

18   the terms of that agreement -- of the agreement; and three, when

19   they signed the agreement, Mr. Parkinson did not intend for

20   Mr. Parkinson or BlueRadios to be bound by the terms of the

21   agreement.

22         Claim two, BlueRadios claims that Kopin breached its

23   covenant of good faith and fair dealing.  Every contract implies

24   a duty of good faith and fair dealing.  A party performs a

25   contract in good faith when its actions are consistent with the

16-cv-2052-JLK    Jury Trial    03-21-2024

1  agreed-common purpose within the reasonable expectations of the

2  parties.  Performances may vary depending upon how much

3  discretion the contract provides for the parties.

4          A party exercising discretion in performance of their

5  contractual duties does not automatically breach the implied

6  covenant of good faith and fair dealing.  The duty of good faith

7  and fair dealing is breached when a party acts contrary to that

8  agreed common purpose and the parties' reasonable expectations.

9          To succeed on this claim, BlueRadios must prove by a

10  preponderance of the evidence, one, that BlueRadios and Kopin

11  entered into a contract.  Two, that BlueRadios performed its

12  obligations under the contract.  Three, that Kopin prevented

13  BlueRadios from enjoying the benefits of the contract by doing

14  one or more of the following:  A, excluding BlueRadios from the

15  benefits and profits of the monetization of Golden-i technology;

16  B, precluding BlueRadios from enjoying the benefits of Kopin's

17  use and enjoyment of BlueRadios' technology; C, disclosing

18  BlueRadios' confidential information without proper permission

19  from BlueRadios; D, incorporating BlueRadios employees'

20  inventive contributions in issued patents and patent

21  applications without naming them as co-inventors; or C -- or E,

22  excuse me, incorporating BlueRadios developments in issued

23  patents and patent applications without naming BlueRadios as a

24  co-owner.  And four, that by doing one or more of the above,

25  Kopin misused the discretion conferred by the contract to act

16-cv-2052-JLK    Jury Trial    03-21-2024

1    dishonestly or to act outside of accepted commercial practices

2    to deprive BlueRadios of some or all of the benefits of the

3    contract.

4          If you find that BlueRadios has proved these elements

5    by a preponderance of the evidence and that Kopin failed to

6    prove its essential affirmative defenses by a preponderance of

7    the evidence, you must find Kopin liable for the breach of the

8    implied duty of good faith and fair dealing.

9          Excuse me a minute.  I don't get time off for sore

10   throat.

11         Okay.  This is number 3.6 on page 34.  If you find in

12   favor of BlueRadios on its claim of breach of contract or of

13   breach of the implied duty of good faith and fair dealing, then

14   you must award damages.  Quote, general damages means the amount

15   required to compensate BlueRadios for its losses that are the

16   natural and probable consequence of Kopin's breach of the

17   contract or addendum.

18         To award damages, you must find by a preponderance of

19   the evidence that BlueRadios suffered damages as a result of the

20   breach, and you must determine the amount of those damages.  For

21   the sake of clarity, please consider the following definitions.

22         Natural losses are those losses that an ordinary person

23   of common experience would expect to follow from a breach of the

24   contract or addendum.  Probable losses are those losses that are

25   reasonably foreseeable when the contract was made, and would

16-cv-2052-JLK    Jury Trial    03-21-2024

1    likely occur if the contract was breached.

2         If you find in favor of BlueRadios but do not find any

3    damages, you shall award BlueRadios nominal damages in the sum

4    of one dollar.  BlueRadios claims that the natural and probable

5    losses from Kopin's breach of contract include lost rights and

6    intellectual property, unpaid royalties, and disgorgement of the

7    monetary and nonmonetary benefits that Kopin received under the

8    contract or the contract addendum.

9         Here, you will advise me, and this is on disgorgement.

10   In addition to and apart from general damages, BlueRadios claims

11   it is entitled to disgorgement damages, which are defined as any

12   profits earned by Kopin from the Golden-i project that are

13   attributable to BlueRadios' intellectual property.  To be

14   awarded disgorgement damages, BlueRadios must prove by a

15   preponderance of the evidence both, one, Kopin's profits, and

16   two, Kopin's breach involved intentional or substantial

17   wrongdoing on the part of Kopin.

18        Kopin in turn has the burden of proving its deductions

19   or expenses, and the portion of the profitable -- of the profit

20   attributable to factors other than the benefit it derived from

21   its breach, including from its own independently developed

22   technology.  If you find that Kopin has failed to prove by a

23   preponderance of the evidence that a portion of the profits from

24   the monetization of Golden-i technology is attributable to

25   factors other than use of BlueRadios technology, you should find

16-cv-2052-JLK    Jury Trial    03-21-2024

1    that the total profit is attributable to Kopin's use of

2    BlueRadios technology.  I will take your findings into

3    consideration and later render an appropriate ruling on the

4    issue of disgorgement.

5            Page 36, with regard to affirmative defenses to claim

6    one and claim two and mitigation of damages.  BlueRadios has the

7    duty to take reasonable steps under the circumstances to

8    mitigate or minimize its damages.  Damages if any caused by

9    BlueRadios' failure to take such reasonable steps cannot be

10   awarded to BlueRadios.  This affirmative defense is proved if

11   you find both of the following have been proven by a

12   preponderance of the evidence:  One, BlueRadios failed to take

13   reasonable steps under the circumstances to mitigate or minimize

14   its damages.  Two, BlueRadios had some or increased damages

15   because it did not take reasonable steps under the circumstances

16   to mitigate or minimize its damages.

17           If you find that any one or more of these propositions

18   has not been proved by a preponderance of the evidence, then you

19   shall make no deduction from plaintiff's damages.  On the other

20   hand, if you find that both of these propositions have been

21   proved by a preponderance of the evidence, then you must

22   determine the amount of damages caused by BlueRadios' failure to

23   take such reasonable steps.  This amount must not be included in

24   your award of damages.

25           Okay.  Number 3.9, what a patent is, and how one is

16-cv-2052-JLK    Jury Trial    03-21-2024

1    obtained.  This case involves a dispute relating to multiple

2    patents, a term I have used several times already and will now

3    explain.  Allow me to discuss what a patent is and how one is

4    obtained.  Patents are granted by the United States Patent and

5    Trademark Office, which is sometimes called the USPTO.  A valid

6    United States patent gives the patent holder the right to

7    prevent others from making, using, offering to sell, or selling

8    the patented invention within the United States or from

9    importing it into the United States without the patent holder's

10   permission.

11          To obtain a patent, one must first file an application

12   with the USPTO.  The USPTO is an agency of the federal

13   government and employs trained examiners who review applications

14   for patents.  The application includes what is called a, quote,

15   specification, which contains a written description of the

16   claimed invention, telling what the invention is, how it works,

17   how to make it, and how to use it.  The specification concludes

18   with one or more numbered sentences.  These are the patent,

19   quote, claims.  If a patent is eventually granted by the U.S.

20   Patent and Trademark Office, the claims define the boundaries of

21   its protection and give notice to the public of those

22   boundaries.

23          After the applicant files the application, an examiner

24   reviews the application to determine whether or not the claims

25   are appropriate for patent protection, and whether or not the

16-cv-2052-JLK    Jury Trial    03-21-2024

1  specification adequately describes the invention claimed.  In

2  examining a patent application, the examiner reviews certain

3  information about the state of the technology at the time the

4  application was filed.  The USPTO searches for and reviews

5  information that is publicly available or that is submitted by

6  the applicant.

7          After the search and examination of the application,

8  the examiner informs the applicant in writing of what the

9  examiner has found, and whether the examiner considers any claim

10 to be appropriate for patent protection.  This writing from the

11 examiner is often called an, quote, office action.  If the

12 examiner rejects the claims, the applicant has an opportunity to

13 respond to the examiner to try to persuade the examiner to allow

14 the claims, and to change the claims or to submit new claims.

15 Unlike a court proceeding, patent prosecution takes place

16 without input from those who did not apply for the patent.

17         Claim five is patent inventorship.  Only the actual

18 inventors may be named as inventors in the patent.  This is

19 known as the, quote, inventorship requirement.  To be an

20 inventor, a person must contribute to the conception of at least

21 one of the claims of the patent in a manner that is significant

22 in quality when measured against the scope of the full

23 invention.  In other words, an inventor must make some

24 significant contribution to the idea claimed in the patent.

25         In reviewing patents approved by the USPTO, an

16-cv-2052-JLK    Jury Trial    03-21-2024

1    individual's listed status as inventor of a patent is presumed

2    correct.  Persons may be inventors even if they do not make the

3    same type or amount of contribution, and even if they do not

4    contribute to the subject matter of each claim of the patent.

5          Persons may be joint or co-inventors even though they

6    do not physically work together, but they must have some open

7    line of communication during and at approximately the time of

8    their inventive effort.  Explaining well-known concepts to

9    inventors or merely helping with experimentation by carrying out

10   the inventors' instructions does not make someone an inventor.

11         In this case, BlueRadios contends that Jeffrey J.

12   Jacobsen should not be named as an inventor of a certain United

13   States patent.  To succeed in removing Jeffrey J. Jacobsen as an

14   inventor of that patent, BlueRadios must prove by clear and

15   convincing evidence that Mr. Jacobsen did not substantially

16   contribute to the conception of at least one of the claims of

17   the patent or that Mr. Jacobsen's contribution was not a -- was

18   not significant in quality as measured against the scope of the

19   full invention.

20         It may do so by presenting evidence that includes joint

21   patent inventor testimony and some other form of corroborating

22   evidence such as contemporaneous documents or physical evidence,

23   circumstantial evidence, or another's testimony.

24         If you find by clear and convincing evidence that

25   Jeffrey J. Jacobsen did not make a significant contribution to

16-cv-2052-JLK    Jury Trial    03-21-2024

1    the conception of at least one of the claims of that patent as

2    measured against the scope of the full invention, he must be

3    removed as a named inventor on the patent.

4        BlueRadios also contends that Mark Kramer and/or

5    Wilfred Tucker should be named as inventors on a different

6    patent.   To succeed in naming Mr. Kramer and/or Mr. Tucker as an

7    inventor, BlueRadios must prove by clear and convincing evidence

8    that he, one, contributed to the conception of at least one of

9    the claims of the patent, and two, that the contribution is

10   significant in quality as measured against the scope of the full

11   invention.

12       If you find by clear and convincing evidence, which can

13   be in the form of alleged joint inventor testimony and

14   contemporaneous documents or physical evidence, circumstantial

15   evidence, or another's testimony, that Mr. Kramer and/or

16   Mr. Tucker made a significant contribution to the conception of

17   at least one of the claims of the patent as measured against the

18   scope of the full invention, then Mr. Kramer and/or Mr. Tucker

19   must be added as named inventors on the patent.

20       Inventors can assign their ownership rights to another

21   person or entity, such as an employer.   The person to whom an

22   inventor assigns ownership rights is called the, quote,

23   assignee.   The assignee has the power to further transfer its

24   ownership rights in whole or in part.   In this case, BlueRadios

25   contends that it is the sole owner of a specific patent.   If you

193

16-cv-2052-JLK    Jury Trial    03-21-2024

1    find that by clear and convincing evidence only BlueRadios

2    employees are inventors of this patent, and by a preponderance

3    of the evidence that these employees assigned ownership rights

4    to BlueRadios, then you must find that BlueRadios is the sole

5    owner of that patent.

6         If you find that by a preponderance of the evidence

7    Mr. Parkinson assigned his rights to BlueRadios for intellectual

8    property he conceived of while he was employed by BlueRadios,

9    then you must find that BlueRadios has ownership rights in the

10   patents containing the certain proprietary technology.

11        If you find that by a preponderance of the evidence

12   Kopin had a contractual obligation to name BlueRadios as an

13   owner of any intellectual property rights that included

14   BlueRadios' developments, then BlueRadios must be added as an

15   owner of the patents concerning certain proprietary technology.

16        Claims three and four.  A trade secret involves any

17   form or type of financial, business, scientific, technical,

18   economic, or engineering information, including patterns, plans,

19   compilations, program devices, formulas, designs, prototypes,

20   methods, techniques, processes, procedures, programs, or codes,

21   whether tangible or intangible, and whether or how stored,

22   compiled, or memorialized physically, electronically,

23   graphically, photographically, or in writing.

24        To qualify as a valid trade secret, BlueRadios must

25   prove by a preponderance of the evidence that, one, the

16-cv-2052-JLK    Jury Trial    03-21-2024

1   information is not generally known to or readily ascertainable

2   through proper means by another person who can obtain economic

3   value from the disclosure or use of the information.  Two,

4   BlueRadios has taken reasonable measures to keep such

5   information secret.  And three, the information derives

6   independent economic value from being secret, meaning it gives

7   the owner an actual or potential business advantage over others

8   who do not know it and who could obtain economic value from its

9   disclosure or use.

10          By its definition, a trade secret concerns information.

11  Trade secret information includes information that is learned or

12  memorized, and there is no requirement that the information be

13  found in hard copy or electronic records.  The result of

14  research and development efforts to prove that a certain process

15  will not work can qualify as an enforceable trade secret.  This

16  type of negative information is sometimes called negative

17  know-how.

18          By contrast, general knowledge, skills, experience,

19  talents, or abilities cannot be trade secrets.  Information that

20  is public knowledge or that is generally known cannot be trade

21  secrets.  BlueRadios claims that Kopin misappropriated its trade

22  secrets under the Colorado Uniform Trade Secrets Act, claim

23  four, and in violation of the Defend Trade Secrets Act, claim

24  five.

25          BlueRadios must prove that the trade secrets were

16-cv-2052-JLK      Jury Trial      03-21-2024

1   misappropriated, which means that they were acquired by improper

2   means or used, acquired, or disclosed by Kopin without

3   BlueRadios' authorization, beyond BlueRadios' authorization, or

4   in breach of the parties' contract.

5        I will discuss what qualifies as improper means

6   shortly, but let me clarify what misappropriation is not.

7   Companies have the right to independently develop their own

8   information without the benefit of someone else's trade secrets.

9   Therefore, even if one company has a protectable trade secret in

10  certain information, other companies are free to independently

11  develop and use their own information.

12       A company cannot misappropriate a competitor's trade

13  secrets and claim it engaged in lawful independent development.

14  Additionally, a party cannot prove misappropriation based on a

15  theory of what is called, quote, inevitable disclosure.  This

16  means that BlueRadios cannot prove that Kopin misappropriated a

17  trade secret by presenting only evidence showing that Kopin

18  hired a company that BlueRadios worked previously with or only

19  evidence showing that Kopin knew or should have known that a

20  company would inevitably disclose BlueRadios' trade secrets to

21  Kopin.  In short, a theory of inevitable disclosure cannot be

22  used as a substitute for proving elements of misappropriation of

23  trade secrets I will read to you in a moment.

24       BlueRadios claims that Kopin misappropriated trade

25  secrets that fall into five categories.  The five categories of

16-cv-2052-JLK    Jury Trial    03-21-2024

1    BlueRadios' trade secrets are, one, board support package design

2    for wearable computer with head-mounted display; two,

3    miniaturized printed circuit board designed for wearable

4    computer with head-mounted display; three, graphical user

5    interface designed for wearable computer with head-mounted

6    display; four, technological platform designed for wireless

7    head-mounted display platform; and five, figures and

8    explanations of figures contained in certain patents on which

9    Kopin did not name BlueRadios as a co-owner.

10         I will instruct you on BlueRadios' claims under both

11   statutes, and then I will provide some definitions and meanings

12   that will help you in your determination of both claims.

13         BlueRadios brings a claim of misappropriation of trade

14   secrets under the Colorado Uniform Trade Secrets Act.  If you

15   determine that BlueRadios proved the following for any of its

16   trade secrets by a preponderance of the evidence, you must find

17   that Kopin misappropriated BlueRadios' trade secrets in

18   violation of the Colorado Uniform Trade Secrets Act:  One,

19   BlueRadios possessed a valid trade secret.  Two, the trade

20   secret was disclosed or used without BlueRadios giving consent.

21   And three, Kopin knew or should have known that the trade secret

22   was acquired by improper means.

23         Claim four, elements of a trade secrets claim under the

24   DTSA.  Now I will turn to BlueRadios' claim for trade secret

25   misappropriation under the Defend Trade Secrets Act.  To succeed

16-cv-2052-JLK    Jury Trial    03-21-2024

1  on its claim for misappropriation of BlueRadios trade secrets,

2  BlueRadios must prove all of the following:  One, that

3  BlueRadios was the owner or licensee of a valid trade secret

4  related to a product or service used in or intended for use in

5  interstate or foreign commerce.

6       Use or intended use of the product or service in

7  interstate commerce means that the product or service involves

8  travel, trade, transportation, or communication between a place

9  in one state and a place in another state.  Use of the product

10 or service in foreign commerce means that the product or service

11 involves travel, trade, transaction, or communication between a

12 place in the United States and a place outside of the United

13 States.

14      Two, that Kopin improperly acquired, used, and/or

15 disclosed the trade secrets without BlueRadios' consent.  Three,

16 that Kopin knew or had reason to know that the trade secret was

17 acquired, used, and/or disclosed by improper means.  Three, if

18 you find that BlueRadios proved all of these elements by a

19 preponderance of the evidence for at least one of its trade

20 secrets, and that Kopin has failed to prove by a preponderance

21 of the evidence affirmative defenses are valid, your verdict

22 must be in favor of BlueRadios.

23      How misappropriation of a trade secret happens.  Kopin

24 can be liable for misappropriation of a trade secret if at any

25 time of use or disclosure, Kopin knew or had reason to know that

16-cv-2052-JLK    Jury Trial    03-21-2024

1    the trade secret was acquired by improper means.  To clarify how

2    you should view BlueRadios' claims, I will define what is meant

3    by improper means, use, and disclosure.

4         Improper means is defined as theft, misrepresentation,

5    breach, or inducing a breach of a duty to maintain secrecy.

6    Improper means does not include reverse engineering, independent

7    derivation, or any other lawful means of acquisition.

8         Kopin knew of the misappropriation if it had knowledge

9    that BlueRadios technology was being used in a patent

10   application or patent, or that BlueRadios technology was being

11   used in a Kopin product without payment to BlueRadios.

12        Kopin had reason to know if under all the circumstances

13   Kopin had knowledge of sufficient facts to raise a question as

14   to whether BlueRadios technology was being used in a patent

15   application or patent, or that BlueRadios technology was being

16   used in a Kopin product without payment to radio -- to

17   BlueRadios.

18        Misappropriating use of a trade secret happens when a

19   party makes productive use of the trade secret without the trade

20   secret owner's consent.  This might occur by using a trade

21   secret without any consent of the trade secret owner or using it

22   in a way that goes beyond the consent that the trade secret

23   owner offered.  Merely possessing the trade secret without

24   utilizing it is not use.

25        To establish that Kopin used an alleged BlueRadios

16-cv-2052-JLK    Jury Trial    03-21-2024

1  trade secret without consent, BlueRadios must prove that, one,

2  Kopin used the alleged trade secret without BlueRadios' consent,

3  and two, at the time of its use, Kopin knew or had reason to

4  know that the alleged trade secret was, A, derived from a person

5  who used improper means to acquire the trade secret; B, acquired

6  under circumstances giving rise to a duty to maintain the

7  secrecy; or C, derived from or through a person who owed a duty

8  to BlueRadios to maintain the secrecy of the trade secret.

9       If BlueRadios cannot prove that Kopin misappropriated

10  its trade secrets through use, it may still do so through

11  disclosure.  Misappropriation by disclosure requires the

12  disclosure of the trade secret without the trade secret owner's

13  consent.

14       To establish that Kopin misappropriated an alleged

15  BlueRadios trade secret through disclosure, BlueRadios must

16  prove that, one, Kopin disclosed the alleged trade secret

17  without BlueRadios' consent.  And two, at the time of its

18  disclosure, Kopin knew or had reason to know that the alleged

19  secret was, A, derived from a person who used improper means to

20  acquire the trade secret; B, acquired under circumstances giving

21  rise to a duty to maintain secrecy; or three, derived from or

22  through a person who owed a duty to BlueRadios to maintain the

23  secrecy of the trade secret.

24       Any person or group with which the trade secret owner

25  did not consent to sharing this information is a party that

16-cv-2052-JLK      Jury Trial      03-21-2024

1    received trade secrets misappropriated through disclosure.  For

2    example, you may find that Kopin misappropriated BlueRadios'

3    trade secrets by disclosure if it disclosed BlueRadios' trade

4    secrets in patent applications or to third parties without

5    BlueRadios' consent.

6         The disclosure may also be within Kopin's business to

7    co-workers.  There is no requirement that the disclosure be made

8    outside Kopin's business to third parties.  The disclosure must

9    have been made without BlueRadios' consent.

10         A statute of limitations refers to the time during

11    which a legal action must be brought.  It represents a deadline

12    after which a party can no longer bring a lawsuit for harm it

13    suffered and knew or should have known about long ago.  The

14    statute of limitations begins to run, meaning the deadline is

15    set, from the time when the plaintiff's claim accrues.  A claim

16    accrues on the date that both the injuries and its cause are

17    known or should have been known by the exercise of reasonable

18    diligence by the plaintiff.

19         This means that the start date for the statute of

20    limitations began when BlueRadios discovered or should have

21    discovered that Kopin breached the contract or addendum,

22    breached its duties of good faith and fair dealing to

23    BlueRadios, or misappropriated BlueRadios' trade secrets.

24         If Kopin can prove that BlueRadios did not bring its

25    lawsuit in time to recover damages, Kopin is not legally

16-cv-2052-JLK    Jury Trial    03-21-2024

1    responsible, even if BlueRadios has otherwise met its burdens to

2    show one or more of these claims should succeed.  For this

3    defense to apply to BlueRadios' trade secret misappropriation

4    claims under CUTSA, Kopin must prove both of the following by a

5    preponderance of the evidence:

6        One, any conduct that amounts to trade secret

7    misappropriation occurred before August 12th, 2013, or involved

8    trade secrets related to other trade secrets that were

9    misappropriated before that date, and two, BlueRadios knew or

10   should have known with reasonable diligence by August 12, 2013,

11   of sufficient facts that would permit a jury to infer that its

12   trade secrets were misappropriated.

13       To be clear, the statute of limitations may prevent

14   BlueRadios from recovering on its trade secrets misappropriation

15   claims under the Colorado Uniform Trade Secrets Act if

16   BlueRadios' trade secrets were misappropriated after

17   August 12th, 2013, and these trade secrets were related to other

18   trade secrets that were allegedly misappropriated before

19   August 12th, 2013.

20       For this defense to apply to BlueRadios' claims that

21   Kopin breached the contract or addendum or Kopin's duty of good

22   faith and fair dealing, Kopin must prove by a preponderance of

23   the evidence both of the following:  One, any contact -- conduct

24   that breached the contract or addendum or Kopin's duty of good

25   faith and fair dealing occurred before August 12th, 2013, and

16-cv-2052-JLK    Jury Trial    03-21-2024

1    two, BlueRadios knew or should have known with the exercise of

2    reasonable diligence of the existence of the breach before

3    August 12th, 2013.

4        Breaches of a continuing duty to perform under a

5    contract can start a new limitations period.  That means that a

6    cause of action accrues each time a breach occurs, prompting a

7    separate limitations period to start.  If you find Kopin

8    violated a continuing duty to perform for BlueRadios after

9    August 12th, 2013, Kopin's statute of limitations defense does

10   not protect it from being responsible for those breaches that

11   happened after August 12th, 2013.

12       If BlueRadios meets its burden as to one or more of its

13   claims by a preponderance of the evidence and Kopin fails to

14   prove both of these requirements, the statute of limitations

15   does not apply, and unless Kopin proves a different affirmative

16   defense is valid, you must deliver a verdict in favor of

17   BlueRadios.

18       Lastly, this affirmative defense may not apply if the

19   statute of limitations should be equitably tolled.  The doctrine

20   of equitable tolling precludes a defendant from asserting a

21   statute of limitations defense where the defendant's intentional

22   wrongful conduct prevented the plaintiff's ability to pursue its

23   claim in a timely manner.  If you find that BlueRadios has

24   proven by a preponderance of the evidence that Kopin engaged in

25   intentional wrongful conduct that prevented BlueRadios from

16-cv-2052-JLK    Jury Trial    03-21-2024

1    bringing its claim in a timely manner, the statute of

2    limitations is reset and restarts only after the time that

3    Kopin's conduct no longer prevented BlueRadios from pursuing its

4    claim.

5         The timing of certain events is important in another

6    context.  The Defend Trade Secrets Act was enacted on May 11,

7    2016.  The Defend Trade Secrets Act is not retroactive.

8    Therefore, Kopin can be liable under the Defend Trade Secrets

9    Act only if, one, Kopin misappropriated BlueRadios trade secrets

10   after May 11, 2016, or two, Kopin misappropriated BlueRadios

11   trade secrets before May 11, 2016, and that misappropriation

12   continued after May 11th, 2016.

13        If you find that Kopin misappropriated BlueRadios trade

14   secrets under the Defend Trade Secrets Act or Colorado Uniform

15   Trade Secrets Act, you must determine what damages BlueRadios is

16   entitled to recover.  Damages for trade secret misappropriation

17   may include both the actual loss caused by misappropriation and

18   the unjust enrichment caused by misappropriation that is not

19   taken into account in computing actual loss.

20        Unjust enrichment is the amount that Kopin benefited

21   from the acquisition, use, or disclosure of BlueRadios' alleged

22   trade secrets without consent.  BlueRadios claims and must prove

23   by a preponderance of the evidence that Kopin was, quote,

24   unjustly enriched by acquiring, using, and disclosing BlueRadios

25   trade secrets without paying BlueRadios and without naming

16-cv-2052-JLK    Jury Trial    03-21-2024

1    BlueRadios as owner on patents containing BlueRadios technology.

2         Claim four, and these are where you advise me with

3    regard to exemplary damages.  If you find that Kopin engaged in

4    a misappropriation of one or more trade secrets and that Kopin

5    is liable for just -- unjust enrichment, then you must also

6    decide whether Kopin's misappropriation of the trade secrets was

7    willful and malicious.  If you find that misappropriation was

8    willful and malicious by clear and convincing evidence, then you

9    may recommend an award of exemplary damages.

10        Exemplary damages are intended to punish and to deter

11   misappropriation of trade secrets.  You may recommend to me that

12   I impose exemplary damages up to two times any amount awarded.

13   For conduct to be both willful and malicious, there must be

14   clear and convincing evidence of the following:  One, willful

15   conduct, and two, malicious conduct.

16        Conduct is willful if done with a purpose or

17   willingness to commit the act or engage in the conduct in

18   question, and the conduct was not reasonable under the

19   circumstances at the time, and was not undertaken in good faith.

20        Conduct is malicious if done with an intent to cause

21   injury or was despicable and done with a willful and knowing

22   disregard of the rights of others.  Conduct is despicable when

23   it is so vile or wretched that it would be looked upon and

24   despised by ordinary, decent people.  Someone who acts with

25   knowing disregard when he is aware of the probable consequences

Kevin P. Carlin, RMR, CRR

16-cv-2052-JLK    Jury Trial    03-21-2024

1    of his act and deliberately fails to avoid those consequences.

2            Now, I'm not going to go into the final instructions,

3    which are the rest of these at this time, but when you go to

4    deliberate, these final instructions give you information about

5    how to organize and how to proceed there.  I've given you this

6    first, and I certainly don't expect you to grasp and understood

7    all of it with this one reading, but I think you will understand

8    why we start, so that you have an introduction to it.

9            During the course of the trial, when instructions come

10   up and they're needed in the opinion of counsel or me or you, it

11   will give you additional instructions, but you have these

12   throughout the course of this trial that you can refer to and

13   take another look at.  And that's because I want your job here

14   to be clearly understood by you, and that it's a matter of honor

15   to proceed by confining what happens here in the courtroom -- by

16   confining your judgment to what happens in the courtroom and

17   applying the law as I give it.  And you can't apply the law

18   unless you understand it.  And that's why I'm starting now, and

19   I will hope not to annoy you, but certainly cover these again

20   and again.  Do you have any questions about them now?  Okay.

21           The timing now is 11:13.  Do we need to take a recess?

22   Anybody want to take a recess now?  Okay.  Then let's do this.

23   Let's go with the opening statements, and then we will recess at

24   whatever time.  I don't want to interrupt your opening

25   statements.

16-cv-2052-JLK    Jury Trial    03-21-2024

1          MR. GIBSON:  It is a little lengthy, Your Honor.  We

2    will probably go past the noon --

3          THE COURT:  I'm sorry?

4          MR. GIBSON:  It will -- it is a little lengthy.  We

5    will probably go past noon with my opening statement, but I will

6    defer to the Court to finish.

7          THE COURT:  Okay.  What if we do this?  What if we

8    hear your opening statement now, and then we will take an hour

9    and a half when you're through, even if it's after 12:00.  We

10   will start -- let's say if it's 1:15, we will come back at

11   1:45 -- 12:15, we will come back at 1:45, rather than 1:30.  Is

12   that all right for you?

13         MR. GIBSON:  Sure.  That's all right, Your Honor.  It

14   may go to about 12:30.  I think it's about an hour and 15

15   minutes, just so the Court knows.

16         THE COURT:  And then we will take the noon recess and

17   then hear the defense opening statement, and then you can call

18   your first witness.

19         MR. GIBSON:  That's excellent, Your Honor.

20         THE COURT:  Do you agree with that?  You will have to

21   wait until after lunch to make your opening?

22         MR. DALTON:  We're fine with that, Your Honor.  I do

23   wonder about a five-minute bio break right now, perhaps?

24         THE COURT:  All right.  Let's take a five-minute

25   break, then.

16-cv-2052-JLK    Jury Trial    03-21-2024

1          (Recess at 11:15 a.m., until 11:26 a.m.)

2          THE COURT:  As those extraordinarily clear

3    instructions showed you, we're going to hear the opening

4    statement from the plaintiffs.  Then we will take a break, and

5    then we will hear the opening statement from the defense, and

6    then we will have the first witness.  And we will get all of

7    that started today, so then the testimony will roll after that.

8    Okay.  Go ahead, please.

9          MR. GIBSON:  Thank you, Your Honor.  If I could have

10   the slide?  Make sure that all the monitors are working.  All

11   right.

12          This is a case about trust, and breach of that trust.

13   BlueRadios trusted Kopin with its secret, cutting-edge

14   technology, and it expected Kopin to honor the promises it made

15   to gain access to BlueRadios' secret, cutting-edge technology,

16   and BlueRadios' significant expertise in wireless engineering,

17   printed circuit boards, board support packages, and many other

18   things that were used and developed for the Golden-i technology.

19          Kopin didn't keep those promises.  What did Kopin do

20   instead?  Kopin took BlueRadios technology, shared it with third

21   parties.  Kopin took BlueRadios technology, used it in its

22   products, licensed it to other people, continues to use it in

23   its products.  Kopin filed patent applications, didn't put

24   BlueRadios employees on those applications in certain

25   situations.  Instead put its own people on.  And Kopin filed

Kevin P. Carlin, RMR, CRR

16-cv-2052-JLK    Jury Trial    03-21-2024

1  other patent applications on things that were clearly BlueRadios

2  technology, and in breach of its promises, didn't give

3  BlueRadios co-ownership of that technology and those patents.

4         We are here in this trial to remedy those wrongs.  Now,

5  we met yesterday.  My name is Stan Gibson.  I represent

6  BlueRadios.  Mr. Kramer is the founder and CEO of BlueRadios.

7  He will be with us throughout this trial.  He will also be our

8  first witness.

9         You're also going to meet Will Tucker, who is sitting

10  back there.  He will be our second witness, and he will be

11  sitting at counsel table while Mr. Kramer testifies, as our

12  corporate designee.  Mr. David Seserman will be assisting me in

13  the trial.  Ms. Lena Streisand will be assisting me in the

14  trial.  And Mr. John Huynh will play a very important role and

15  run the technology in the trial.

16         So, let's talk about BlueRadios and its cutting-edge

17  technology.  You're going to hear Mr. Kramer explain that

18  BlueRadios was founded in 2000, initially as another company

19  name, and then later the name was switched to BlueRadios.  He's

20  going to talk about the highly-acclaimed engineers that worked

21  at BlueRadios.  It's a small company, but it had technology no

22  one else had that they developed.

23         And the wireless space, in terms of board support

24  packages, printed circuit boards, they were able to take -- some

25  of you may have played with a Game Boy, the Game Boy Advance 20

16-cv-2052-JLK    Jury Trial    03-21-2024

1   years ago.  They figured out how to make that work with a

2   wireless cartridge.  You used to have to go to the store and buy

3   cartridges and put them in, if you wanted new games.  They

4   figured out how to do it wirelessly.  You could even play

5   Battleship on it.  Mr. Tucker will talk about that.

6        And they kept advancing and improving that technology.

7   They had customers, some of the biggest medical device

8   companies, something like Boston Scientific would use their

9   technology, their wireless ways of communicating and their

10  ability to miniaturize in order to get patient data and be able

11  to transmit that.  No one else had that technology.

12       And BlueRadios developed that.  And you're going to

13  hear Mr. Kramer and Mr. Tucker explain how they had this

14  miniaturized abilities, and they had the wireless streaming

15  technology.

16       So, you're going to learn a lot about BlueRadios'

17  groundbreaking technology in this case.  You're going to learn

18  about what they had before they worked with Kopin, and what they

19  developed after they started working with Kopin.  Before they

20  started working with Kopin, you will learn about some of the

21  awards that BlueRadios received.  You see Mr. Kramer there

22  receiving an award on a Nintendo project.  That's the Game Boy I

23  mentioned.  And another award from Microsoft, which Mr. Kramer

24  will talk about, all before there was any dealings with Kopin.

25       Now, in the fall of 2006, Jeff Jacobsen of Kopin

Kevin P. Carlin, RMR, CRR

16-cv-2052-JLK    Jury Trial    03-21-2024

1    approaches BlueRadios.  And Mr. Jacobsen, you will learn, was

2    the special assistant to the CEO of Kopin, John Fan.  He was

3    there to figure out how to develop some sort of wireless

4    head-mounted device, or even a head-mounted device, because when

5    Jacobsen first -- Mr. Jacobsen first comes to BlueRadios, he's

6    got these ideas of Kopin, which is a display company.

7        Let me talk just a little bit about Kopin.  It's a

8    display company.  It makes these kinds of monitors, but they've

9    made what are called microdisplays that would fit right here, a

10   little small display.  And they wanted to figure out how they

11   could sell more of these, because the market for these displays

12   was very competitive.  You couldn't sell as many.  So, they were

13   starting to make these microdisplays and thinking, how could you

14   wear it on a head?

15       And what they had was the idea maybe you put a computer

16   in a backpack, and you would have a wire, and then the wire

17   would run the video and any data to the display.  Or maybe you

18   would have a pendant you wear around your neck that would have

19   the computer.

20       And that's what Mr. Jacobsen was talking to Mr. Kramer

21   about in the fall of 2006.  That's what Kopin had.  They were

22   thinking, we will have a head-mounted display.  It will be wired

23   to a computer on the backpack or wired to a computer on a

24   pendant, and then we can sell more of our microdisplays.

25       Well, Mr. Kramer is going to explain that he heard

16-cv-2052-JLK    Jury Trial    03-21-2024

1    that, and he didn't think much of that idea.  Because if you're

2    going to have a head-mounted display so somebody can see what's

3    on a computer right here, how are they going to interact with

4    that?  Are they going to really want to carry in their backpack

5    a big laptop?  What's the point of that?  Are they going to want

6    to wear a pendant with wires?

7          He said, you don't need any of that.  We have the

8    technology, we can put that on your head.  All of it.  We can

9    wirelessly stream from a computer or a cell phone, the data to

10   the device itself.  It will have its own computer on it.  It

11   will have a printed circuit board, a board support package,

12   which is the software.  We're going to hear a lot about that.

13   And you have it all on the head.  You don't have a pendant.  You

14   don't have to have a backpack.  You can stream all of it

15   directly to your head.

16         So, Mr. Kramer explains that.  And they've been doing

17   those -- that kind of streaming where you can stream from a

18   computer to a display wirelessly.  And back then, and you gotta

19   remember, back then, this -- the iPhone, the smartphones, they

20   weren't out yet.  They didn't exist.  That's how cutting-edge

21   this was.  This wasn't around.

22         What we had back then is we had these.  These flip

23   phones.  Different ones, different versions.  You couldn't do

24   any kind of real streaming with these.  You couldn't do Wi-Fi,

25   Bluetooth.  That wasn't around, but BlueRadios was already able

16-cv-2052-JLK    Jury Trial    03-21-2024

1    to stream over Bluetooth 2.0.  And Mr. Kramer explained that to

2    Mr. Jacobsen.  And they had a product in development called

3    BlueVideo.  And here is actually a -- the actual board, this was

4    all done before Kopin was around.

5            And with this small board, you could stream video.  And

6    one of the things that BlueRadios was working on, in addition to

7    the medical device companies, is they were thinking of how could

8    you have a security camera outside and have that camera stream

9    into your house?  So, you wouldn't have to wire everything.

10   Because back then, you had security cameras and security

11   systems, they were all wired.  It's kind of cumbersome to run

12   all those wires.  They had a way of streaming using this device.

13   You could put a camera outside in the street, and you could

14   stream all the way into your house, and that was all done before

15   there was any meeting with Kopin.

16           Mr. Kramer explains all that to Jeff Jacobsen.  He is

17   incredibly excited.  The assistant, the special assistant to the

18   CEO of John Fan -- of Kopin, is very excited about this.

19           So, what happens in February of 2007, a nondisclosure

20   agreement is signed between BlueRadios and Kopin, and they start

21   to talk about how they can work together.  And Mr. Jacobsen and

22   a couple -- or another individual from Kopin come out to

23   BlueRadios here in Colorado to see a demonstration.  And during

24   that demonstration, Mr. Kramer and BlueRadios successfully show

25   how you can stream video.

16-cv-2052-JLK    Jury Trial    03-21-2024

1       So, this device that Kopin was extremely interested in

2   all of a sudden doesn't have to be this head-mounted display

3   that's connected to some cumbersome computer or pendant.

4   There's now a way to put this so you can just have on your head

5   a device that can be streamed to, that will -- you can have

6   video, data, and they're very excited about that.

7       And what happens after this demonstration is there's

8   the NDA signed, and the confidentiality is important in these

9   documents, because Kopin agrees, promises when it's getting

10  access to this technology, it's only going to use it with

11  respect to this purpose.  And we will look at a similar

12  provision in the contract.  And there's restrictions on what

13  they can do, who they can disclose it to, what they can do with

14  it.

15      It says there, they will not distribute, disclose, or

16  disseminate information to any third party, and that's in the

17  NDA.  So, that all gets signed.  The demonstration gets done in

18  February in Colorado.  And after that demonstration is done,

19  Mr. Jacobsen explains how excited he is to John Fan, his boss,

20  the CEO of Kopin at the time.

21      And they set up a meeting in Boston at Kopin's

22  headquarters.  Mr. Kramer goes out, and he does a demonstration

23  for a number of Kopin people at that meeting.  He takes this

24  board, which he will talk about, this development board, takes

25  this board, he's able to hook it up to a USB device that will

Kevin P. Carlin, RMR, CRR

16-cv-2052-JLK    Jury Trial    03-21-2024

1    enable the wireless communication.  That will -- and he's able

2    to take this phone and take data from what's connected to this

3    board and this device and stream it to this Nokia phone over

4    Bluetooth.  Nobody else could do it.

5          It's new.  It's novel.  It's innovative.  It's

6    cutting-edge.  And Kopin is incredibly excited.  You're even

7    going to hear Mr. Kramer explain that John Fan wanted to test

8    how far could it go.  It's one thing to do it in the same room.

9    They took the phone, put it in a different room, and put it in a

10   refrigerator to see if it could still stream.  So, you could

11   stream from the phone to this board, and then have a display in

12   the other room and see what was going on on the phone.  And

13   Mr. Kramer is going to explain that.

14         So, after that demonstration, Kopin definitely wants

15   access to that technology and the BlueRadios expertise.  Because

16   the engineers, you're going to hear from Mr. Kramer and

17   Mr. Tucker, they have an incredible skill set.

18         So, there's the board that I just showed you in the

19   demonstration.  May 18th, Mr. Jacobsen writes to Mr. Kramer that

20   without BlueRadios' preexisting Bluetooth knowledge, know-how,

21   and technology, independently developed, Golden-i would be

22   impossible to manufacture at this time.

23         That's not Mr. Kramer's words.  Those aren't

24   Mr. Tucker's words.  This is the special assistant to the CEO

25   John Fan.  He's been hired back to Kopin, particularly to do

Kevin P. Carlin, RMR, CRR

16-cv-2052-JLK    Jury Trial    03-21-2024

1    this development, and he writes to Mr. Kramer that Golden-i

2    would be impossible without BlueRadios.

3         Now, Mr. Jacobsen, who you're not going to hear from

4    live.  We're going to play his videotaped deposition.  It's

5    rather lengthy, because it contains questions from my side, from

6    BlueRadios, and also questions from Kopin's counsel.  And for

7    purposes of having it all together, you're going to hear it all

8    at the same time.  So, it's going to contain questions from both

9    sides of the lawyers at the same time.

10        But the words he writes in these emails

11   contemporaneously are important and impactful.  And there's a

12   lot of emails and a lot of documents you're going to see from

13   Mr. Jacobsen, but the first thing he says about the technology

14   after this demonstration that Golden-i -- this project where

15   they're trying to put a microdisplay where you can see out of --

16   and I will show you one a little bit later -- use a microdisplay

17   and have it receive video wirelessly, they're saying it would be

18   impossible without BlueRadios.  That's their words.

19        So, what happens next?  Well, Kopin wants access to the

20   technology, so they sign a contract, and they make promises in

21   that contract on June 5th, 2007.  This is the signatures of the

22   contract.  It's important to note that it's signed by Richard

23   Sneider, the CFO, who I expect you will hear later in the case

24   as well, but Mr. Jacobsen is the one who negotiated the contract

25   with Mr. Kramer, and Mr. Jacobsen is the one that had the

16-cv-2052-JLK     Jury Trial     03-21-2024

1    authority from Kopin to negotiate that contract.

2             And you're going to get to hear from both Mr. Kramer

3    and Mr. Jacobsen by videotaped deposition about what they said.

4    There's some key parts of the contract I want to highlight for

5    you now.  There's a project deliverables, which the Court read

6    to you in a jury instruction.  So, I'm not going to repeat all

7    of them here, but these are demonstration units that BlueRadios

8    was going to provide to Kopin.

9             I think you're going to hear Kopin say it didn't work.

10   The first generation didn't work.  Mr. Kramer is going to

11   explain that's not right.  It worked.  It worked when it was

12   demonstrated in February.  The demonstration in April worked.

13   As Mr. Jacobsen said, it would be impossible, and the later

14   demonstrations, they worked too.  Kopin is going to try to tell

15   you they didn't, but we're going to look at Kopin's own words to

16   see what's true and what's not.

17            One of the things that we're going to be talking about

18   in the case are the trade secrets.  And the judge just read this

19   to you, but there's five categories of trade secrets.  We're

20   going to be talking about this board support package that was

21   designed for wearable computer.  That's really talking about the

22   software and the firmware, and Mr. Kramer and Mr. Tucker will

23   explain to you what that is, how it was developed.

24            The miniaturized printed circuit board that's designed

25   for a wearable computer, they're going to explain to you what

16-cv-2052-JLK     Jury Trial    03-21-2024

1    that is, and I'm going to show you some examples of that.  The

2    graphical user interface, designed for the wearable computer,

3    this is what you actually see in your eyes.  So, this

4    microdisplay, you could see just like it's close to your eye,

5    and you can see just like it looks like on the display that you

6    have in front of you, just close to your eye.

7            Of course you've gotta figure out, how are you going to

8    navigate that?  You don't have a keyboard.  You don't have a

9    mouse.  Well, Mr. Tucker and Mr. Kramer and the rest of the team

10   at BlueRadios, they figured out ways to navigate that using

11   head-tracking and voice recognition and noise cancellation,

12   particularly for a head-mounted computer that was wearable.

13           They developed and worked on something called the

14   Whisper chip to make that work.  That's for -- it's called a

15   Whisper chip because it's for noise cancellation.  And that had

16   to be modified to work on a head-mounted wearable computer.

17   That was important because if you have this device on your head

18   and you want to tell -- and we're going to see some

19   demonstrations of this -- you want to tell the screen how you're

20   going to navigate, you say, open programs.  If somebody is too

21   close to you, there's too much noise, it's not going to hear

22   you.  You need this noise cancellation so the computer could

23   recognize your voice, and they figured out how to do all that.

24           You could also do head-tracking.  So, you could move

25   your head, and you could move the screen.  And for the wearable

16-cv-2052-JLK     Jury Trial     03-21-2024

1    computer with the head-mounted display, they figured out how to

2    do that.  So, you're going to learn about those trade secrets

3    and how they interplay with these categories.

4           And then the technological platform so you could load

5    different applications onto this head-mounted display.

6           And then a last category we'll be talking about are the

7    figures and the explanation in the figures of various patents.

8    And what you're going to learn on those as we go through this is

9    that there were figures that come directly from BlueRadios

10   employees, and they make it into Kopin patents that Kopin has

11   never provided BlueRadios with co-ownership rights as it agreed

12   to do under the contract.

13          So, the board support package -- and I'm not going to

14   go into details here, because these are trade secrets.  So, this

15   is just an overview.  When we get to the actual trade secrets

16   and the description of those, we will ask the courtroom to be

17   sealed, because they remain confidential to BlueRadios.

18          So, this is an example of a software stack and how it

19   can work, so that the software that's running on this small

20   computer can be used.  We're going to talk about the

21   miniaturized circuit display -- the miniaturized printed

22   circuits that are designed for that.  This version, which is

23   called generation one, or the gum stick, it's very small, but

24   there's pictures of it there for you.

25          You can see that it was called a gum stick because it's

16-cv-2052-JLK    Jury Trial    03-21-2024

1   about the size of a piece of gum.  That's how small it got.

2   We're talking about going from something that was this big down

3   to this, and the guys at BlueRadios knew how to do it.

4           We're going to talk about the graphical user interface,

5   how this could be navigated, as I was talking about earlier,

6   just with voice commands or by head-tracking.  We're going to

7   talk about the technological platform.  There was source code

8   that was developed for that.  Mr. Tucker is going to explain

9   these trade secrets in a lot of detail to you.  He's going to

10  walk you through them.

11          These are some of the figures that I was talking about.

12  These are figures that the ideas come from BlueRadios, and

13  patents have figures in them, as the Court read an instruction

14  on.  And I know it's a lot to take in to start with, so I'm

15  going to give you an overview, and then we will get into more

16  detail, but there's figures in patent applications that are

17  useful for explaining how the patent will work.  These figures

18  have ideas from BlueRadios.  And under the contract, BlueRadios

19  is supposed to be a co-owner.  And we're going to walk through

20  those figures.  There's eight categories of those.

21          So, in October of 2008, after this version, the gum

22  stick had been demonstrated.  Kopin decides it wants to go to a

23  different kind of chip, and they sign an addendum to the

24  contract for that purpose.  And we're going to talk about both

25  the contract and the addendum to the contract.  The addendum to

16-cv-2052-JLK    Jury Trial    03-21-2024

1    the contract talks about how there's going to be a

2    fully-functional delivery of ten printed circuit boards that are

3    going to be on this new processor, which is listed called an

4    OMAP processor.

5              And for purposes of the case, we're going to show you

6    that they were indeed fully-functional.  And we're talking about

7    the printed circuit boards.  This is what we're talking about as

8    the second generation.  This will be called gen 2 or gen 2.5.

9    You're going to see references to that.  And in March of 20 --

10   March 25th, 2009, BlueRadios delivers ten gen two PCBs, printed

11   circuit boards, to Kopin, just as it was supposed to in the

12   contract.  The contract says deliver ten fully-functional

13   boards.  Ten are delivered in March of 2009.

14             And that triggered obligations of Kopin, royalty

15   obligations.  So, did Kopin pay royalties?  No.  They haven't

16   paid a penny of royalties to this day.

17             Let's see what did happen.  After BlueRadios spent all

18   these years developing this technology and then coming up with

19   everything that would make Golden-i work, then putting it onto a

20   second platform, we're going to learn what Kopin did.  These ten

21   PCBs are delivered.  That's a picture of what I'm holding up in

22   my hand.

23             What do the Kopin internal documents show about these

24   ten PCBs?  This is seven months later.  Jeff Jacobsen, he's in

25   charge of the Golden-i project.  He's writing to John Fan, the

16-cv-2052-JLK    Jury Trial    03-21-2024

1    CEO of Kopin, the top guy, that the gen two PCBs have been

2    operational and demonstrated for six months.  For six months

3    this was working.

4           During the third quarter of 2009, approximately 2,000

5    additional one-on-one Golden-i demonstrations were given at six

6    major annual conferences.  These are fully-functional, but Kopin

7    won't tell BlueRadios they're fully-functional.  No.  Because

8    they're going to say, oh, the royalty provision wasn't

9    triggered.  Well, it sure was according to their internal

10   communications.  They just wouldn't tell BlueRadios that.

11          Instead, they keep telling Mr. Kramer, oh, we're going

12   to need to do more work.  You gotta give us more time.

13   Mr. Kramer is going to explain, that went on for years.  They

14   kept saying, we're still working on it.  Give us more time.  We

15   are making modifications.  The market is getting there.  It's

16   not there yet.  You're going to see what was happening behind

17   the scenes.

18          Mr. Jacobsen wasn't just in one email.  In a second

19   email, Mr. Jacobsen says to John Fan -- this is about a month

20   later, eight months after they were delivered.  John, the new

21   gen 2.5 units are an absolute dream to demo.  No excuses, no

22   explanations.  They just work and demo very, very well.  The gen

23   2.5 units are almost monkey proof.  That's -- those are their

24   words.  That's what they're telling their people internally.

25   That's what Jeff Jacobsen is telling the CEO, the head of Kopin.

16-cv-2052-JLK    Jury Trial    03-21-2024

1    None of that is getting shared with BlueRadios.  Not a word of

2    it.

3            In fact, Kopin decides to go behind the scenes, and

4    you're going to hear about the coverup.  Kopin decides to go

5    behind the scenes and figure out a way to do this without

6    BlueRadios.  BlueRadios had worked with a company called

7    Mistral, which you're going to hear quite a bit about.  They had

8    assisted on the layout in providing some additional engineering.

9    Kopin decides to go behind BlueRadios' back to Mistral, and use

10    Mistral.

11            And then they start saying, do not send or convey any

12    more information to BlueRadios.  You're going to see more

13    evidence of this.  It's not just one document.  Not just one

14    email.  You're going to learn in this case that Kopin told

15    Mistral, do not communicate with BlueRadios.  Kopin told another

16    company that worked on the board support package called Ittiam,

17    do not talk to BlueRadios.  Mr. Sneider, who I expect you will

18    hear from, even said this could be a Wall Street Journal issue,

19    if you start talking to BlueRadios.

20            This is the Wall Street Journal drill, meaning cover it

21    up.  Hide it.  Don't let anything get out.  We don't want to be

22    on the front page of the Wall Street Journal.  And you're going

23    to have to ask yourselves, why do people say that if they've got

24    nothing to hide?

25            So, as we get into the case, I expect you're going to

16-cv-2052-JLK    Jury Trial    03-21-2024

1    hear Kopin claim, oh, BlueRadios knew what we were doing.  They

2    should have done something about it.  Pay attention to these

3    exhibits and these documents where Jeff Jacobsen is saying this

4    is like the Wrath of Khan.  I asked about Star Trek.  This is

5    like the Wrath of Khan.  Let them eat static.  Or Hogan's

6    Heroes, which I also asked about, where Jeff Jacobsen writes --

7    this is from Hogan's Heroes.  Sergeant Schultz, I know nothing.

8    I see nothing.  That's what he wanted to be said by all the

9    Kopin people, Mistral, Ittiam.  They knew nothing.  They saw

10   nothing.  And you're going to hear a lot about the coverup.

11           So, I want to talk a little bit about the breach of

12   contract.  That's one of the claims.  This is part of the

13   instruction the Court just read, and the confidentiality

14   provision in the contract.  This provision explicitly says that

15   there's going to be confidential and proprietary information

16   from BlueRadios, and it should not be disclosed to any party

17   other than authorized personnel, and Kopin and BlueRadios shall

18   not use each other's confidential information for any purpose

19   other than the purpose contemplated herein.

20           So, let's see what happens.  That's a promise that was

21   made in the contract.  So, Mr. Kramer trusted Kopin.  He's

22   giving all this technology, and then providing all of

23   BlueRadios' engineering services and knowledge, know-how, skill

24   set, all of those things in reliance on this promise.

25           What happens?  Let's talk about Mistral.  June of 2008,

16-cv-2052-JLK    Jury Trial    03-21-2024

1    BlueRadios hires Mistral to help with this printed circuit board

2    layout.  Mr. Tucker is going to explain how complicated those

3    are, how BlueRadios had its own engineer that had worked it up,

4    and then they wanted some assistance in the layout.  That's in

5    2008.

6            By November 2008, without telling BlueRadios, Kopin

7    hires Mistral, saying it's a backup plan to BlueRadios.  Don't

8    disclose it to BlueRadios.  Now, instead what they're doing is

9    they're waiting until BlueRadios delivers the fully-functional

10   printed circuit boards.  March 2009, these set printed circuit

11   boards are delivered.  We know they're fully-functional.  You're

12   going to hear about the testing that was done at BlueRadios.

13   You're going to hear those emails that I saw you -- already

14   provided to you, and you're going to hear other evidence from

15   the witnesses on that.

16            This is Mr. Tucker confirming he's delivered those ten

17   boards.  March 25th, 2009.  They've been tested.  And what

18   happens in October?  And you're going to hear Kopin say, oh,

19   well, BlueRadios knew that we were working with Mistral.  Well,

20   you know what BlueRadios didn't know?  What BlueRadios never

21   authorized, what was completely against the contract I just

22   showed you how Kopin was not allowed to share BlueRadios'

23   third-party information, that proprietary trade secret

24   information?

25            Kopin sends BlueRadios' gen two PCBs to Mistral, and

16-cv-2052-JLK    Jury Trial    03-21-2024

1    they're going to say Mistral was designing a clean room.  They

2    were doing a ground-up design.  And Mistral even would tell

3    BlueRadios that, because they were part of the coverup.  Kopin

4    was telling them, don't say anything.  But what really happens

5    is Mistral is trying to work as a backup plan.  They need the

6    gen -- they need these PCBs.  They need them.  And you're going

7    to see documents that reflect that.

8            So, Kopin sends them.  No authorization from

9    BlueRadios.  They're telling BlueRadios, oh, there's still

10   issues with them.  They may not function well.  Internally they

11   know they function great.  For six months, 2,000 demonstrations.

12           They also send them to Ittiam.  So, we've got Mistral,

13   which is working on the printed circuit boards.  We've got

14   Ittiam that's working on all the software and firmware, the

15   board support package, and Kopin is sending BlueRadios'

16   proprietary, confidential trade secret information to both of

17   them.

18           It's not that Mistral or Ittiam was doing this

19   independent of Kopin, that they already had BlueRadios'

20   information.  No.  They say, we're not using it.  We may have

21   had some of it.  We're not using it.  We won't use it.  But

22   what's really going on behind the scenes is Kopin, behind

23   BlueRadios' back, is providing these gen two PCBs -- these

24   fully-functional gen two PCBs that BlueRadios has promised to

25   deliver, that it did deliver, that were fully-functional, by

16-cv-2052-JLK    Jury Trial    03-21-2024

1  Kopin's own admissions, they're providing those to Mistral and

2  to Ittiam so they can cut them out -- they can cut out

3  BlueRadios, use their trade secrets without paying a penny for

4  them.

5           So, what happens?  We see that Mistral creates a new

6  gen three after it's received the gen two PCBs, these printed

7  circuit boards that were fully-functional.  Another statement

8  here that the gen two, this is -- this device here, this has

9  been working for six months, but Kopin won't tell BlueRadios

10 that, because they want first to make sure Mistral can have its

11 own design, which they -- they created once Kopin had sent the

12 gen two PCBs, these, from BlueRadios to Mistral and to Ittiam.

13 So, that is a breach of contract, and it's a breach of the

14 implied covenant of good faith and fair dealing.

15          I want to talk about other things that were done.

16 Patent inventorship.  The Court read this instruction to you.

17 There needs to be a significant contribution to the idea in a

18 claim of patent.  We're going to have an expert talk about this,

19 Professor Rader, who lectures on patent law.  He is going to

20 explain some of this to you, and the Court's instructions

21 explain it as well.  There's a contribution to the idea of the

22 claimed patent.  In the patents, at the very end, after there's

23 figures, which I showed you a couple of, and then some

24 discussion about the figures called the specification, there's

25 claims at the very end.

16-cv-2052-JLK    Jury Trial    03-21-2024

1    And we look at those claims to decide who is an

2    inventor.  And you're going to learn what Mr. Kramer and his

3    team contributed to make them inventors.  So, you're also going

4    to learn that Kopin, which had the right under the contract to

5    prosecute patents, as long as it gave BlueRadios ownership for

6    BlueRadios technology, you're going to learn that a firm that

7    worked for both BlueRadios and Kopin called Hamilton Smith

8    Brooks, or -- Hamilton Brooks -- called HBSR for short, you're

9    going to learn that they filed on January 4th, 2008, a patent

10   application.

11       The patent applications will have applicants which

12   become the inventors.  And this named the inventors as

13   Mr. Kramer, Mr. Tucker, Mr. Sample, and Mr. Jones.  Mr. Kramer

14   will explain who those are.  They're all BlueRadios employees.

15   That's how it was filed.  This is a picture of the actual

16   filing, January 4th, 2008.

17       What happens?  A year later, the patent application

18   itself gets filed.  When it's filed, all of a sudden, Mr. Jones

19   disappears from the application, and Mr. Jacobsen is on there.

20   Now, we're going to explain that that was improper, that

21   Mr. Jacobsen didn't make a contribution to any claim of this

22   patent, and therefore, he should be removed as an inventor.

23       In January of 2013, the patent issues.  That means the

24   United States Patent and Trademark Office reviews the patent

25   application, decides it's new.  It's novel.  It's not obvious.

16-cv-2052-JLK    Jury Trial    03-21-2024

1    And they issue a patent.  And on that patent, when it's issued,

2    Mr. Jacobsen is listed as an inventor.  We're going to explain

3    that he should not be.  And at the end of this case, ask you to

4    take him off that patent, because he did not contribute to a

5    claim.

6            Now, the patent -- the Kramer patent, which -- talk a

7    little bit about patents.  This isn't a patent case, but you are

8    going to hear quite a bit about patents.  There's a patent

9    number at the top.  For short, patent attorneys often refer to

10   patents by the last three digits.  Because there's so many

11   patents in this case, that's going to get confusing.  So, you

12   might hear this patent referred to as the 671 patent.  That does

13   come after -- the three digits, but frequently patents will also

14   be referred to by their subject matter or by the first named

15   inventor.  And you can see on the inventor list, Mark Kramer is

16   listed as the first named inventor.  And so we are going to call

17   this the Kramer patent.

18           There's a second patent that we're going to be talking

19   about, which is called the proxy patent.  That patent on

20   January 5th, 2009, listed four individuals as inventors:

21   Mr. Parkinson, Mr. Tucker, Mr. Jacobsen, Mr. Sample.  We're

22   going to talk about Mr. Parkinson a little bit later.  The judge

23   read an instruction that deals with Mr. Parkinson, and I'm going

24   to go through that in a little bit.

25           This proxy patent, the important thing to note here is

16-cv-2052-JLK    Jury Trial    03-21-2024

1   this application, it had Mr. Tucker listed as an inventor, and

2   Mr. Sample.  When -- and this is the picture of it.  When it

3   gets filed, they amend the application in September 2013, and

4   they remove the inventors Tucker and Sample.  Plainly BlueRadios

5   employees.  Shouldn't have been removed.  They should have

6   stayed on.

7            But what happens is Kopin -- and you're going to see

8   emails about this -- they want to deal with the BlueRadios

9   problem, or BlueRadios issue.  So, they figure out a way.  Let's

10  not give BlueRadios ownership, because if they're listed on this

11  patent, they're obviously going to have ownership.  Let's figure

12  out how to take them off.

13           So, Kopin requests correction of inventorship to take

14  off Mr. Tucker and Mr. Sample.  And when the patent finally

15  issues, it names only Mr. Parkinson and Mr. Jacobsen as

16  inventors.  That was wrong.  Mr. Tucker is going to explain what

17  was contributed by Mr. Tucker and Mr. Sample to this patent.

18  They contributed to the claim of the patent, and this patent

19  should be corrected to reflect their rightful inventorship on

20  the patent.  But you can see when it issues, right now, in

21  December of 2014, they're nowhere to be seen on the patent

22  itself.

23           The patent inventorship instruction, again, if we prove

24  to you by clear and convincing evidence that they made a

25  significant contribution to the patent, then that patent, the

16-cv-2052-JLK    Jury Trial    03-21-2024

1    proxy patent, should be corrected to list them as inventors.

2    And Mr. Tucker will explain why that is the case.

3        So, for the Kramer patent, we're asking that

4    Mr. Jacobsen be removed, because he is not an inventor.  It

5    wasn't filed with him on it.  Kopin added him later, because

6    they were the ones in charge of the patent prosecution.  But he

7    didn't contribute to any claim in the patent.  You're going to

8    hear his videotaped deposition testimony about that.  So, he

9    should be removed.

10        The proxy patent, which I explained, Mr. Sample and

11    Mr. Tucker should be added to that because they contributed to

12    at least one claim.

13        Now, the Kramer application, which I talked about

14    before, lists only BlueRadios employees.  It has some important

15    figures in it.  I want to talk a little bit about the figures

16    that are in it.  But Mr. Kramer is going to explain this.  The

17    bubble figure -- there's going to be eight of these figures, and

18    we're going to have a demonstrative during Mr. Kramer's

19    testimony with these on it so you will be able to see them more

20    clearly.

21        The bubble figure appears in the Kramer provisional

22    patent application listing only BlueRadios employees.  It then

23    is going to make its appearance in -- and so plainly there's an

24    acknowledgment that this is BlueRadios.  That figure first

25    appears only with BlueRadios inventors.  It came from

16-cv-2052-JLK    Jury Trial    03-21-2024

1    BlueRadios.  The Bluetooth 2.0, streaming 3.0, that was what

2    BlueRadios did.  Mr. Jacobsen acknowledged it would be

3    impossible.  So, this figure appears in a lot of subsequent

4    patents, and Kopin claims it's entitled to own those patents

5    without any rights to BlueRadios.  We're going to fix that.

6    Every patent that has this figure has BlueRadios developments in

7    it, should be co-owned by BlueRadios.

8         There's another figure.  This is another example.  The

9    proxy patent also has this same figure in it.  That's on the

10   right.  And then there's figures that came -- again, they're in

11   this first file, January 2008, acknowledge they're BlueRadios

12   only inventors.  That figure on the left is in that first

13   application.  Mr. Tucker is going to explain that came from him.

14   I don't think there's any dispute about that.  I don't think

15   you're going to hear Kopin dispute that.  That's his figure.

16   That's BlueRadios.

17        And it makes its way into the Kramer patent that

18   issues.  You're going to learn that figure is in a lot of other

19   patents that Kopin is not allowing BlueRadios to own.  For

20   example, the proxy patent, again, this figure that came out of

21   the original January 2008 figure, the one on the left, gets

22   repeated on the right in the proxy patent, and Kopin claims

23   BlueRadios has no ownership rights to that patent.

24        The internal components schematic in the Kramer patent.

25   On the left, you see the schematic.  This is filed with

16-cv-2052-JLK    Jury Trial    03-21-2024

1    BlueRadios inventors, the figure on the left. And on the right,

2    you can see it issues as a patent with BlueRadios inventors.

3    And then, again, it appears in this proxy patent where Kopin is

4    saying BlueRadios inventors shouldn't be listed. Mr. Tucker and

5    Mr. Sample shouldn't be listed, even though this plainly

6    originated with BlueRadios, and they shouldn't have any

7    ownership rights.

8         So, ownership, as the Court looked at, inventors can

9    assign their ownership rights to another person or entities such

10   as an employer. The assignee has then the further power to

11   transfer its ownership rights. But the key here is each of the

12   individuals at BlueRadios assigned their rights to BlueRadios,

13   including Mr. Kramer. So, BlueRadios owns what they invented,

14   and Kopin tried to take off Mr. Sample and Mr. Tucker -- did

15   take off those two as inventors so that there would be no

16   ownership to BlueRadios. That's one of the things you're here

17   to fix.

18        The contract is important on ownership rights too. It

19   says that BlueRadios is going to own all the rights in any and

20   all technology and products that it developed before the start

21   of this contract or developed outside the scope of the contract.

22   And I talked to you about some of what it already had before

23   there was ever a contract. It further provides that things that

24   are developed by BlueRadios in the course of the development

25   contract will be jointly owned.

Kevin P. Carlin, RMR, CRR

16-cv-2052-JLK    Jury Trial    03-21-2024

1    And they're going to argue, with no obligation to

2   financial accounting.  You're going to hear Kopin say, that

3   means we just get them and don't have to pay anything for them.

4   Well, that ignores the royalty provision, ignores the

5   confidentiality and the purpose provision.  The important point

6   here is to not only understand that they have to pay for these,

7   but they also have to give BlueRadios joint ownership, and they

8   haven't done that.

9    So, when we look at the different applications that

10  have been filed, this hardware diagram, Mr. Tucker is going to

11  explain, again, that this came from him.  This is going to get

12  called a critical hardware figure.  And Mr. Tucker is going to

13  explain that this came from him.  And again, I don't think there

14  will be any dispute about this hardware figure.  This is a

15  BlueRadios trade secret that Kopin puts in a patent application,

16  which they could do if they provided BlueRadios with ownership

17  rights.  When they don't provide BlueRadios with ownership

18  rights, it's a breach of contract, and it's a misappropriation

19  of the trade secret.

20    And we're going to see that in several of these

21  figures.  We're going to talk about some of them now.  I

22  mentioned a few of them.  They're going to come up over and over

23  again in the case.  I just want to give you an overview of them.

24  There's the bubble figure, the hardware figure, the internal

25  components schematic, the remote control figure, the military

16-cv-2052-JLK    Jury Trial    03-21-2024

1    helmet figure.  There's a voice and head-tracking figure, a flow

2    chart figure, and the solar house figures, which oddly enough

3    you're going to hear Mr. Kramer explain, the solar house

4    figures, Kopin took them from Mr. Kramer.  They don't have

5    anything to do with Golden-i.

6        Mr. Kramer designed a house with solar in it.  He

7    provided these figures to Mr. Jacobsen.  He will explain why.

8    Mr. Jacobsen takes them and puts them into patent applications

9    that Kopin owns, and Kopin won't even give BlueRadios

10   co-ownership of those, because Kopin is just taking everything.

11       So, the bubble figure, as I mentioned before, it first

12   appears in January 2008 on this application that only names

13   BlueRadios people.  This figure issues as part of a patent, and

14   Kopin then continues to file patent applications that include

15   this development without giving BlueRadios ownership.

16       This is a list -- and we will go through these in more

17   detail during the case.  This is a list of all the bubble

18   figures -- all the patents the bubble figure appears in, just to

19   show you how many times Kopin used BlueRadios developments and

20   contributions without providing BlueRadios with co-ownership

21   rights or ownership rights.

22       The hardware figure, which we've talked about, first

23   appears originally in this January 4th, 2008, patent.  It's in

24   that Kramer patent that issues.  BlueRadios' invention,

25   contribution development, it's used in all of these patents by

16-cv-2052-JLK    Jury Trial    03-21-2024

1    Kopin, which Kopin won't provide BlueRadios with co-ownership

2    rights of, in breach of the contract.  And because it was a

3    trade secret, that's also misappropriation of trade secrets.

4    They're not allowed to use this unless they provide BlueRadios

5    with co-ownership rights.

6         The internal components schematic was another one that

7    only BlueRadios inventors were on, yet it starts to appear in

8    all these other patents that only Kopin lists its people on, and

9    Kopin claims they own all of it.

10         The flow chart figure, which you're going to hear some

11    about, Mr. Kramer is going to explain how these are his ideas

12    that were transcribed under this flow chart.  Not exactly how he

13    would put it, but this all came from him.  And this flow chart

14    figure, without any -- naming any BlueRadios inventors or

15    providing any BlueRadios ownership, appears in all of these

16    patents that BlueRadios should co-own but doesn't.

17         I want to talk briefly about Chris Parkinson.  Chris

18    Parkinson was an independent contractor before July of 2008

19    working with Kopin, for a company called Integral RFID or

20    something like that.  Mr. Kramer is going to explain what

21    happened.  Kopin approached him and said they'd like

22    Mr. Parkinson to work with BlueRadios.  It will help him to gain

23    better access to the technology.  And so Mr. Parkinson signs an

24    employment agreement and a property [sic] information and

25    inventions agreement.

16-cv-2052-JLK    Jury Trial    03-21-2024

1        That's a very important document, because in that

2   document, Mr. Parkinson represents that he doesn't have any

3   prior intellectual property, and that all intellectual property

4   he does have while he's working for BlueRadios will be owned by

5   BlueRadios.  This is the same document that Mr. Kramer has all

6   of the employees sign.  He uses NDAs when he works with third

7   parties.  With employees, with independent contractors, he makes

8   sure that they're going to assign their intellectual property

9   rights to BlueRadios, and Mr. Parkinson signs that.

10       And you're going to see the employment agreement

11  July 28th, 2008.  This isn't some oral agreement, two people

12  just said, oh, you want to work for me, okay, I will pay you

13  this much.  No.  This is an employment agreement.  Kopin agrees

14  that they will pay Mr. Parkinson while he's working for

15  BlueRadios, because they want Mr. Parkinson to have access to

16  all of this information, the confidential information that he

17  can receive.

18       And you see the assignment.  He agrees that any

19  inventions he makes, conceives, reduces to practice, shall be

20  the sole property of the company, which is BlueRadios.  He

21  assigns such inventions and all rights therein to BlueRadios.

22  And that's in July of 2008.

23       In May 2009, this is an important date, Kopin starts to

24  file patent applications naming Mr. Parkinson as an inventor.

25  He's working for BlueRadios.  He's agreed right in this

16-cv-2052-JLK    Jury Trial    03-21-2024

1    timeframe that all of his inventions are owned by BlueRadios.

2         So, what happens?  Mr. Parkinson, they enter into this

3    employment agreement, this intellectual property assignment.

4    And these patents, which Mr. Parkinson, he said he didn't have

5    any intellectual property before working for BlueRadios, all of

6    these patent applications, the patents at issue afterward,

7    they're filed while he's working for BlueRadios.

8         And Kopin just takes these.  They don't give BlueRadios

9    any ownership.  Instead, they're going to try to tell you this

10   is an illusory agreement with Mr. Parkinson.  The judge read you

11   an instruction that pertains to that.  For this to be an

12   illusory agreement, Mr. Kramer would have to tell you that he

13   never intended this to be an agreement.

14        Well, he's going to tell you the exact opposite.  He

15   wouldn't have gone through all this with an employment agreement

16   and intellectual property assignment agreement for any other

17   reason, because he wanted to make sure he gets that from all of

18   his employees and independent contractors to make sure what

19   they're developing while they work for BlueRadios, while they

20   have access to BlueRadios' information and trade secrets, that

21   BlueRadios owns it.

22        And that's what Mr. Kramer did.  And there's all these

23   patents at issue for this remote control figure.  This is

24   developed by Mr. Parkinson while he's working for BlueRadios.

25   All of these patents should be co-owned by BlueRadios.

16-cv-2052-JLK    Jury Trial    03-21-2024

1    Mr. Parkinson worked there, and he transferred his rights.

2    There's a voice and head-tracking figure.  This also has

3    Mr. Parkinson on it.  Mr. Parkinson is listed as an inventor on

4    this patent application.  It's filed while he's assigned the

5    inventorship rights to BlueRadios, and it's before he terminates

6    his employment.

7            So, in June of 2009, he decides he doesn't want to work

8    with BlueRadios anymore.  That's fine.  But everything he does

9    before that termination date should be co-owned by BlueRadios.

10   And you're going to see this voice and head-tracking figure.

11   That's in all of these patents that BlueRadios should have

12   co-ownership rights in.  The military helmet figure.  That is

13   the beginnings of what you're going to see in -- starts to be

14   used by Kopin to sell to the military.  This application with

15   this figure in it is also done and filed while Mr. Parkinson

16   works for BlueRadios.  BlueRadios has co-ownership rights to

17   this as a result.

18           Kopin's use of the military helmet figure, it appears

19   in these patents that should be co-owned by BlueRadios.  Here is

20   the solar house figures.  So, as I mentioned, Mr. Kramer

21   generates these original designs for his private home.  These --

22   this application that was filed in March of 2009 has these

23   drawings, these figures in it too.  They came from Mr. Kramer.

24   Kopin has three issued patents that have Mr. Kramer's designs,

25   and they won't give co-ownership rights, in contradiction of the

239

1   agreement.

2          So, Mr. Parkinson does all of that work while he's at

3   BlueRadios, and then the agreement is terminated.  But all that

4   work, all those figures I showed you, all those designs and

5   developments are done and filed while Mr. Parkinson is at

6   BlueRadios.  So, this is a termination of the agreement.

7          Kopin is going to try to argue that Mr. Kramer never

8   meant this to be a real agreement.  To find it was illusory, you

9   would have to find that Mr. Kramer thought it was an illusion --

10  not Mr. Parkinson, but Mr. Kramer -- and when they entered into

11  it, they thought that.  Well, look at the facts here and the

12  records.  There's an official corporate seal that Mr. Kramer

13  uses when the agreement is terminated.  This was no illusion.

14  This is a made-up-after-the-fact argument so Kopin doesn't have

15  to give BlueRadios co-ownership rights of what Mr. Parkinson

16  created.  And this is the contract again about ownership, which

17  we looked at earlier.  This is a critical provision about who

18  should own these patents.

19         So, I want to talk about Mr. Parkinson just for another

20  minute.  After he leaves his employment with BlueRadios, he

21  becomes a full-time Kopin employee.  In 2014, he leaves Kopin to

22  form a company called WearNext that markets and sells the

23  Golden-i.  Kopin owns 15 percent of WearNext.  You're going to

24  learn that Kopin licensed the Golden-i technology -- it even

25  says that in the licensing agreement.  They licensed the

16-cv-2052-JLK     Jury Trial     03-21-2024

1    Golden-i technology to RealWear, which is the successor to

2    WearNext, and Kopin gets ownership.

3          They get paid money, and they get ownership of

4    RealWear.  So, they want to say this project was a failure.

5    There's a company out there that they own part of that they get

6    money from that makes this device.  This is the Golden-i.

7    You're going to see demonstrations of it back before there was

8    any company called WearNext or RealWear.  RealWear didn't create

9    this.  This has BlueRadios technology, and Kopin is profiting

10   from it.

11         So, when we look at how Kopin is continuing to use

12   BlueRadios' contributions, they're licensing.  They get stock.

13   They make commercial use of it -- of the inventions and the

14   trade secrets with certain companies like Scott Safety, which

15   we're going to talk about, and the military.

16         There's Golden-i product demonstrations.  Mr. Kramer is

17   going to talk to you about how when they originally came up with

18   this, they wanted the user to know when they had successfully

19   navigated.  It would make a little chirp.  Mr. Tucker and

20   Mr. Kramer came up with that chirp.  That chirp was in these

21   product demonstrations of Golden-i.  This is Golden-i being

22   demonstrated back, I believe in 2009, and has the chirp.

23         And when you use this device to this day, when you

24   navigate and you tell this to go to programs, it opens your

25   program folder, you tell it to go to pictures, you go to music,

16-cv-2052-JLK    Jury Trial    03-21-2024

1    it opens those folders, you hear a little chirp so you know that

2    it did -- or you tell it to go back so you can go back up the

3    levels, you go into the files, you go back up, you can do that,

4    and you get a little chirp.  This is Golden-i.  It wasn't a

5    failure.  It's been incredibly successful to Kopin, because they

6    were just a display company.  Now they do a whole lot more.

7            Again, this has been licensed to RealWear, both for

8    money and stock.  RealWear still advertises it.  Hands-free use.

9    Remote control.  All of these things.

10           Commercial use, I talked about.  This is Scott Safety

11   that you're going to hear about.  This is so if a firefighter

12   needs to get more visuals, they can wear this up close.  They

13   can navigate through menus.  It has the Whisper chip technology

14   in it, and it has this wireless hands-free situational

15   awareness.

16           As Kopin mentioned yesterday, I believe, they sell a

17   lot to the military.  Because there's -- Golden-i has been

18   adapted for military use, and it makes sense that it would be,

19   because a soldier can wear a microdisplay that wirelessly

20   transmits video, so they can see what's going on.  They don't

21   have to -- they can look around a corner that way without

22   actually having to stick their head around the corner, which is

23   what this talks about.  Kopin didn't have anything like this

24   before BlueRadios.  Nothing.  They were a display company.  Now

25   they make these head-mounted display units.

Kevin P. Carlin, RMR, CRR

16-cv-2052-JLK    Jury Trial    03-21-2024

1     We will talk about some of the schematics that show

2   what this is.  We will have an expert explain Kopin's use of the

3   BlueRadios contributions.  Dr. Edwin Hernandez will testify

4   about that.  And then we're going to get to the end of the case

5   where we talk about damages.  We're going to have Mr. Mark

6   Pedigo talk about damages.  He's a damage expert.  He's going to

7   explain how Kopin has monetized Golden-i.  The royalties that

8   should be paid, none of which have been paid.

9     He's going to talk about how unjust enrichment works,

10  and these are instructions that the Court read to you, and how

11  Kopin has profited hundreds of millions of dollars from this

12  technology, and how the unjust enrichment works so that

13  BlueRadios can be fairly compensated for its contributions.

14     We're going to talk about disgorgement.  And one of the

15  ways that there's fair compensation for this use is to disgorge

16  the profits.  And the Court read an instruction about that

17  earlier that it's BlueRadios' burden to prove Kopin's gross

18  revenue, which we will do.  We will use Kopin's own numbers.

19  Mr. Pedigo will explain that.

20     Kopin then has the burden to prove any deductions or

21  expenses.  That gets you to the profits.  And then Dr. Hernandez

22  is going to explain that 85 percent of what Kopin is doing or

23  what -- 85 percent of what Kopin has came from BlueRadios.  And

24  he's going to walk through that number with you and explain how

25  he got to that, because Kopin, what it contributed to Golden-i

16-cv-2052-JLK    Jury Trial    03-21-2024

1    was the display, the microdisplay, the housing.  Not the

2    computer itself, but the form of the housing.  Some funding.

3            But all of the guts of this, all of the trade secrets,

4    all the contributions that make this work, that came from

5    BlueRadios.  So, when you look at an example and you hear that

6    they've sold $80 million to one military unit, and there's

7    $20 million of costs, that gets you to a 60 million-dollar

8    profit, 85 percent for that one company should be attributable

9    to BlueRadios, and that's how you award the unjust enrichment

10   and make sure that money is returned to BlueRadios.

11           We will also at the end ask for an award of exemplary

12   damages, because as the Court read to you at the very end, this

13   conduct was willful and malicious.  They made promises to gain

14   access to this technology.  It would have been impossible to

15   do -- all of this business they've done for years would have

16   been impossible without BlueRadios.  That's their own words.

17   Impossible.

18           And they misled and led BlueRadios down the primrose

19   path when they had BlueRadios deliver ten fully-functional

20   boards that worked.  They even admit internally worked for six

21   months.  And you're going to see they wouldn't tell Mr. Kramer

22   that.  He writes them.  Are you accepting these?  Are you

23   accepting these?  And they ignore him, or they tell him at trade

24   shows, we're still working on it.  We're going to get the

25   product out there.

16-cv-2052-JLK    Jury Trial    03-21-2024

1    Meanwhile, behind the scenes, they never disclose.

2    They're sharing this information with Mistral, with Ittiam.

3    They're providing fully-functional boards to them so they can

4    develop a board that's based on BlueRadios technology and cut

5    BlueRadios out of the picture, because they don't want to pay

6    BlueRadios.  They don't want to give BlueRadios the ownership.

7    And they hope because BlueRadios is a small company, it will

8    just go away.

9    Well, members of the jury, we're here to right those

10    wrongs today and in the next four weeks.  And we're going to

11    present the evidence that shows you just why you should award

12    BlueRadios tens of millions of dollars, correct patent

13    inventorship, and assign BlueRadios the ownership rights to

14    which it's entitled.

15    I thank you for your time and attention today, and I

16    thank you for the time and attention you will give us over the

17    next several weeks.  Thank you.  Thank you, Your Honor.

18    THE COURT:  Thank you very much, Mr. Gibson.  We will

19    take a recess now for lunch.  And it's 12:30, and I still think

20    we need that amount of time, so we will come back at 2:00 and

21    hear the opening statement from the defense.

22    (Recess at 12:36 p.m., until 2:03 p.m.)

23    THE COURT:  Mr. Dalton, you may proceed with your

24    opening statement.

25    MR. DALTON:  Thank you, Your Honor.  Is it all right

16-cv-2052-JLK    Jury Trial    03-21-2024

1    if I move this a little bit to face the jury?

2              THE COURT:  Yes, of course.

3              THE COURTROOM DEPUTY:  Be careful of the connections,

4    though.

5              MR. DALTON:  Good afternoon, members of the jury.  I

6    hope you had a nice lunch, and thank you for coming back.

7              Members of the jury, I'd like to start by referencing

8    one of the instructions His Honor read to us this morning.  It's

9    instruction 1.3.  And you can pull it up so you can see it.

10   This is about evidence.  I'd like to direct your attention to

11   statement number two.  Statements and arguments by lawyers are

12   not evidence.  The lawyers are not witnesses.  What they say in

13   their opening statements, closing statements, and other times is

14   intended to help you interpret the evidence, but it is not

15   evidence.

16              I'm so glad you got that instruction, because

17   Mr. Gibson did a whole lot of arguing and testifying during that

18   opening, but what matters is what the evidence will show, not

19   what lawyers argue.  And though an opening statement is not

20   evidence, members of the jury, it is a promise, a promise of

21   what the evidence will show.  Please hold Mr. Gibson to his

22   promises, and feel free to hold me to mine.  Because again and

23   again in that opening, BlueRadios has told you a story, but they

24   didn't show you the evidence to support it.  Again and again,

25   they got facts wrong.  We will discuss some of them right now,

Kevin P. Carlin, RMR, CRR

16-cv-2052-JLK    Jury Trial    03-21-2024

1    and the rest will have to wait to get to during testimony.

2         I'm here to make you a promise about what the evidence

3    will actually show.  And again, hold me to it.  Because once all

4    the evidence is in, it will show that the full story is very

5    different from what you heard this morning.

6         Members of the jury, this case is about two things: a

7    contract and intellectual property.  We've heard that term

8    enough, I think we can all assume we know what it means.  And

9    the specific way that the parties chose to handle intellectual

10   property ownership in a contract they entered.

11        But you wouldn't know that from BlueRadios' slides,

12   because out of the 100 slides you saw, they waited until slide

13   62 to show you any of the provisions of the contract that

14   related to intellectual property ownership.  I won't wait that

15   long, because you will see that the contract and the addendum,

16   they're your home base.  They're where you can go to get the

17   exact rules that the parties agreed to live by in their

18   agreement.  The evidence will show they are the most important

19   documents in the case.

20        You met me yesterday.  My name is Josh Dalton.  With me

21   at counsel table is Harvey Bartle and Kandis Gibson, and most

22   importantly our CEO of Kopin, Mr. Michael Murray.  Over the next

23   50 minutes or so, we're going to go over some key points that

24   we'd like to share about the case and preview what you're going

25   to hear and what you're going to see in the evidence.

16-cv-2052-JLK    Jury Trial    03-21-2024

1          Because you're going to hear that those contracts I

2     mentioned, the contract and the addendum you heard about, they

3     were heavily negotiated and carefully drafted by two

4     professional companies that chose to do business together.  And

5     they lay out the detail of the deals the parties made to do

6     business together.  And when you make a deal, you have to honor

7     it.

8          The evidence will show Kopin did honor the deal, but

9     you will hear that instead of honoring the contracts, BlueRadios

10    wants to change the deal, ignore the terms, pretend it didn't

11    even happen.  In fact, adding insult to injury, you heard during

12    that opening, BlueRadios is acting like Kopin was some kind of

13    company that broke into their vault and stole their intellectual

14    property without BlueRadios ever knowing.  The facts could not

15    be further from that story.

16         The evidence will show that everything Kopin had from

17    BlueRadios was voluntarily given under that contract, used by

18    permission and as permitted under the contract, and a really big

19    part of what you will hear, BlueRadios got over half a million

20    dollars for two PCB designs that you will hear did not work.

21         Now, in order to help you negotiate the case, as the

22    Court said, openings can be kind of a roadmap.  You heard that

23    yesterday.  We would like to offer you five keys to the case to

24    help sort of set the record straight and address BlueRadios'

25    claims and talk about Kopin's responses.  These are things that

16-cv-2052-JLK    Jury Trial    03-21-2024

1   we hope you will think are important, and ask you to keep in

2   mind as you listen to the evidence after I sit down.

3          The evidence will show that Kopin was given broad

4   rights to the BlueRadios-related intellectual property.  Two,

5   that BlueRadios got exactly what it bargained for, and was paid

6   in full.  Three, that BlueRadios waited years too long to file

7   this lawsuit, in violation of the statute of limitations.  Four,

8   that Kopin honored the contract and did not breach it.  And

9   five, that Kopin did not take BlueRadios' patents or trade

10  secrets and intellectual property.

11         Let's jump into key number one.  Members of the jury,

12  the evidence will show that Kopin and BlueRadios, like any two

13  companies that want to do business together, signed a contract.

14  What you're looking at here is Exhibit 53.  It's the first page

15  of the original contract that the parties signed.  Now, you will

16  see that the words in this contract, they change quite a bit

17  from the first draft.  We will look at that together during the

18  case.

19         The evidence will show that the parties went back and

20  forth for weeks hashing out the terms, adding language, taking

21  language away, each side negotiating for what mattered most to

22  it until the words were something they could both agree to and

23  sign.  And that's what they did.

24         Each side was negotiating for what mattered most to it.

25  For BlueRadios, you will hear that it wanted to be guaranteed to

16-cv-2052-JLK    Jury Trial    03-21-2024

1    cover labor costs and materials for the work that they were

2    going to do on this printed circuit board design.  You heard

3    about that from Mr. Gibson.

4          And they wanted some kind of potential upside if the

5    product that would come out of this PCB design was a success.

6    And you will hear that BlueRadios negotiated a pretty good deal

7    for itself.  The evidence will show that they were going to be

8    paid handsomely.  You will see Kopin agree to make guaranteed

9    payments for a minimum of a year of $35,000 per month just to

10   cover their labor costs, and to pay additional expenses like

11   materials that were built by BlueRadios.

12         And you will see that Kopin also agreed that there

13   could be more money, the potential of royalties on unit sales,

14   between two and four dollars if that printed circuit board was

15   designed and finished and within a product.

16         And how about Kopin?  You know, what did Kopin want?

17   Other than the obvious, the printed circuit board it was paying

18   so much to have developed, you heard that Kopin wanted to make

19   sure that it had intellectual property rights.  You will hear

20   that there were basically two types of intellectual property

21   that BlueRadios could put into this project.  The first would be

22   new ideas it had, things that it developed during the project,

23   signified here by a light bulb, like a new idea.  And second,

24   things that it already had previously invented or developed and

25   were reusing in this project.  We've got that represented here

Kevin P. Carlin, RMR, CRR

16-cv-2052-JLK    Jury Trial    03-21-2024

1    by the recycle symbol.

2         You will hear that Kopin going into the negotiations

3    wanted to make sure that it had broad rights in both types of

4    intellectual property, and so you will hear that Kopin went in

5    wanting to get joint ownership in any BlueRadios developments

6    that were created during the project that it was paying for,

7    35,000 a month, without having to pay anything further.  You

8    will hear they went in wanting a broad and exclusive license --

9    exclusive means just for them -- to any BlueRadios intellectual

10   property that was reused, recycled.

11        And you will hear that they wanted the exclusive right

12   to control if, when, and how patents were pursued with regard to

13   any of the Golden-i technology.  We can see how the negotiations

14   went by looking at the contract itself, section seven, the

15   intellectual property ownership provision.  You will see there

16   the exact words that the parties agreed to.

17        Members of the jury, words matter.  They tell you

18   exactly what you're entering into, and that's fair.  So, for any

19   new developments that BlueRadios has made while working on the

20   project, you will see that Kopin negotiated that any of

21   intellectual property rights developed by BlueRadios in the

22   course of this development contract will be owned jointly with

23   no obligation of financial accounting to the other party.

24        Now, we heard Mr. Gibson say a bunch of times, under

25   the contract, these figures are in patents, so they're jointly

16-cv-2052-JLK    Jury Trial    03-21-2024

1   owned.  Members of the jury, you won't find that -- those words

2   in this contract.  This contract is clear that it is

3   intellectual property rights developed by BlueRadios that will

4   be jointly owned by the parties with no obligation of financial

5   accounting.  Kopin is not in there.  This is not a two-way

6   street.  They negotiated a one-way street.

7           And so you will see here that BlueRadios agreed that

8   the parties would share ownership of the new developments that

9   it made, and that each party could then use them without paying

10  the other anything.  That's what the contract says.

11          Now, for the IP that was reused, you will see that they

12  got themselves that license.  They got an exclusive

13  royalty-bearing license to any solely-owned BlueRadios

14  intellectual property rights incorporated into the project

15  deliverables.  Those recycled rights put into the project

16  deliverables, and that gave them the right to use, sublicense,

17  make, and have made and sell products for all microdisplay

18  applications.  Under the license, they had permission.

19          You will see also by the way that that's an exclusive

20  license, meaning that's just Kopin.  No one else can do this.

21  That's what's in the contract.

22          You will also see that for patents, we talked about

23  those, Kopin negotiated that it would have the sole right and

24  responsibility to decide whether or not to seek patent

25  protection with respect to any intellectual property rights that

Kevin P. Carlin, RMR, CRR

16-cv-2052-JLK    Jury Trial    03-21-2024

1    are developed as part of or incorporated into the project

2    deliverables.  So, that's both of the types of IP covered.  It's

3    solely up to Kopin, complete discretion whether, if, when, and

4    how to seek any patents on the Golden-i project.  And they

5    agreed that they would do this at their expense.  Now, that

6    means all the lawyer fees, all the filing fees, they agreed to

7    pay 100 percent of.  That was part of the deal.

8          So, the evidence will show that Kopin was able to

9    negotiate for those broad ownership rights in BlueRadios' new

10   developments without any further payment in paragraph two, that

11   they were able to successfully negotiate that broad and

12   exclusive license in any of the reused IP in paragraph four, and

13   they were able to get that exclusive right to control all patent

14   prosecution in paragraph three.

15         So, moving on to key to the case number two.  The

16   evidence will show that BlueRadios got what it bargained for,

17   and it was paid in full.  Now, this was pretty simple.  Members

18   of the jury, the evidence will show that between June of 2007

19   and September of 2008, Kopin paid every one of those

20   35,000-dollar-a-month payments, and all those material expenses.

21   They paid a total of over half a million dollars to BlueRadios

22   for this PCB development project.  Unfortunately, you will hear

23   that BlueRadios didn't live up to its side of the deal, because

24   the printed circuit board it finally delivered in January didn't

25   work.  It was a failure.

16-cv-2052-JLK    Jury Trial    03-21-2024

1          Now, there was some discussion about whether or not

2     that was true, but you're going to hear evidence that the

3     printed circuit board that they turned over in January had a

4     processor in it that got so hot that within a few minutes you

5     couldn't touch it, and it burned through batteries so quickly.

6     Clearly, that's not a working product.  We will talk about that

7     a little bit more in a second.  And of course because this thing

8     got too hot to touch, and no products were made, there could be

9     no royalties.  So, there were no royalties provided.

10          Now, we heard about that addendum; right?  And the

11     evidence will show that after this failure, BlueRadios wanted

12     another shot to try to make a printed circuit board that would

13     work so maybe they could get some royalties on a future product.

14     And you will hear that the parties negotiated, and when they

15     wanted to change the words of the agreement, they did so

16     formally in writing in an agreement called the addendum, because

17     that's how you change the words of a contract.

18          You will see in this addendum that BlueRadios agreed to

19     a new royalty.  Now, we're going to get into some of the other

20     details of this.  This, by the way, is Exhibit 56.  This is the

21     addendum.  We're going to get into some of the other details of

22     the addendum in a bit, but for this key number two that they got

23     paid, let's look at the royalty provision here.  You will see

24     that they negotiated that they would get two dollars per

25     Golden-i unit on certain products made with a certain processor,

16-cv-2052-JLK     Jury Trial     03-21-2024

1   and upon acceptance by Kopin of ten fully-functional, stable,

2   and consistently-operating processors.

3           Members of the jury, you heard Mr. Gibson say

4   "fully-functional" about six times, pointing to this standard.

5   You can't leave words out of a contract.  The standard is as

6   negotiated specifically by the parties, fully-functional,

7   stable, and consistently-operating, and the evidence will show

8   that the PCBs that were delivered were anything but.  As a

9   result, they never qualified for those royalties, and there were

10  no royalties owed.

11          So, reviewing what BlueRadios was due under these

12  contracts, they got their half a million dollars or more,

13  because they negotiated for that.  But there were no royalties

14  on that gen one that got too hot, and there were no royalties on

15  those PCBs that were not fully-functional, stable,

16  consistently-operating.  So, the money they got, the evidence

17  will show, was all they were entitled to.  They were paid in

18  full.

19          Throughout the trial, members of the jury, no matter

20  what, always remember Exhibit 53, Exhibit 56, the contracts.

21  And in particular, always remember section seven, those IP

22  ownership rights.  The evidence will show that BlueRadios failed

23  to provide a sufficient PCB design, and therefore, they

24  underperformed.  The evidence will show that BlueRadios was

25  still paid in full.  They got over half a million dollars.  And

255

16-cv-2052-JLK    Jury Trial    03-21-2024

1    note, there will be no dispute that BlueRadios got to keep all

2    of that money, because that's what they negotiated for.  A deal

3    is a deal.

4         But instead of honoring these carefully-crafted and

5    heavily-negotiated contracts, especially the provision around

6    IP, you will see BlueRadios trying to rewrite it, rip it up, or

7    just retreat from it entirely.  But for BlueRadios, just like

8    for Kopin, a deal is a deal.

9         Now, before we move on -- I'm going to get a glass of

10   water.  Before we move on to key to the case number three, I

11   think a little bit more background about Kopin would be helpful

12   to frame the facts.  So, it's now my honor to tell you the story

13   of Kopin Corporation.

14        And to tell the story of Kopin Corporation, you have to

15   start with the story of Mr. John Fan, Dr. John Fan.  Who is

16   Dr. Fan?  Dr. Fan is a first-generation immigrant to the United

17   States.  He and his family fled Communism in China by way of

18   Hong Kong.  He eventually came to the U.S., entered his studies,

19   and got all the way up to Harvard University, where he got a PhD

20   in applied physics.  Not too shabby.

21        And after that, you will hear that he went to work at

22   the Massachusetts Institute of Technology.  And not just

23   anywhere there, but you will hear that he went to the Lincoln

24   Laboratory.  Members of the jury, this is a special laboratory

25   you will hear that is dedicated to trying to research and solve

16-cv-2052-JLK    Jury Trial    03-21-2024

1    the United States' most pressing national security concerns.

2    And you will hear that while working on solar panels for missile

3    defense, Dr. Fan came up with some technology that was so

4    exciting and so innovative that he was able to form an entire

5    company around it.

6        That's Kopin.  Headquartered in Westborough,

7    Massachusetts, Kopin employs 150 folks that work on

8    microdisplays and optics used around the world.

9        Now, Dr. Fan will tell you that it all started in 1985,

10    there in Massachusetts.  And that by 1990, Kopin was approached

11    by DARPA.  Members of the jury, this is the U.S.'s, like,

12    advanced military research arm, cutting-edge stuff.  And you

13    will hear that DARPA asked Kopin if they could use this

14    innovative technology from Dr. Fan to try to make tiny little

15    screens that could maybe be used by soldiers in the field to

16    further things like that.

17        And you will hear that Kopin was successful in using

18    that technology, and they made the microdisplay.  You will hear

19    that once they made that microdisplay, they were able to begin

20    selling it successfully into things like camcorders and digital

21    cameras around the world.

22        But you will hear that Dr. Fan and his team had another

23    idea of how to use these tiny screens.  You will hear that they

24    were -- they had the idea of using them in a head-mounted

25    display that was wirelessly connected to the world around it.

16-cv-2052-JLK    Jury Trial    03-21-2024

1   The evidence will show that way back in the 1990s, the thing

2   that you heard Mr. Gibson say Mr. Kramer came up with, Kopin

3   already was filing for and getting patents on a wireless

4   head-mounted display.

5            Now, one of the co-inventors, members of Dr. Fan's

6   team, was a fellow called Jeff Jacobsen.  You've already seen a

7   few emails from Jeff.  So, look.  Jeff was vice president of

8   business development from February 1990 and August of 1998, and

9   as you probably know business development, it's sales.  And Jeff

10  was -- you will hear he was a born salesman, a guy who could

11  sell sand in the desert.  But Jeff did not have a technical

12  degree.  He had a degree in business administration.  But you

13  see what Jeff lacked in technical training, he more than made up

14  for with raw enthusiasm and movie quotes and colorful emails to

15  match it.

16           And you will hear that with Jeff, with that enthusiasm,

17  he was always promising that the next big thing was just around

18  the corner.  Just wait a little bit longer, just go a little bit

19  further, until sometimes when it wasn't.  But at Kopin in the

20  1990s, they realized that technology was not ready for this

21  wireless head-mounted device.  It was too big, too heavy, too

22  slow.  So, they put those patents on the shelf, and they focused

23  on those microdisplays and optics.

24           And you heard about their business that they did in the

25  1990s and in the 2000s on.  Great business on the camcorders,

16-cv-2052-JLK    Jury Trial    03-21-2024

1   digital cameras, but you will hear that by 2004, Kopin had

2   gotten so good at its microdisplays that it was able to begin

3   selling optics and microdisplays, eyepieces that the evidence

4   will show were used by defense contractors to design and build a

5   thermal weapons site for the United States military to be used

6   by the United States Army.  They had truly become world class.

7           Now, around that same time, Jeff, as I mentioned -- you

8   saw in 1998 he left to pursue some other things, but he came

9   back and talked to Dr. Fan in 2006.  And he told Dr. Fan that he

10  thought technology was maybe ready for the wireless head-mounted

11  device.  It had gotten smaller and faster.  IPhones weren't out

12  yet, but Blackberries were.  That whole area of technology was

13  opening up.  And he convinced Dr. Fan that he had some ideas

14  about how to use this new technology to make this wireless

15  head-mounted device a reality.

16          You will hear that Dr. Fan hired him back and gave him

17  a special job just for him called senior adviser to the CEO.

18  Reported directly to Dr. Fan.  And you will hear that once he

19  got that role, he made it his mission to do one thing: to make

20  this wireless head-mounted display a reality.  A reality that he

21  named the Golden-i.

22          But you will hear that before Mr. Jacobsen went out

23  looking for components to be used in the Golden-i, he followed

24  company policy, and he met with Kopin's patent attorneys.

25  That's that Hamilton Brooks Smith Reynolds firm that you sort of

16-cv-2052-JLK    Jury Trial    03-21-2024

1    heard about with Mr. Gibson.  You will hear that he met with the

2    attorneys, and he disclosed all the ideas he had about this new

3    development so that they could be written down and protected

4    before he went out publicly to talk to anyone.

5         Because you see, Jeff knew that in addition to needing

6    the microdisplay and the optics that he worked on, he would have

7    to go out and look for providers of a whole score of technology.

8    He would need a processor, the brain of the whole thing, memory,

9    battery, microphone, wireless transmission, voice recognition,

10   noise cancellation.  All things he already knew were needed, and

11   he went out and looked for them.

12        The evidence will show that just for that first couple

13   of models, the gen one and gen two, Kopin entered contracts with

14   over a dozen hardware and software providers for all of these

15   various components.  So, members of the jury, when you heard

16   that the guts of it, everything inside the case came from

17   BlueRadios, the evidence will show that's just clearly not the

18   case.

19        Now, one of the folks that they -- that Jeff did

20   contact in 2007, because we're here today, is BlueRadios.  And

21   as Mr. Gibson said, BlueRadios was working on trying to modify

22   or hack or use Bluetooth to be able to transmit video.  This is

23   neat because at the same time, Wi-Fi like what we all stream

24   video on today -- thank you, Netflix -- wasn't ready, and that

25   Bluetooth was being used mostly for audio, like phones.  So,

Kevin P. Carlin, RMR, CRR

260

16-cv-2052-JLK    Jury Trial    03-21-2024

1   this was neat that they were able to transmit video over

2   Bluetooth.

3           And you heard that once Jeff heard about the video

4   Bluetooth, he went running back to Kopin, and he said, this is

5   exciting.  We should do business with these guys.  But

6   Mr. Gibson said that this all happened, this conversation

7   happened months earlier in 2006.  He said, though, that Jeff was

8   so excited that he ran back and told Kopin all about it, and

9   then you will note there was apparently a three-month gap

10  between when he said Mr. Kramer gave Jeff all those ideas about

11  taking that dumb idea and making it up on the head and wireless,

12  all the ideas apparently he said he gave to Mr. Jacobsen, well,

13  he said that conversation happened in 2006.

14          But the evidence will show there is not a single piece

15  of evidence that backs that up.  I will show you evidence,

16  emails, when the NDA was signed, and testimony including from

17  BlueRadios employees that that conversation happened in 2007.

18  And again, when you think about the idea that he was so excited

19  that he ran back, why would he then wait three months, members

20  of the jury?  Ask yourself that question.  To have the first

21  email with them in February or sign that NDA in February?

22          And you will see why, again, this isn't some innocent

23  error of memory, members of the jury.  Because those patent

24  applications that Jeff wrote and sat down with the patent

25  attorneys before he went out, well, that was 2006 and early

16-cv-2052-JLK    Jury Trial    03-21-2024

1    2007.  By trying to put themselves back in time, BlueRadios is

2    trying to put themselves before that happened.  It's no

3    accident.

4          Now, members of the jury, it is true that eventually an

5    NDA was signed.  The parties began to discuss the possibility of

6    doing business together, and that what you will see -- and I

7    will show you this, we will walk through them together -- is a

8    ton -- there are emails, there are draft agreements going back

9    and forth, carefully being negotiated, parties adding words,

10   taking words away, fighting for what was important to them in

11   drafting this contract.

12         And we will look at the first draft that BlueRadios

13   sent, and you will see it's very different from what the parties

14   actually ended up agreeing to and signing.  Members of the jury,

15   that's going to be important, because obviously words matter.

16   You will hear that that contract was finally signed in June of

17   2007.

18         And you will see that in that contract, BlueRadios

19   negotiated to be paid that 35,000-per-month guarantee and to get

20   all those material costs paid to do something called NRE,

21   nonrecurring engineering, working on this printed circuit board

22   design for Kopin.  And they had promised they could do it right

23   away.  And that mattered to Kopin, because Kopin -- this was in

24   May of -- May, June of 2007 -- wanted to be able to show off

25   this new device at CES in January of 2008.

16-cv-2052-JLK    Jury Trial    03-21-2024

1    Okay.  Now, what is CES?  If you haven't heard of it,

2    it's called the Consumer Electronics Show.  It happens in Las

3    Vegas every year in January, and it is the biggest Consumer

4    Electronics Show in the world.  You will hear that it's where

5    companies go, 10,000 companies go there.  100,000 people attend

6    to show off and launch their latest, greatest technology.  This

7    is the premier launchpad for new technology.

8    And you will hear that it was so important to Kopin

9    that they be able to launch at CES, that you'll see they put it

10    right in the contract.  But again, the evidence will show that

11    that PCB that they did deliver, it did come in January, but it

12    was not a working product.

13    You will hear that this product, well, the thing is

14    this printed circuit board, and it's a little one like

15    Mr. Gibson showed you.  It had a processor on it, like a brain,

16    the main processor, and it was called the Da Vinci.  BlueRadios

17    selected the Da Vinci and put it on this processor.  The problem

18    was this Da Vinci thing got so hot within a few minutes, as I

19    mentioned, that you couldn't touch it, which is not great for

20    something next to your head, and that it ran out of batteries

21    right away.

22    And you will hear that the parties all agreed in the

23    wake of this failure that they should change the processor.

24    That they would need to abandon that Da Vinci processor that was

25    meant for a bigger product, and move to something else.  You

Kevin P. Carlin, RMR, CRR

16-cv-2052-JLK    Jury Trial    03-21-2024

1    will hear they agreed in the spring of 2008 to move to something

2    called the OMAP processor.  This was a different brain for the

3    printed circuit board that comes from Texas Instruments.

4        You heard that the only problem was that BlueRadios had

5    picked the Da Vinci chip, you will hear, because they had

6    experience with it.  They had used it.  They designed things

7    with it.  They built things with it.  They had no experience

8    with the OMAP, so they would need help.

9        So, you will see that in March of 2008, Kopin

10   introduced BlueRadios to Mistral.  Yes, the Mistral.  The folks

11   that basically wrote the book on the OMAP.  You will see in this

12   email Mr. Jacobsen is introducing Mr. Tucker from BlueRadios to

13   Mistral for the very first time, saying, please meet Kopin's

14   head hardware engineer, lead hardware engineer, Will Tucker.

15       And you will see that in this email thread, once

16   Mr. Tucker is introduced, he begins to share some concerns with

17   Mistral.  He shares with them that he's worried that their

18   current PCB designer, you will hear about Mr. Foss.  They had

19   concerns that he might be too slow, and not able to produce a

20   production-quality board.  You see, he straight-up asked him.

21   I'm looking to see if Mistral may be able to fill in where we,

22   BlueRadios, are lacking.

23       And you will see Mistral's response.  Sure.  Mistral

24   will leverage 35XX experience, that's the OMAP, to fill in your

25   requirements.  And you did see on Mr. Gibson's timeline that in

16-cv-2052-JLK    Jury Trial    03-21-2024

1    June, that's exactly what happened.  The parties entered into an

2    agreement -- the parties being Mistral and BlueRadios -- under

3    which Mistral was going to lay out and build the PCB for this

4    second attempt by BlueRadios.

5          But unfortunately, even with this forward progress, and

6    the OMAP, a year into this project, a year into this contract,

7    hundreds of thousands of dollars in, Kopin had very little to

8    show for it, which resulted, in June of 2008, in a letter from

9    Dr. Fan, the founder and CEO, still CEO at that time, to

10   BlueRadios, in which he cancels the contract.

11         You will see in this June 25th, 2008, letter, he

12   says -- he expresses how disappointed he is in the state of the

13   development of the Golden-i, and he notes that even by this

14   early point, they had spent $2 million on chasing Golden-i.

15   Half a million we know is just to BlueRadios.  The other million

16   and a half were those other folks we talked about.  And that

17   they still didn't have any kind of a product that was optimal

18   for the market.  They were still searching for the right

19   product.

20         He tells BlueRadios that they would continue the

21   contract, the current 35,000-dollar-a-month guaranteed for three

22   more months to let them try to continue their work with the

23   OMAP, the new processor.  And then they were going to turn off

24   the money.  It would be canceled on September 30th, 2008.

25         But the evidence will show that Jeff and BlueRadios

16-cv-2052-JLK    Jury Trial    03-21-2024

1    were able to convince Kopin to give BlueRadios one more shot at

2    building a printed circuit board that actually worked.  And

3    that's where we get the addendum.  Now, you will hear that just

4    like with the original contract, we're going to walk through the

5    first draft of the addendum and the second and the third, the

6    back and forth the parties engaged in.  Very able to negotiate

7    for themselves.  Again, negotiating for what was most important

8    to them, until they finally entered this addendum in October of

9    2008.

10          Now, again, you will see that this time, instead of

11    BlueRadios getting paid whether it failed or not, this time the

12    addendum required BlueRadios to provide ten fully-functional,

13    stable, and consistently-operating PCBs using that new OMAP

14    processor.  That's what the parties negotiated would be the

15    standard they would have to hit to qualify for those royalties.

16    And you will see that Kopin specifically negotiated and had

17    words put in that they would have to accept those ten PCBs as

18    being fully-functional, stable, and consistently-operating

19    before they would qualify for those royalties.

20          Now, the evidence will show that there were more PCBs

21    delivered in March of 2009, but the evidence will show that they

22    were never fully-functional, stable, or consistently-operating.

23    You heard a lot of Jeff's hand-waving emails about how great it

24    was for demonstrations.  Members of the jury, you're going to

25    hear from Mr. Jacobsen's testimony, his videotaped testimony,

Kevin P. Carlin, RMR, CRR

16-cv-2052-JLK    Jury Trial    03-21-2024

1    and you're going to hear from folks who were also participating

2    in those demos, that a demonstration where you can get something

3    to work quickly to show someone kind of proof of concept, five

4    minutes, that's great for a demo.  That is not fully-functional,

5    and it's certainly not stable, and it's certainly not

6    consistently-operating.

7         Instead you will hear that when they tried to do this,

8    these products would be on one day, off the other.  They had

9    functionality problems, stability problems, and that they were

10   never up to that standard.  Now, Mr. Kramer I'm sure will

11   disagree, and he will get on the stand and disagree.  And it's

12   true the parties did disagree about whether those PCBs met that

13   fully-functional, stable, consistently-operating standard, but

14   it's not disputed that Kopin never accepted those PCBs as living

15   up to that standard.

16        And the parties kind of reached a stalemate in mid

17   2009, and they stopped working together.  Now, you will hear

18   that this left -- this left Kopin in a tough spot, because they

19   wanted to continue with the Golden-i.  They had spent half a

20   million dollars.  In fact, there was other millions of dollars

21   on the project on two PCB designs from BlueRadios that didn't

22   work.  They were going to need to find a new provider for their

23   PCB, for the chip that goes into the head-mounted device.

24        And you will hear, no surprise, that Kopin turned to

25   the OMAP experts at Mistral.  And the evidence will show that

16-cv-2052-JLK    Jury Trial    03-21-2024

1    Kopin went out of its way to avoid any possible issues with

2    BlueRadios.  In fact, far from being some sort of secret plot

3    against BlueRadios, as you heard, even though they had those

4    broad rights in the intellectual property, they did go out of

5    their way by making it clear to Mistral, you will see that they

6    wanted an entirely new PCB design and layout from Mistral.

7            And you will hear that Mistral wrote back that they

8    would not be using anything from BlueRadios, and that they would

9    do a new PCB design from the ground up.  And the evidence will

10   show they did.

11           Now, members of the jury, you heard something about a

12   board being shipped.  The evidence will show there's a whole

13   story there.  We will get into that during the testimony.  But

14   what you will see is evidence of multiple emails going back and

15   forth confirming repeatedly that Kopin wanted a brand new

16   design, and nothing to do with any BlueRadios technology, and

17   that Mistral undertook to them that that's exactly what they

18   would do.

19           Now, critically, you remember we heard about that

20   special BlueVideo, stuff from BlueRadios, their cool technology.

21   Well, when they built those two PCBs, not surprisingly, they put

22   that technology in their two printed circuit boards, their chip

23   set for this video over Bluetooth.  But critically, when Mistral

24   built its PCB in 2009, by then, Wi-Fi was ready.  So, they used

25   standard Wi-Fi, again, like we all stream video today, instead

16-cv-2052-JLK    Jury Trial    03-21-2024

1    of any kind of BlueVideo technology from BlueRadios.  BlueRadios

2    was truly at that point out of the picture.

3         Now, while you will hear that the Mistral PCB with the

4    standard Wi-Fi, it worked better -- it functioned better, but

5    financially, woof, you will hear it was a disaster.  You will

6    hear that Kopin was only able to sell a couple hundred of these

7    things, and you will hear that the next version, it was a bomb

8    too.

9         Even though they partnered with Motorola, big name,

10   Motorola was able to sell 53, five-three, total.  Same problem

11   when they partnered with Fujitsu.  Another big name.  They were

12   able to sell just about 300 total.  Now, you will hear from the

13   chief financial officer for Kopin, Mr. Sneider, and he will tell

14   you that by 2015, Kopin had sunk a ridiculous, over $20 million

15   into chasing this Golden-i.  And he will tell you that they're

16   still millions of dollars in the hole on the Golden-i project

17   even today.

18        Well, finally, out of patience for this kind of loss,

19   in 2015, Kopin shut down the Golden-i project.  You will hear

20   from Mr. Sneider, the CFO, that what helped keep the company

21   going then and now is its core strength, its preexisting core

22   strength, way before BlueRadios.  Its microdisplays.  Its

23   optics.  First in that -- in the camcorders, digital cameras,

24   and then and now for over a decade as a proud supplier of

25   eyepieces that are used, the evidence will show, by defense

16-cv-2052-JLK    Jury Trial    03-21-2024

1    contractors who are designing and building items like that

2    weapon sight and helmets and other things that are used every

3    day by our men and women in uniform.

4         So, now that we've covered a little bit of the back

5    story, let me introduce you to some of the folks that are going

6    to help me put the evidence in to tell you that story.  First,

7    we're going to hear from Dr. John Fan.  Dr. Fan himself will be

8    here.  He is now retired after decades running the company, well

9    deserved.  But he will tell you about his time at the company,

10   the development in the company, its innovations, the Golden-i

11   project, et cetera.

12        Next we're going to hear from someone I mentioned

13   earlier, Mr. Sneider.  He's the company's chief financial

14   officer.  He will tell you about their business, their optics

15   business, display business, and of course as the CFO, their

16   finances.

17        We're next going to hear from Dr. Hong Choi.  He's the

18   chief technology officer.  Well, he was.  After decades, he is

19   recently retired.  Again, well deserved.  And he will tell you

20   about Kopin's patents and how Kopin relied on its patent counsel

21   to get those patents.

22        We will then hear from Dr. Chris Parkinson.  I'm sure

23   you're excited to hear from him after what we heard from

24   Mr. Gibson.  Now, Dr. Chris Parkinson was a computer programmer.

25   The evidence will show that in 2007, he signed an agreement with

Kevin P. Carlin, RMR, CRR

16-cv-2052-JLK    Jury Trial    03-21-2024

1    Kopin.  The evidence will show in that agreement, he agreed that

2    all of his intellectual property working for Kopin would go to

3    Kopin.  The evidence will show that was shipped to BlueRadios,

4    and they knew that before this supposed contract.

5            Now, the evidence will show that this employment

6    agreement and this invention disclosure agreement that they're

7    saying is not illusory, well, they didn't tell you that this

8    agreement said on its face that he was to be paid $50,000 a

9    year.  The evidence will show that he wasn't paid a penny by

10   BlueRadios.  I think I saw some of you maybe look a little

11   confused when Mr. Gibson said Kopin was going to pay him the

12   $50,000.

13           First, members of the jury, you will see there's not a

14   shred of evidence supporting that claim, that Mr. Kramer signed

15   his name to a contract binding his company to pay someone almost

16   a thousand dollars a week, but he will have you believe that he

17   did that with just sort of a wink and a nod from Mr. Jacobsen.

18   You guys pay him.  There's no evidence of that.  There's no

19   writing of that.  There's no email about that.

20           And Dr. Parkinson will tell you that he was getting a

21   set amount of money from Kopin for his work on the project, and

22   that that money was the same before, during, and after the

23   employment.  And you will hear that when he quit, quote/unquote,

24   he called it a masquerade.  You will hear from Dr. Parkinson,

25   and he will tell you all about it.

16-cv-2052-JLK    Jury Trial    03-21-2024

1    We're next going to hear from Mr. Steven Pombo.  He's

2    an industrial designer.  He's also a former Kopin employee.  And

3    he will tell you about his life as an industrial designer and

4    about his work on -- as you can see, he's wearing one, the form

5    factor.  He was the guy that built the case, that built the

6    structure.  He will tell you about his work building structures

7    like that for Kopin before and during Golden-i.

8    And finally, we're going to hear from this guy,

9    Mr. Murray.  He's our current CEO after having taken over for

10    Dr. Fan.  He's going to tell you about Kopin's present and

11    Kopin's future.

12    We're also going to hear from three expert witnesses.

13    You will hear from Dr. Phinney.  He's going to be our technical

14    expert.  You will hear from Mr. Donner.  He will be our patent

15    expert.  And you will hear from Mr. Schoettelkotte.  He's going

16    to be our damages expert.

17    Okay.  So, I think we were just finishing off the key

18    to the case number two before we jumped into that background.

19    So, now let's move on to key to the case number three.  The

20    evidence will show that BlueRadios waited way too long to bring

21    this lawsuit, and that you the jury should find that they have

22    violated the statute of limitations.

23    Now, members of the jury, that was one of those

24    instructions you heard from His Honor today, all about statute

25    of limitations.  It's something that's there because we know

16-cv-2052-JLK    Jury Trial    03-21-2024

1    memories fade, people move on, lose touch.  Witnesses move on,

2    lose touch.  Evidence gets misplaced or tossed.  And after a

3    number of years, it's not fair to make someone try to defend a

4    lawsuit, and that's what the statute of limitations is all

5    about.

6         And as you heard, it sets a deadline, an amount of time

7    during which a legal action must be brought after which you

8    cannot bring it, as His Honor said.  And it does that by setting

9    a deadline that starts running.  And it starts running, as it

10   says here, when the plaintiff's claim accrues.  What that means

11   is once the plaintiff knows the facts that it believes gives it

12   a cause of action, a claim against the defendant here,

13   BlueRadios and Kopin, well, the clock starts.

14        You're going to hear that BlueRadios had a lot of

15   disputes around the Golden-i around 2010.  Here is one example.

16   You will hear evidence that BlueRadios had set up Google alerts

17   to keep track of what was happening in Golden-i, and that one of

18   the things it got in February was a press release from Mistral.

19   You know, the guys who were supposed to be keeping everything

20   quiet?  Mistral put out a press release saying we're working

21   with Kopin on the Golden-i.

22        And he got that press release, and he called Mistral.

23   And the evidence will show he demanded to know what Mistral was

24   doing with Kopin, and threatened to seek an immediate injunction

25   against them to take them right to court.  You will hear that

Kevin P. Carlin, RMR, CRR

16-cv-2052-JLK    Jury Trial    03-21-2024

1    Mistral's communications back to BlueRadios that it would not

2    use any BlueRadios materials was not enough to satisfy

3    Mr. Kramer, because the next month in March, Mr. Kramer again

4    demanded a call with management and again threatened legal

5    action, even calling their silence an admission of guilt.

6         But the evidence will show that even with all that,

7    BlueRadios didn't sue Mistral, Kopin.  In fact, you're not going

8    to see Mistral at all.  They never sue them ever.  And around

9    that same time in March, you will see that Mr. Kramer wrote a

10   letter to Kopin, and in it he said, hey, it's been about a year

11   since I gave you those PCBs.  Where are my royalties?  When will

12   those royalties be disbursed?

13        Now, the evidence will show that Kopin did not accept

14   the boards, because they were not fully-functional, stable, or

15   consistently-operating.  There's no dispute that Kopin didn't

16   accept them.  And there will be no dispute that Mr. Kramer and

17   BlueRadios certainly thought they should have, meaning at that

18   point, there was a clear dispute between the parties about the

19   contract, about royalties, about further payments under the

20   contract.

21        In the jury instructions, you will hear that the

22   statute of limitations on claims of this nature, claims like the

23   ones in the letter, are three years.  That's why you heard about

24   the August 13th, 2016, deadline.  Because, members of the jury,

25   there was no lawsuit filed in 2010 or '11 or '12.  The lawsuit

274

16-cv-2052-JLK    Jury Trial    03-21-2024

1    that brings us all here today wasn't filed until August of 2016,

2    over three years too late under the statute of limitations.  You

3    the jury will have to look at that evidence and make a decision

4    whether you believe the statute of limitations applies, and

5    BlueRadios waited too long to bring its lawsuit.

6           Let's move to key number four, that the evidence will

7    show Kopin honored the contract and did not breach.  Now, if

8    we're going to talk about breach of contract, let's go ahead and

9    look at the jury instruction on breach of contract.  That was

10   3.1, you heard today.  And in that you heard that basically it's

11   pretty simple.  A breach is when a party fails to perform a

12   contractual promise, the obligations the parties wrote down with

13   those words that they negotiated, put in the contract.  The

14   specific promises they make in the contract.  No more, no less.

15          And breach occurs when a party fails to substantially

16   perform those obligations or promises.  So, if we're going to

17   look at whether the obligations and promises were met, we should

18   look at the contracts.  Members of the jury, 53 and 56.  The

19   2007 contract, the 2008 addendum.  Those are going to be your

20   home base.  That will show you exactly what the parties agreed

21   to in this case.

22          So, the evidence will show that Kopin's obligations

23   were, you know, pay BlueRadios the 35,000 a month for at least a

24   year.  Pay all those material costs.  And again, they were

25   paying things like that for all these other companies at the

16-cv-2052-JLK    Jury Trial    03-21-2024

1    same time, running up millions of dollars.  Pay royalties to

2    BlueRadios if they were triggered by BlueRadios hitting the

3    milestones and things they had to to earn them.  And pay

4    100 percent of the costs for any Golden-i patents that they

5    pursued.

6            And how about BlueRadios?  The evidence will show they

7    have basically three main obligations.  In the first contract it

8    was to deliver those PCBs that worked for 2008 CES.  In the

9    second contract you will see that it was to deliver

10   fully-functional, stable, and consistently-operating -- not just

11   fully-functional.  Words matter.  Printed circuit boards.  And

12   to basically just follow the intellectual property ownership

13   agreement they made about how intellectual property was going to

14   be dealt with and shared by the parties.

15           The evidence will show that BlueRadios did not honor

16   that first obligation, because those PCBs were too hot to

17   handle.  The evidence will show that they did not deliver those

18   fully-functional, stable, or consistently-operating PCBs.  And

19   as for following the IP ownership provision, that section seven,

20   well, the evidence will show if they had done that, none of us

21   would be here.

22           How about Kopin?  The evidence will show that Kopin did

23   pay all of those labor costs, that $35,000 a month for over a

24   year, that guaranteed minimum of 12 months.  The evidence will

25   show that they did pay all those material costs.  The evidence

16-cv-2052-JLK    Jury Trial    03-21-2024

1    will show that they did not pay royalties, because they were not

2    triggered, because under the words the parties agreed to, they

3    never earned royalties, they being BlueRadios.  And the evidence

4    will show that they did go ahead and pay 100 percent of the

5    costs for any of those patents that were pursued around the

6    Golden-i technology.  Which is why we believe the evidence will

7    show that Kopin honored the contract and did not breach it.

8         Let's move to our fifth and final key to the case.

9    Kopin did not take BlueRadios patents or trade secrets.  Let's

10   start with patents.  Now, you heard this tale about how there

11   was this secret coverup, this scheme to take patents that

12   BlueRadios employees should be on, and secretly take them off.

13        We will test that theory with the evidence, because

14   you're going to hear that a patent is not like a title to a car.

15   You can't put a name on it or take a name off of it and it works

16   just fine.  The evidence and the jury instructions will tell you

17   that there are very specific rules about who and who only can be

18   named as an inventor on a patent.

19        Let's go right to that instruction now.  That's patent

20   inventorship 3.1.  And there you're going to see that only the

21   actual inventors may be named on the patent, and that a person

22   must contribute to the conception of at least one of the claims

23   of the patent to be an inventor.

24        Members of the jury, the claims.  That's going to be

25   critical, because you're going to see that patent -- they have

16-cv-2052-JLK    Jury Trial    03-21-2024

1    the same parts, the same main parts.  They all have a front

2    page.  It's got like the name of the inventors, the date, the

3    number, the title, but behind that is the specification.  That's

4    where they describe the invention, what other people have tried,

5    ways to try to solve the problem.

6         And they can put all kinds of figures, pictures, and

7    words in the specification, but the evidence and that jury

8    instruction will show that if they don't contribute to one of

9    the claims, you can put all the pictures in the world in the

10   specification, and you are not an inventor.  You have to have

11   contributed to one of these guys, the claims.

12        They're on the back page of the patent.  That's the

13   last part of the patent.  And they all say, what is claimed is,

14   and they then provide a very detailed description, these

15   different things called elements, element by element of exactly

16   what, down to these words -- again, words matter -- what this

17   particular patent is claiming is its invention.  These are what

18   you own when you own a patent.  This is the metes and bounds,

19   the boundary of what the patent can be used to prevent, your

20   monopoly you get over your idea.  This is where you look to find

21   it.  Nowhere else.  And again, bottom line, the instruction says

22   if you want to be on the front, you gotta be on the back.  You

23   gotta contribute to one of the things on the back.

24        And that's critical, members of the jury, because

25   you're going to hear that Kopin had a pretty good patent program

16-cv-2052-JLK    Jury Trial    03-21-2024

1    and was familiar with this patent stuff, and they knew that if

2    you mess this up, if too many or too few folks are on the front

3    of the patent, it's not just a minor problem.  That patent is

4    deemed invalid.  That means you can't enforce it against anyone.

5    That means your investment is completely wasted.  And you will

6    hear that Kopin, they knew that, and they were the ones that put

7    100 percent of the costs of getting these things in the first

8    place.

9            So, you will hear that when they wanted to get patents,

10   they turned to and relied on their longterm patent counsel,

11   Hamilton Brooks Smith Reynolds, and they relied on them to get

12   these patents right, including listening to their advice about

13   which inventors should be added or removed from the front of the

14   patent, depending on how the claims turned out at the end.

15           There was a reference in the instruction about

16   examination.  You will hear that it's this long process where an

17   application goes in, and there's an examiner who basically tries

18   to figure out if there's anything worth patenting in there, and

19   it's a whole process back and forth.

20           And you will hear at the claims at the beginning,

21   they're rarely what comes out at the end if you're lucky enough

22   to get a patent.  And the evidence will show that the patent

23   application has zero promise that you're going to get a patent.

24   You might get nothing.  That's the risk you run.  But even if

25   you get something, the evidence will show these claims get

16-cv-2052-JLK    Jury Trial    03-21-2024

1  usually narrower, smaller.  In other words, they cover less.

2  And you will hear that Kopin relied on the advice of its patent

3  counsel to determine which folks should be on the front of the

4  patent depending on what the claims at the end of the patent

5  when it finally issued looked like.

6          You heard about people being taken off of patents, but

7  there was no focus on the fact that the document showed that the

8  patent attorneys were explaining to the patent office,

9  Mr. Tucker and Mr. Sample are associated with a claim at the

10  back that has been removed, and you will hear that it was

11  removed because it was obsolete.  And because of that they said

12  to the patent office, they should be removed as inventors.

13          Now, remember, members of the jury, they had an

14  obligation to get the patent law right.  They couldn't just

15  leave them on there because they wanted to.  If they were no

16  longer associated with the claim, they had to come off, or the

17  patent would be invalid.

18          So, you will hear that, again, Kopin just wanted to get

19  these right so they would be valid.  And you may ask, well, why

20  would they be fine with something being jointly owned instead of

21  a Kopin-owned patent?  Back to home base.  Back to section

22  seven, the rights that they negotiated for themselves around IP

23  ownership, where you heard that they got to own jointly any

24  BlueRadios development made during the Golden-i with no

25  obligation of financial accounting, meaning that a Kopin-only

16-cv-2052-JLK    Jury Trial    03-21-2024

1    patent, they would have owned and not have to pay anyone for,

2    and a jointly-owned patent with BlueRadios, because of this

3    contract, they would be able to own and not have to pay anyone

4    for.

5        They just wanted to get it right, because the evidence

6    will show they had a huge downside of losing the whole thing and

7    wasting a lot of money, but no real upside in leaving these

8    folks off.  You will hear they just wanted to get it right.

9        In fact, members of the jury, you're going to hear that

10   in 2018, in this case, Kopin and BlueRadios, believe it or not,

11   went hand-in-hand to His Honor and asked him to exercise his

12   power to have Mr. Tucker and Mr. Sample added to two issued

13   Kopin patents.  This was a joint request.  Why?  BlueRadios had

14   pointed out to Kopin that one of those claims at the end, it was

15   about a specific Bluetooth technology that the patent attorneys

16   had previously said was conceived by Tucker and Sample.

17   Mr. Tucker, Mr. Sample, those BlueRadios employees.  As soon as

18   that was pointed out to Kopin, they agreed.  We need to correct

19   inventorship so these patents will be valid.  They just wanted

20   to get it right.

21       Let's move on, now, to trade secrets.  Now, members of

22   the jury, trade secrets, there's basically two questions you the

23   jury should keep in mind.  First, can BlueRadios even show that

24   there were any actual trade secrets under the law that they had?

25   Can they meet that burden?  And second, whether that would even

16-cv-2052-JLK    Jury Trial    03-21-2024

1    matter, given your home base, the contract.  The evidence will

2    show that the answer to both questions will be no.

3           Let's look at that jury instruction on trade secrets,

4    because there you're going to see that there were those three

5    things you heard about that BlueRadios would have to prove to

6    you the jury, the burden of proof, for any of these things they

7    claim to be trade secrets.  They would have to show that this

8    information was not known generally, and that it wasn't

9    something you could figure out if you're like an engineer or

10   someone smart about this kind of technology.  And they had to

11   show that they were taking reasonable measures.  They were doing

12   things to keep it secret.  And they will have to show that that

13   secrecy created independent economic value for them.

14          Now, a trade secret, I think, we can all think of, one

15   that comes to mind is the formula for Coca-Cola.  It's secret.

16   They keep it that way.  And it's worth a whole lot because of

17   it.  But members of the jury, the trade secret is not a cola or

18   a soda.  The trade secret is not a cola made with these

19   ingredients.  That's all stuff that's known and ascertainable.

20   The trade secret is much smaller.  It's what happens with those

21   ingredients?  What are the specific ingredients?  Where do they

22   source them?  How do they process them?  What exact steps?  What

23   temperatures, for how long?  All the secret little things they

24   do behind closed doors that they keep secret to make that

25   Coca-Cola taste.  That is the trade secret.  Not this.

16-cv-2052-JLK    Jury Trial    03-21-2024

1       And the evidence will show when we hear from

2   Dr. Phinney that all of BlueRadios' alleged breakthroughs, they

3   were well-known technologies.  You heard they were taking credit

4   for things like head-tracking, voice recognition, noise

5   cancellation.  The evidence will show that stuff was invented

6   years before this conversation, and because of that, you the

7   jury, if you apply the evidence, we believe will find that the

8   information is not, you know, secret, and it was generally known

9   and ascertainable.  So, they wouldn't get past number one of

10  those three elements of trade secrets that you will apply.

11      But second, BlueRadios didn't keep their secrets

12  secret.  You just heard from Mr. Gibson.  He put this figure up.

13  And he said, this is a figure that they claim that they own.

14  We'll set that aside.  And they say this was secret.  We'll set

15  that aside.  Because what you saw is that they sent this figure

16  to Mr. Thibodeau in September of 2007.  You're going to hear

17  that Mr. Thibodeau was a patent attorney.  And when they talked

18  about these things being included in patent applications, what

19  they kind of left out was they were an enthusiastic and willing

20  participant in the effort to try to get patents, that they

21  provided this information with the intent that they be put in

22  patent applications.

23      Now, they can talk about what we thought we would be

24  named on, but members of the jury, you never know if a patent

25  application will be allowed in whole or in part.  But what you

16-cv-2052-JLK    Jury Trial    03-21-2024

1    do know is that when you put a patent application in, it becomes

2    published to the world, destroying any secrecy of anything in

3    it.

4            So, the evidence will show -- I mean, there's a reason

5    Coke doesn't have a patent on its secret formula.  The evidence

6    will show that they made the choice to try to get patents on

7    these supposed figures, and every one of those figures falls

8    into this category.  We will see that.  They chose to take the

9    chance to try to get patents on it.  Whether or not they were

10   going to be named, they chose to take the shot.  They put them

11   in the public record, and they destroyed their secrecy.  That

12   means that if you look at that second element of 3.12, they did

13   not keep their secrets secret.

14           And what about that second question?  Even if

15   BlueRadios is able to convince you that they contributed

16   something to Golden-i that could be deemed by -- that you

17   determine, you the jury find under the facts meets that

18   standard, all three elements, would it even matter?  Members of

19   the jury, the evidence will show no, and you know where I'm

20   going to take you.  Back to home base.  Back to section seven,

21   and those broad intellectual property rights that the parties

22   carefully negotiated word for word.

23           Remember, those rights gave Kopin that broad right in

24   all forms of intellectual property, including in trade secrets.

25   Meaning that even if there were trade secrets, Kopin had every

16-cv-2052-JLK    Jury Trial    03-21-2024

1    right to use them, because you don't need to steal something you

2    already have the right to use.

3            So, when BlueRadios tries to tell you that there was

4    this elaborate scheme to try to cover things up and pretend not

5    to use what they claim was so terrific but secretly to really

6    use it with these other folks, you the jury will have to ask

7    yourself if that makes any sense.  Is that credible?

8            And what incidentally was the price that the parties

9    negotiated for the use of this intellectual property in the

10   Golden-i?  What was that back and forth?  What were the words

11   they picked?  Well, the evidence will show that if it was a

12   joint development, we heard that they get to own those jointly.

13   Kopin gets to own those, BlueRadios' developments jointly with

14   no obligations of financial accounting without having to pay

15   anything more.  They were on the 35,000-dollar-a-month dime.

16   Kopin negotiated that that would be enough payment.

17           You heard Mr. Kramer say that his employees, when

18   they're being paid by him, all of their inventions belong to

19   him, belong to BlueRadios, because their salary is enough.

20   Well, so if it's a joint -- if it's jointly owned because it's a

21   BlueRadios new development, that was the light bulb, no

22   additional cost.  And if it was one of the recycled -- something

23   they already had and put in, well, those would be under that

24   royalty-bearing license, that exclusive royalty-bearing license.

25           And we can see what the parties negotiated for that.

16-cv-2052-JLK    Jury Trial    03-21-2024

1    Again, no financial accounting -- obligation of accounting for

2    that new stuff.  And under the addendum, they agreed to that

3    two-dollars-per-unit royalty on the OMAP-processor-based

4    Golden-is if they delivered those ten fully-functional, stable,

5    consistently-operating printed circuit boards, which the

6    evidence will show they did not.  Two dollars per unit was the

7    price they negotiated for that broad license -- that broad

8    exclusive license.

9        Now, having discussed the five keys to the case, let me

10   take a moment of your time on something that is kind of

11   important, which is the burden of proof, and remind you what you

12   heard today, that remember, BlueRadios brought Kopin into court.

13   They sued Kopin, dragged us into court, and that's why they have

14   the burden of proof to you the jury to prove -- to tip that

15   scale more likely than not all of their claims.  That's the

16   preponderance of the evidence, the elephant one.

17       And you will see, though, on the patent ownership

18   stuff, the evidence is that they must prove that to you by clear

19   and convincing evidence --

20       MR. GIBSON:  Objection, Your Honor.  Misstates the

21   law.  That's for inventorship, not ownership.

22       THE COURT:  Sustained.  Please rephrase.

23       MR. DALTON:  The standard for inventorship is that you

24   have to show by clear and convincing evidence that someone

25   contributed to one of those claims at the end.  They've gotta

16-cv-2052-JLK    Jury Trial    03-21-2024

1  show that to you by clear and convincing evidence, or they have

2  not met their burden.

3         Kopin witnesses are going to testify that this Golden-i

4  thing was not successful.  It wasn't what they hoped it would

5  be, that it was a financial disaster from the beginning.  You're

6  going to hear testimony from Mr. Sneider, the CFO, that Kopin

7  spent millions of dollars chasing this Golden-i.  You're going

8  to hear from Mr. Sneider that Kopin is still millions of dollars

9  in the hole over this Golden-i.

10         It's undisputed that BlueRadios made over half a

11  million dollars under carefully-negotiated contracts for two

12  failed printed circuit boards.  Members of the jury, the

13  evidence will show that's more than enough.

14         Let me leave you with those five keys to the case.  I

15  would invite you to write these down to help keep in mind after

16  I sit down and then Mr. Gibson puts on his case next, before we

17  get to put on ours.

18         Number one, Kopin was given those broad rights to the

19  relevant BlueRadios intellectual property.  Number two,

20  BlueRadios was paid in full for its work.  They got every penny

21  they earned under the contract, over half a million dollars.

22  Number three, BlueRadios waited years too long to file this

23  lawsuit in violation of the statute of limitations.  Number

24  four, Kopin honored the contract.  There was no breach of

25  contract.  And number five, Kopin didn't take BlueRadios'

16-cv-2052-JLK    Jury Trial    03-21-2024

1    patents or trade secrets.  It's common sense.  You don't steal

2    what you have the right to use.  You don't need to.

3              Thank you so much for your patience with me, for your

4    participation in this process.  As the judge and Mr. Gibson have

5    said, we truly appreciate it.  We cannot do this without you.

6    Thank you for your time.

7              THE COURT:  Thank you, Mr. Dalton.  Let's take a brief

8    recess for about ten minutes, and then come back, and we will

9    start with the testimony.

10         (Recess at 3:13 p.m., until 3:29 p.m.)

11              THE COURT:  Mr. Gibson, call your first witness,

12    please.

13              MR. GIBSON:  Your Honor, as our first witness,

14    BlueRadios will call Mark Kramer.

15              THE COURT:  Mr. Kramer, if you would come this way,

16    and -- yeah.  Set it down.  Right over here to the witness

17    stand.

18              THE WITNESS:  Oh.  I didn't want to cross the

19    protected area.

20              THE COURT:  It's okay.  You can do that.  And then if

21    you will face Ms. Abiakam, she will administer the oath.

22         (The Witness is Sworn)

23              THE COURTROOM DEPUTY:  Please be seated.  Please state

24    your full name for the record, and spell your last name.

25              THE WITNESS:  Mark John Kramer with a K.  K-R-A-M-E-R.

16-cv-2052-JLK    MARK KRAMER – Direct    03-21-2024

1        THE COURT:  Please go ahead.

2        MR. GIBSON:  And, Your Honor, we had agreed with the

3   parties to agree to a statement about the witness briefly.

4   Ms. Streisand was going to do that for each of our witnesses.

5        THE COURT:  That's fine.  Go ahead.

6        MS. STREISAND:  You are about to hear the live

7   testimony of Mark Kramer, the president, CEO, and one of the

8   founders of BlueRadios.  Mr. Kramer oversaw BlueRadios' work on

9   the Golden-i.

10       MR. GIBSON:  May I proceed, Your Honor?

11       THE COURT:  Yes, please.

12                    **DIRECT EXAMINATION**

13  BY MR. GIBSON

14  Q    Mr. Kramer, where did you grow up?

15  A    I grew up in my parents' farm in Minnesota.  We grew up in

16  a trailer with three brothers living in the same room.  It

17  wasn't a double wide trailer, either.

18  Q    And where do you live now?

19  A    Outside of Cripple Creek, Colorado.

20  Q    And what do you do for a living?

21  A    I manage the activities at BlueRadios, being the CEO.

22  Q    Now, are you married?

23  A    Yes, I am.

24  Q    And is that to Janet Kramer, who was sitting at counsel

25  table yesterday?

                    Kevin P. Carlin, RMR, CRR

16-cv-2052-JLK    MARK KRAMER - Direct    03-21-2024

1    A    That's correct.

2    Q    And how did you meet?

3    A    We met not too far from the courthouse here.  We met

4    through a dating service.  That was before the internet.  So,

5    you had to go through like a service and give your bios, and

6    they match you up.  That was her first time with the service.

7    My third -- I wasn't like too keen to do another one, and that

8    was her first one.  And out of that, she went back to her office

9    where she worked.  It was mostly men there, and she said, I'm

10   going to marry this guy.  And they laughed at her.  And they

11   said to her, you just met him.  I just know he's the one.  Well,

12   I didn't know this conversation occurred.  And then ten days

13   later, I proposed to her, and we got married four months later.

14   Q    And how long have you been married?

15   A    Twenty-five years.

16   Q    And are you involved in your community?

17   A    Yes, I am.

18   Q    And how so?

19   A    I lived in -- well, we started BlueRadios in Castle Rock,

20   Colorado, in the basement of my home.  So, Will Tucker was here,

21   and then Randy Jones.  We meet in the basement, and start -- we

22   were working on this.  Then I got involved with a community for

23   our HOA.  I think there were 600 homes in the HOA I was in.  I

24   was the president on the board for 13 years.  And then I was

25   involved with city council to get things changed.  We had some

16-cv-2052-JLK    MARK KRAMER - Direct    03-21-2024

1   development work near our HOA where they weren't following the

2   master plan.  So, I petitioned to city council to acquire the

3   land back from the developer because they weren't agreeing to

4   the terms they agreed to in the contract.  And that ended up

5   being a park.  It was Douglas County, and Castle Rock purchased

6   the land and made a park for all citizens of the area.

7   Q    Now, are you an engineer?

8   A    Yes, I am.

9   Q    And how did you get into engineering?

10  A    Well, when I was growing up on my farm, one of the

11  Christmas presents I got from my parents was AM/FM alarm clock.

12  It doesn't sound -- back then there wasn't, you know, a lot of

13  electronics, and the alarm clock itself was mechanical.  Well, I

14  went to plug it in, and the radio didn't work.  So, I go, great.

15  All the clock is good for is getting you up to do chores in the

16  morning.  So, my dad felt really bad, so he took it apart and

17  tried to work on it.  And he was frustrated, because that's not

18  his skill set.  I was too young to really do much to it.  And it

19  really hurt my feelings that my present doesn't even work, and

20  it was nothing he could return.  So, it made me pique my

21  interest in electronics, especially radio communications.  So,

22  when I went to college, and through high school, that's why I

23  specialized in electronics and got into wireless communications.

24  Q    Now, where did you go to college to obtain your engineering

25  degree?

16-cv-2052-JLK    MARK KRAMER - Direct    03-21-2024

1   A    Minnesota State University.

2   Q    And when did you graduate?

3   A    1986.

4   Q    And what type of degree did you obtain in engineering?

5   A    Electrical engineering degree.

6   Q    How long did it take you to get that degree?

7   A    I got done in three years.  I took overload credits.  So,

8   that was quarters.  And a full-time student would take 16

9   quarters -- 16 credits in a quarter.  I took 32 credits some

10  quarters to get done sooner.  It took not just the dean of the

11  engineering physics school -- sign off on it.  It took the dean

12  of the whole university signing off on it, because no one has

13  ever taken that many credits in one quarter.  Therefore, I got

14  done in three years, and while I was still working for the State

15  of Minnesota on the campus doing some engineering lab work and

16  stuff like that.

17  Q    Now, do you have any other degrees?

18  A    I have an executive MBA.

19  Q    And where and when did you obtain that?

20  A    I got that in 1992.  It was in Berea, Ohio.  And then I

21  have a doctorate in business, and specialize in production

22  operations management.

23  Q    And when did you get your doctorate?

24  A    1999.

25  Q    Now, after you graduated from engineering school in

16-cv-2052-JLK    MARK KRAMER - Direct    03-21-2024

1    Minnesota, what did you do for employment?

2    A    Well, I got recruited before I even graduated from college.

3    If you think of the timeframe, that's when the -- a lot of

4    spending on the defense budget, especially advanced space

5    programs.  So, I got hired by General Dynamics space systems

6    division in San Diego, California.  So, I was working on

7    different programs there.

8    Q    And what were you doing for General Dynamics, the space

9    systems division in San Diego?

10   A    Well, interesting thing was the initial project that gave

11   me a letter offer was on the shuttle Centaur program.  And if

12   you remember your history, in 1986, they had the Challenger

13   accident.  Well, they were designing a high-energy upper stage

14   to put in the cargo bay of the space shuttle.  Well, that

15   project got canceled, and when they got me there, they were

16   trying to figure out what to do with me, because the project I

17   just worked on, the government terminated.  So, they sat around,

18   and before you know it I was interviewing with three or four

19   departments in different divisions.  And they said, hey, we want

20   you here.  We want you here.  So, I got a whole new job

21   assignment working on the Atlas and Atlas-Centaur launch vehicle

22   program systems.

23   Q    Now, had you become familiar with what we've been calling

24   printed circuit boards?

25   A    Yes.  I've been working on -- since college, I was heading

16-cv-2052-JLK    MARK KRAMER - Direct    03-21-2024

1    up the lab for all the printed circuit board manufacture design

2    for the school, teaching students how to make those boards, and

3    supervising.  I also put a hybrid circuit lab together to do

4    thick film hybrid circuitry.

5    Q    Mr. Kramer, if you could slow down a little bit, I think

6    it's going to help the reporter.  I think you sped up quite a

7    bit there.  This is not an Atlas rocket going off to space, so

8    we want to go slow.

9    A    They start off slow, but they accelerate really fast.

10   Q    Can you talk about what a printed circuit board is?

11   A    Printed circuit board is a medium of fiberglass, what we

12   call FR4 material.  And on top of that, you deposit copper

13   traces.  Those are etched away.  And those traces that are left

14   behind are electrical connections, and those electrical

15   connections connect into the electrical components.

16       So, if you opened up your iPhone, or not that you'd do

17   that, but the material that's FR4 is typically green or a

18   different color, solder mask, those copper traces, components,

19   interconnections, and there's layers on those boards.  So, those

20   interconnections are like city streets and multiple layers, and

21   they can be as high as 14 layers down to a single layer.

22   Q    All right.  And how long have you worked with printed

23   circuit boards?

24   A    Forty years.  Four, zero.

25   Q    Now, let's talk about your time at San Diego.  At some

16-cv-2052-JLK    MARK KRAMER - Direct    03-21-2024

1    point during that timeframe, were you hired by NASA?

2    A    Yeah.  I was working on the Atlas-Centaur program in San

3    Diego.  Two of our clients were the Air Force space systems

4    division and NASA.  And NASA was launching either weather

5    satellites, planetary missions -- so, I got recruited away to go

6    move to Cleveland, Ohio, to work at the NASA Lewis research

7    center to work on the Atlas-Centaur program there.  And my

8    specialty was guidance and navigation control.  So, that's with

9    computers, of course.  And then I would eventually -- you hear

10   me on TV.  I give the launch go/no go for NASA on all those

11   missions for the space agencies.  That's all the planetary

12   missions and all the satellites for geostationary or whatever

13   they are, the low earth orbit.

14   Q    And that was when you were in San Diego?

15   A    That's when I was in Cleveland, Ohio.

16   Q    And what exactly were you doing when you were in Cleveland,

17   Ohio, with NASA?

18   A    I was -- my specialty was the guidance and navigation

19   systems design.  Tying all the computers, all the communications

20   equipment together on the launch vehicle.  I worked on the C

21   band S band transmitter, the command destruction receivers.

22   That's probably the most classified -- command destruct

23   receivers.  That's probably the most classified in all the

24   satellites, and that's what actually destroys the vehicle once

25   it leaves the ground.  In case there's an emergency, you have to

16-cv-2052-JLK    MARK KRAMER - Direct    03-21-2024

1  destroy it.  That's highly classified.  I worked on all that,

2  all the communication on that, encoding, decoding, and all that.

3  Q    And when you were working at NASA, did you also work with

4  Lockheed Martin?

5  A    Well, at that time, I went through a transition.  I got

6  moved back to San Diego, back to John Amex [sic] to head up a

7  team of engineers at the San Diego NASA resident office.  So, I

8  had a team of engineers, overseeing the work as we were getting

9  a lot more contracts.  They wanted to have a presence physically

10  at the facility.

11  Q    And what type of work were you doing?

12  A    Oversight.  Monitoring, manufacturing, engineering,

13  production.  I had authority to sign the DD250s off, which is

14  the acceptance of the military equipment that goes to the launch

15  site.  I would -- because I go to the launch site as well with

16  work.  I would actually -- the stuff is so expensive, so

17  sensitive, I would actually go to Miramar Naval Air Station,

18  accompany the payload, that goes to the C-5 aircraft, and I

19  would fly to the Kennedy Space Center, the Cape Canaveral side

20  of it, land, and sign that work over to the government.

21  Q    Why was it so sensitive?

22  A    Well, the several -- the work we were doing is very highly

23  geopolitical and towards the military too.  We do a lot of

24  joint -- people don't know this.  NASA partners with the DOD on

25  most projects.

16-cv-2052-JLK    MARK KRAMER - Direct    03-21-2024

1    Q    The DOD is?

2    A    Department of Defense.  Because of our expertise and

3    knowledge, and the Air Force typically has a typical turnover of

4    three years in different positions, where at NASA we have guys

5    that have 40, 50 years experience doing the same jobs, so we

6    have a long depth of experience in that area.  So, we would help

7    them.  And even on the DOD programs, I would get sent down to

8    either Vandenberg or Cape Canaveral to assist the Department of

9    Defense in their classified payroll, the --

10                THE COURT REPORTER:  I didn't understand any of that.

11    Q.    (By Mr. Gibson) I think you're going to have to still

12    slow down a little bit.  Maybe you can just slow that down and

13    repeat it for the court reporter.

14    A    So, some of the national defense for the Department of

15    Defense, it's a national reconnaissance office.  And they have

16    payloads -- they're one of the big five agencies for

17    intelligence.  They're bigger than the CIA, even for budget.

18    That's because the budget is so big, because you're putting very

19    expensive pieces of equipment into orbit, and that dwarfs all

20    the other government agency funding.

21    Q    And you mentioned the Atlas launch vehicles a little bit

22    today already.  What were you doing with the Atlas launch

23    vehicles, and what are they?

24    A    If you remember your history, famous 1962 John Glenn orbit

25    the Earth, that was on an Atlas rocket.  And that was built in

16-cv-2052-JLK    MARK KRAMER - Direct    03-21-2024

1   San Diego at General Dynamics, Cape Canaveral.  From that point

2   on, we got away from manned systems, because it was too

3   high-risk to put a man on that rocket.  We start launching

4   satellites, and we start doing the system integration, mounting

5   the satellites on top of the Atlas rocket to either do a

6   planetary mission or low Earth orbit mission or whatever.

7   Q    And what were you doing specifically in that project?

8   A    All the systems integration of the payload to the launch

9   vehicle, taking the requirements from one prime contractor to

10  other prime contractor, doing all the tests of validation,

11  verification.  And I was doing that while I was a chief engineer

12  for NASA at the resident office in San Diego.  And eventually

13  that worked.  We moved to what we know present time here, at

14  Denver, Colorado, area, to Lockheed Martin.

15  Q    Now, did you also work on the advanced cruise launch?

16  A    Some of that.  I guess you gotta give me more clarification

17  of advanced cruise launch.

18  Q    Did you work on any of the cruise missiles and the launch

19  systems?

20  A    Yeah.  Out of San Diego, it was a Tomahawk, called the

21  Tomahawk program.  So, that was a laser guidance system for the

22  Tomahawk, because we always made the joke you can launch it from

23  San Diego and hit a sewer grid plate in New York that far away,

24  because it was all laser targeted at that time.

25  Q    And what type of work were you doing on that?

16-cv-2052-JLK    MARK KRAMER - Direct    03-21-2024

1    A    Once again, the guidance systems.  There's fin actuators

2    you control that controls the rocket -- the missile in this

3    case.  And you navigate that to your target by using the sensors

4    that detect the laser, but you do -- the short range Tomahawk

5    uses imagery to fly through buildings and structure.

6    Q    And what types of skills did you have to have for these

7    positions that you've been talking about so far?

8    A    Well, testing, validation, quality assurance, systems

9    engineering.  All the analysis -- engineering analysis goes into

10   that.  Both mechanical, electrical, thermodynamics.  You know, I

11   had to work on the hydraulic systems with the engineers,

12   because, you know, the rocket is just not electrical systems and

13   electromechanical systems as well.

14   Q    At some point, did you end up relocating to Denver?

15   A    Yeah.  When the acquisition was made, it was Martin

16   Marietta, which is out of Waterton Canyon.  They were there for

17   decades.  They acquired Jell Enamics [sic] space systems

18   division.  I was involved in the transition from the whole

19   operation from San Diego to the Waterton Canyon facility here

20   outside of Denver.

21   Q    And what were you searching when you worked at Martin

22   Marietta?

23   A    We were supporting -- at that time they had the Titan

24   launch vehicle program and some other classified satellite work

25   was done there.  So, we were also working on the payload

16-cv-2052-JLK    MARK KRAMER - Direct    03-21-2024

1    integration of satellites on the Titan launch vehicle family,

2    and then the Atlas family moved there as well.

3    Q    And did you report to Kennedy Space Center at that point as

4    well?

5    A    Exactly.  I supported Kennedy Space Center, and actually,

6    since I was a satellite office, I had dotted lines to

7    Washington, D.C., to the NASA administrator.  Because when

8    you're in the field office, you have full responsibility for the

9    people there.  So, I always made the joke was people don't

10    realize that NASA administrator is appointed by the president of

11    the United States.  It's a high job.

12    Q    And what were you doing when you were reporting to the

13    Kennedy Space Center at this point in time?

14    A    I would cover all the quarterly meetings on behalf of the

15    NASA administrator.  And we would go down to the Colorado

16    Springs at Air Force Space Command, and these quarterly meetings

17    were held there with the FAA administrator and the NASA

18    administrator -- the NASA administrator didn't want to leave

19    Washington, D.C., to come here, so I would cover those for him.

20    I would say as NASA administrator for the whole space agency.

21    Q    Try to slow down just a little bit, still.  You have a

22    tendency to speed up.  I guess you're like a rocket, and you go

23    slow up, and then start to really speed up.  So, let's try to

24    slow down a little.  When you were doing this work that you've

25    been describing, did you have any classifications or security

Kevin P. Carlin, RMR, CRR

16-cv-2052-JLK    MARK KRAMER - Direct    03-21-2024

1    clearance?

2    A    Yes.

3    Q    What were those for?

4    A    The level, or what they were for?

5    Q    What were they for?  If you want to describe the level,

6    that's fine too.

7    A    The levels were top secret and higher.  I had special

8    access programs, and for the things I mentioned earlier, the

9    military payloads, a lot of those were -- they were just spy

10    satellites.  That's -- what orbits they're in is all classified.

11    How the command destruct receiver decoders work is all

12    classified, and highly classified.  There's confidential, top

13    secret, confidential.

14    Q    And do you have ongoing confidentiality obligations from

15    those top secret classifications you have?

16    A    Yeah.  It has -- even as of today, I gotta still protect

17    the stuff I was told 25 years ago.

18    Q    What does that mean?

19    A    You cannot disclose to people the specifics that you worked

20    on, the technology you were working on, any performance data,

21    any of -- the biggest concern is since I worked in the guidance

22    systems, I knew the trajectory of where the satellites are in

23    orbit today, still operational.  And some of those programs are

24    for the joint armed services.  The Milstar program is commonly

25    known now is being replaced.  That was a constellation of

16-cv-2052-JLK    MARK KRAMER - Direct    03-21-2024

1   satellites around the whole Earth that have all the armed forces

2   communicate in one common platform.

3   Q    And what were you doing on Milstar, to the extent you can

4   tell us?

5   A    Generally, once again, the computer systems onboard.

6   Q    And what are some of the projects you were working on that

7   you can discuss without violating those ongoing confidentiality

8   obligations?

9   A    Pretty much all the -- if you look at the weather satellite

10  for any of the local television stations, you hear the GOES,

11  G-O-E-S, geostationary operational environmental satellites.  I

12  launched -- I was on the launch team for like 12 series of

13  those.  Those are all the satellites that get the weather

14  mapping.  So, every time you turn on the TV, you see the weather

15  mapping, the radar, that's from the GOES operational satellite

16  system.  I worked on the Cassini planetary mission that went to

17  the Saturn to the Titan planet called Titan, the moon, and we

18  were mapping that.  And that was a seven, eight-year travel just

19  to get to that Saturn orbit and deorbit and get mapping of that

20  Titan moon.

21        Worked on the Mars -- before even the -- all the Mars

22  stuff now is pretty popular, but I was on the first three Mars

23  mapping of the planet and all that.  Earth observation satellite

24  system, there's -- SOHO was international one with the European

25  Space Agency.  So, most of them were collecting information.  I

16-cv-2052-JLK    MARK KRAMER - Direct    03-21-2024

1  won't bore people with the classified stuff, because you can't

2  really say much about those.

3  Q    Fair enough.  Now, at some point did you leave Martin

4  Marietta?

5  A    Well, I left NASA while I was working outside of Lockheed

6  Martin, and I worked for a company called World Wireless

7  Communications.  I got hired as a vice president for

8  engineering.

9  Q    What was World Wireless?

10  A    They were a NASDAQ publicly traded company at the time.

11  Probably around 50, 60 people.  They were trying to do internet

12  of things.  Those are like little sensor devices, like your

13  refrigerator, your meters, and they want to get them on the

14  internet and communication.  So, I was working on the

15  engineering team to take information from small devices,

16  scattered around the U.S., collect it wirelessly, that data,

17  send it through a gateway, post it up to the internet, and have

18  it communication two-way.

19  Q    At what point did you start working for World Wireless?

20  What year, roughly?

21  A    It would have been '98 or something like that, or '99.

22  Q    And what were your responsibilities there?

23  A    Once again, I was the VP of engineering, overseeing the

24  engineering team.  I think we had about 20 engineers in Denver,

25  and maybe ten in Overland Park, Kansas, doing R&D as well.

303

16-cv-2052-JLK    MARK KRAMER - Direct    03-21-2024

1  Q    And at that time, is that when you met Will Tucker, who is

2  siting at counsel table?

3  A    Yes.  I hired him.  I think he moved in from Seattle,

4  Washington, from Boeing, but I hired him directly.

5  Q    And did you also hire a Randy Jones?

6  A    That's correct.

7  Q    And a Frank Foss?

8  A    That's correct.

9  Q    And can you describe a little bit of the technical work you

10 were doing at World Wireless.  I think you mentioned they were

11 an internet of things, but can you describe the technical work

12 you were doing?

13 A    Yeah.  It's getting down to the same thing.  You design

14 printed circuit boards.  You do software.  You do firmware.  We

15 do server level, what you call cloud stuff, which you host the

16 data on the internet.  We're doing that through like an Oracle

17 database.  We had web servers running, and because we were

18 designing systems for large meter companies like Pacific Gas and

19 Electric -- so, they will have gas meters, electric meters.

20 They didn't want to have trucks going out to read those meters,

21 so we would put technology on those to where you post those,

22 collect it to the internet, and put into a database.  So, they

23 get rid of the drivers driving around reading the meters.

24 Q    And you mentioned software and firmware.  Can you describe

25 what each of those are.

16-cv-2052-JLK    MARK KRAMER - Direct    03-21-2024

1   A    Firmware is a piece of software, but it's tightly tied to

2   the actual physical hardware.  When I say hardware, like the

3   microprocessors, other components on the board.  So, firmware is

4   driven inside of those parts.  Software is -- general is a upper

5   layer application that rides the top of the firmware.

6   Q    And how did the World Wireless' technology work for these

7   customers?  You mentioned PG&E.  Did you also have customers

8   like McDonald's and Wendy's?

9   A    Yeah.  We were doing things for the quick service

10  restaurants, because they want to know when their machines

11  needed repair.  They didn't want to wait until the ice machine

12  broke down, because that's the biggest profit margin at

13  McDonald's.  If you can't sell a Coke, you lose money on the

14  burgers, then.  So, we were monitoring that equipment remotely.

15  They get service reports.  They can send trucks out to look at

16  stuff before it becomes a last-minute failure.

17  Q    And I take that with the company called World Wireless,

18  that was all being done wirelessly?

19  A    That's correct.

20  Q    Now, at some point did you decide to start your own

21  company?

22  A    Yeah.  During that period of time, there was -- you know,

23  that was the internet craze.  That's when you can buy cat food

24  online.  They thought that was a new company.  So, everybody was

25  putting money into it.  When the dot com crash, the venture

16-cv-2052-JLK    MARK KRAMER - Direct    03-21-2024

1   capital went away, it was hard to keep our going -- R&D

2   investment going.  Saw the handwriting on the wall.  We decided,

3   time to leave and get out and start our own company, because

4   layoffs are going to be coming.

5   Q    When you say we, who are you referring to?

6   A    Will Tucker and then Randy Jones and then there's another

7   gentleman in Overland Park, Kansas, doing some work for us on

8   the side as well.

9   Q    And when you first started the new company, what was the

10  name of it?

11  A    It was Extra Fun.

12  Q    And was that the company that then became BlueRadios?

13  A    That's correct.

14  Q    And was this in the -- what?  2000 timeframe?

15  A    That's correct.

16  Q    And what kind of work did you start out doing at Extra Fun

17  that then became BlueRadios?

18  A    Well, we targeted at that time a mass produced customer

19  item for the mass market was the Nintendo Game Boy platform.

20  That was the second-most-sold electronic device of its time,

21  because it was that popular with kids.  The only thing that

22  rivaled it was the Panasonic 2.4 gigahertz cordless phone.

23  Q    And did you start working on something with the Game Boy

24  Advance?

25  A    Yeah.  We ended up designing a wireless cartridge that you

306

1    plug into the socket for the game console.  That's a handheld

2    game console.

3    Q    And when you talk about a wireless cartridge, it's been

4    over 20 years.  I think my son who is 25 had a Game Boy Advance,

5    but can you tell us -- and one of our jurors wasn't even born

6    then, so tell us what the Game Boy Advance was with the

7    cartridge.

8    A    The Game Boy Advance is a handheld cartridge, or handheld

9    game console with a small display on it, maybe 300 by 400

10   pixels, small.  It's colored, has game controls on it, little

11   buttons you select, navigate.  Then the cartridge would swap

12   into a slot underneath it.  It's about -- something about this

13   size, real thin.  And that would hold the electronics in the --

14   at that time, the firmware and software to operate it.

15   Q    And the cartridges, can you tell me what were the -- what

16   was the purpose of the cartridge that you would, say, go buy

17   from the store and use in the Game Boy Advance?

18   A    The cartridges back then held the game application

19   software.  So, if you wanted a Mario Brothers game, you had to

20   go down to Walmart, go to the shelf, get the game cartridge, pay

21   for it, and then every time you want a new game, you gotta go

22   back to the store, get another cartridge for the new game.  We

23   said that was kind of inefficient.  We decided it would make

24   more sense if you can make it wireless, download the game

25   content directly to the cartridge, and bypass all that

16-cv-2052-JLK    MARK KRAMER - Direct    03-21-2024

1    storefront.

2            And what's interesting enough, at that timeframe, there

3    was no Apple store.  There was no Google Play store to download

4    apps.  And people thought we were crazy.  Why would you want to

5    download an app to a wireless mobile device?  And what do we use

6    today?  Everything is that.  We were probably five years ahead

7    of the market in that area.

8    Q    So, now I can have my Sony PlayStation or my Xbox, and if I

9    want to play a new game, I can just download it.  I don't have

10   to go to the store.  Were you trying to do that for the Game Boy

11   back in 2001?

12   A    We were successful at it.  The issue was trying to get

13   Nintendo to adopt the technology to promote it.  It's always

14   about bringing products to market.  It's not just designing

15   them.

16   Q    And what did you design in terms of a wireless game

17   cartridge for the Game Boy Advance?

18   A    We implemented a custom -- lack of a better word, it's a

19   custom chip and a custom firmware program into it.  That would

20   kind of take over the control and handle all the hand-shaking

21   that we call glue logic is all the low level functions.  We had

22   memory in there, additional memory to store more than one type

23   of game, because there are multiple games.  We had applications

24   in there to actually run things like chat messaging, email.  We

25   could print to a printer if we wanted to, all done wirelessly

16-cv-2052-JLK    MARK KRAMER - Direct    03-21-2024

1    over the internet.  So, all the content would go through the

2    gateway up to the cloud.  The cloud server would push down the

3    content as requested, and handle the email or chat messaging

4    portion of it.

5    Q    And in terms of -- you used the term "wireless."  What do

6    you mean by wireless?

7    A    Well, at that time we were doing the Bluetooth wireless

8    standard.  We were one of the first companies, I think, in the

9    whole world at that time the Bluetooth standard came out, we got

10   the technology shrunk down to a single chip module with all the

11   application code, firmware all embedded into that one chip.  The

12   antenna RF was already integrated.  The power was already

13   integrated the size of your thumbnail, and the integrators

14   didn't have to do all this extra work.  So, we got people to

15   market really quick with that technology.

16   Q    Are there different kinds of Bluetooth technology?  You

17   mentioned Bluetooth.  Are there others?

18   A    Yeah.  There's Wi-Fi.  There's all sorts of proprietary

19   standards.  There's ANTS.  Another one is -- Zigbee is another

20   standard, and they operate in the same 2.4 gigahertz spectrum as

21   well.

22   Q    Now, in terms of the game cartridge itself, were you able

23   to get it to work?

24   A    Yes, we did.

25   Q    And to your knowledge, was there anything like it at the

16-cv-2052-JLK    MARK KRAMER - Direct    03-21-2024

1   time?

2   A    No.  It was, I think, before Nintendo decided to do it on

3   their own, it had to be like eight, nine years later.  It was a

4   long time before they decided to adopt the technology.

5   Q    Back in the 2001-2002 timeframe, do you remember what the

6   state of phones were?  It wasn't an iPhone?

7   A    No.  It was like the examples you gave earlier in your

8   opening.  There was the flip phone.  There's -- the displays

9   were very small.  You could probably have five lines of text on

10  it, character-wise, maybe.  Pixels, maybe 50 by 60 characters,

11  you know, pixel size.

12  Q    Now, at some point did you change the name of the company

13  to BlueRadios?

14  A    Yes.

15  Q    And why did you do that?

16  A    Well, we found out so many people like the wireless

17  solution, it made no sense to use the word Extra Fun, because

18  that was targeted right to the consumer market, more a game

19  device to -- we decided to rebrand the whole company and change

20  to BlueRadios, because it's Bluetooth technology at that time

21  doing wireless, and we -- and we want to be more B2B, business

22  to business, selling business to consumer.

23  Q    And when you were at Extra Fun and then changed the name to

24  BlueRadios, where were you working?

25  A    I was working in the basement of my first house in Colorado

16-cv-2052-JLK    MARK KRAMER - Direct    03-21-2024

1    was in Castle Rock, in the basement.

2    Q    And at some point did that change?

3    A    Yeah.  We grew.  We expanded.  And then we moved to the

4    Denver Tech Center.

5    Q    Now, let's talk about when you changed the name to

6    BlueRadios.  That was about 2003?

7    A    That's correct.

8    Q    And what was the business of BlueRadios when it started?

9    A    We want to sell -- the industrial medical and consumer

10   markets are embedded with little radio module about the size of

11   your thumbnail.  So, you would buy those like you buy a

12   component, and we would sell those volume to different

13   companies.  Like, the automotive industry was really big for us.

14   Medical is big, still is today.  And the consumer market is

15   less, because it's first adoptive rates are different.

16   Q    Were you also on the space shuttle at all?

17   A    Our technology was first adopted on the Morton Thiokol

18   solid rocket motors that were monitoring both the ground and in

19   flight instrumentation on the solid rocket motors, and then the

20   crew compartment use our wireless technology in the space

21   shuttle cabin for voice communication as well.

22   Q    And when was that?

23   A    That was really early on.  2005, 2006.

24   Q    Now, when you mentioned -- you talked about -- a bit about

25   Bluetooth.  We've heard Bluetooth.  Can you describe a little

16-cv-2052-JLK    MARK KRAMER - Direct    03-21-2024

1  bit more about what Bluetooth is and how it was being used in

2  that 2000 to 2004 timeframe.

3  A    Bluetooth is an international wireless standard.  The

4  two-point -- it operates in a 2.4 gigahertz frequency band, and

5  that spectrum is for industrial, scientific, and medical type of

6  industries and devices.  Bluetooth was -- primarily came out as

7  an audio solution for Bluetooth headsets connecting to your

8  phone, so you got rid of the plug in your ear down to your phone

9  jack.  We looked at it as an opportunity to capitalize on the

10 data transmission market.  And when I say data, I'm not talking

11 about audio data.

12        THE COURT:  I'm sorry.  Excuse me.

13        THE WITNESS:  We were talking about just raw data that

14 you can do anything with.  It can be video data.  It can be

15 telemetry data.  It can be whatever.  And if you packetize it

16 correctly and compact it and do some clever things like we were

17 doing, you can make it what we call the wireless wire which

18 means we got rid of the two or four wires between devices and

19 made it wireless.  And we were going long-range distances, not

20 just getting rid of the two to three feet cable between the

21 phone and the headset.

22 Q.    (By Mr. Gibson) Did you also have other expertise with

23 other wireless formats?

24 A    Yeah.  We were doing stuff with Wi-Fi.  Wi-Fi at that time

25 wasn't robust enough, wasn't -- and it consumed a lot more

16-cv-2052-JLK    MARK KRAMER - Direct    03-21-2024

1    power, and it was a newer emerging standard.  And even for the

2    video transmission stuff, we fully tested it with the Wi-Fi, and

3    we had to test it with other technologies because with our tech,

4    our implementation was more generic, where we did the data

5    compression.  So, we pushed that data over any wireless media.

6    We weren't limited just to Bluetooth.  We had to do with the

7    other standards.  Ultra-wideband was another one.

8    Q    And what type of technical experience did you have at

9    BlueRadios between yourself and your team?

10   A    Well, we had -- we always made the joke, we have all the

11   way from the cloud server design all the way down to the

12   microchip design.  We were designing down to the chip level.

13   So, we had a pretty vast compression of that we squeezed this

14   stuff down into useable devices for clients.  A lot of companies

15   focus in one specific niche market.  We're big on system

16   integration.

17   Q    And in the 2005 to 2006 timeframe at BlueRadios, what type

18   of products did you have?

19   A    We had a whole family of different wireless modules based

20   on configurations that each client wanted.  Like, we sold stuff

21   to the defense department.  They wanted special encryption into

22   the technology that we couldn't ship to the consumers.  So, when

23   they were communicating in the forces, the encryption algorithms

24   that we were using were twice the 256-bit encryption -- back

25   then was pretty good.  Today it's not, but back in that

313

16-cv-2052-JLK    MARK KRAMER - Direct    03-21-2024

1    timeframe the standard was like 64-bit encryption.  So --

2    Q    And what was your role at BlueRadios in this timeframe?

3    A    Well, I was overseeing all the engineers, doing the sales,

4    marketing.  Since we bootstrapped everything, we were privately

5    held, so we have no funding issues.  So, managed the money, paid

6    the bills, placed purchase orders, processed invoices, stuff

7    like that.

8    Q    And did you have people you supervised?

9    A    Yes.

10   Q    And who were some of those people?

11   A    Well, we mentioned earlier Will Tucker, Randy Jones, John

12   Sample, Frank Foss, and several other ones that won't be

13   relevant to this case, but then my lovely wife, she says I never

14   managed her, but --

15   Q    We won't ask any more questions about that.  When you had

16   employees or independent contractors, would you have them sign

17   any kind of document to transfer over their intellectual

18   property rights?

19   A    Yes.

20   Q    Why did you do that?

21   A    We want to protect whatever work they were working on.

22   They don't claim it as their own when they leave, and they make

23   it clear that they don't own it.  I don't own it.  The

24   corporation owns it.

25   Q    And the corporation being BlueRadios?

16-cv-2052-JLK    MARK KRAMER - Direct    03-21-2024

1    A    That's correct.

2    Q    And if you used any contractors, would you have them sign

3    what's been called a nondisclosure agreement or confidentiality

4    agreement?

5    A    Yes.

6    Q    Why would you do that?

7    A    For the same reason.  All the work they're working on is

8    owned by our company, and we claim rights to it to protect it

9    from our competitors.

10   Q    And did you want it to be kept confidential?

11   A    Yes.

12   Q    Now, what were you selling to some of the medical

13   providers?  Can you give some examples?

14   A    Each one is a little different.  They would approach if

15   they need help with the system integration.  One of the early

16   ones we did for Boston Scientific, we helped them on a gateway

17   unit that you would have on your nightstand next to your bed,

18   and they would have medical devices in the room like a weight

19   scale, and you weigh yourself, a blood pressure cuff, a pulse

20   oximeter, and some other ones.  And the most important ones is

21   the implantable.  It was a pacemaker in the heart.

22         And we would take all that information wirelessly to

23   the gateway, put it into the cloud, and doctors could get this

24   information in real-time without having to come in and be

25   monitored at the hospital and take up a bed.  And a lot of these

16-cv-2052-JLK    MARK KRAMER - Direct    03-21-2024

1    were high-risk patients.  And then we would help them with

2    integration design, do the initial board design, firmware design

3    for them, and then return, and they had to buy our wireless

4    technology and put it in their products.

5    Q    So, maybe you can just break that down.  Was one of those

6    companies Boston Scientific?

7    A    That's correct.

8    Q    And you were talking about the pacemaker.  So, what were

9    you doing with respect to helping Boston Scientific with its

10   pacemaker?

11   A    We -- on that side, we had limited -- we gave the wireless

12   technology and put them in an implantable, which is the

13   pacemaker.  Had to make it very small.  That one only had to

14   transmit to the gateway unit, which is sitting in the bed next

15   to the nightstand.  We helped them with the gateway design, the

16   architecture of that, and also put in the wireless technology,

17   which is ours, into that gateway, and then they would push it up

18   to the cloud and put it into a database that the doctors could

19   access.

20   Q    How important was that technology that it actually work in

21   terms of transmitting wirelessly?

22   A    With all that goes to the FDA, some of that stuff is

23   life-critical.  The pacemaker is life-critical.  We did one for

24   a company called Zoll, Z-O-L-L.  That's a life vest.  So, if

25   you're going to go into the hospital for open heart surgery,

16-cv-2052-JLK    MARK KRAMER - Direct    03-21-2024

1    because you have heart problems, they want to know if your heart

2    starts having rithmatic problems, the -- it would shock your

3    heart and actually bring you back to life, and that's why they

4    call it a life vest.  And we provide the wireless data

5    technology of the wireless embedded on the vest that went to,

6    once again another gateway -- we provide that technology.

7    Q    You're using that term, "gateway."  Can you just describe

8    what you mean about that.

9    A    Think of your Wi-Fi gateway at home or Xfinity or Comcast

10   cable box, those are considered gateways that tie to the back

11   end of the network, either through a cable, satellite, or fiber

12   optics.  That's -- your collector point of information goes to

13   them, bidirectional in most cases.

14   Q    And you said that you were helping integrate firmware.

15   What do you mean by that?

16   A    The firmware, once again, is embedded tightly close to the

17   hardware and the chipsets that's inside the -- in this case a

18   gateway or the embedded device that's in the implantables.  So,

19   we would give that firmware to them as well if they need a

20   routine to do something.

21   Q    Now, can you describe this wireless technology, how are

22   you -- what kind of device were you using that would actually

23   transmit the information wirelessly?

24   A    It would be -- a component module is made up of a

25   substrate.  It's made of a baseband processor.  That's a fancy

16-cv-2052-JLK    MARK KRAMER - Direct    03-21-2024

1    word for the wireless technology.  A digital processor is in

2    there as well.  There's passive parts, inductors and capacitors,

3    resistors, crystals for timing for clocks.  And there's a metal

4    RF shield, because the equipment is so sensitive, you gotta

5    shield it from outside interference.

6             And we also embed inside that little thing the size of

7    your thumbnail a ceramic chip resonator, which acts as the

8    antenna.  When I say the antenna, the 2.4 gigahertz spectrum.

9    So, all that's compacted on something the size of your

10   thumbnail, and the firmware is inside of that as well.

11   Q    And what you're talking about being compact in the size of

12   your thumbnail, did that include a printed circuit board?

13   A    Correct.  And then some of the more advanced technology, we

14   were doing a bench with a Golden-i, we did cold-fire ceramic for

15   the substrate.  We weren't even using FR4 printed circuit board

16   material, like fiberglass.  We were using ceramic.  And then the

17   positing, the electronics and the ceramic, because it has a

18   higher temperature profile for resistance to cold and hot

19   temperatures.

20   Q    And I used in opening statement the term "board support

21   package."  Can you describe what a board support package is.

22   A    So, if you hold up like this circuit board right here, that

23   would be the software goes in there.  It has to derive all the

24   peripherals on here, hardware interfaces.  It would be all

25   the -- you have the wireless interfaces.  It could be Wi-Fi,

16-cv-2052-JLK    MARK KRAMER - Direct    03-21-2024

1   Bluetooth connecting to devices, switches.  So, that board

2   support package would control switch controls, the wireless, and

3   for Golden-i, it would be like head-tracking.  It would be the

4   board support package.  It would also include voice control,

5   noise cancellation.  The graphical user interface would be a

6   routine that runs in there.  I can go on and on.  It's all the

7   stackup of the software to make this thing do something, because

8   you get this, it really doesn't do anything other than --

9   Q    Without the board support package, you can't use it?

10  A    There's no use, yeah.  It's useless without the board

11  support package.

12  Q    So, it is -- the board support package is really software

13  and firmware?

14  A    That's correct.

15  Q    All right.  Now, I think I talked about in my opening,

16  maybe we can have the opening slide four.  Did you win any

17  awards for your technology?

18  A    Yes.  The Bluetooth SIG, which is the Bluetooth special

19  interest group -- that's what SIG stands for.  That's an

20  international consortium of companies that get together and put

21  the standard out.  And there was a worldwide competition of

22  people applying most innovative wireless implementation of

23  Bluetooth.  We applied to the contest, and we were selected

24  first place award.

25  Q    And did you also receive an award from Microsoft?

16-cv-2052-JLK    MARK KRAMER - Direct    03-21-2024

1    A    Yeah.  Because that solution we had, we were using the

2    Microsoft Windows platform, like a PC or a laptop that would be

3    a home gateway.  This was before any home gateways were

4    available.  Like today you have a Wi-Fi in a restaurant.  So,

5    the Game Boy would connect up to that laptop or PC through one

6    of our proprietary wireless dongles, for lack of a better word,

7    you plug into your computer.  It gets you connected to the

8    internet, and that local piconet.  And Microsoft acknowledged

9    that.  We had a first place award from them as well at the

10   Windows Hardware Developers Conference in, I think it was

11   Louisiana or somewhere like that.

12   Q    We can go ahead and take that down.  Are you familiar with

13   the term "intellectual property" and what often gets called IP

14   for short?

15   A    Yes.

16   Q    What does that mean to you?

17   A    It's our works of art, are what we call things that we've

18   done that we take -- protect and have value of it, like our

19   output of what we do as engineers.

20   Q    And do you keep that intellectual property confidential at

21   BlueRadios?

22   A    Yes.

23   Q    Now, I think we have a demonstrative 1650 might be on that.

24   I think it's what you called the USB dongle.  Do you have that?

25   Look on the side tray there.

320

16-cv-2052-JLK    MARK KRAMER - Direct    03-21-2024

1    A    Yeah.  This is the device.

2    Q    And we have a picture if we can display the picture of it

3    so the jury can see, since they're far away from what you have.

4    Can you describe what that is.

5    A    The one I have here doesn't have the plastics around it and

6    the fancy plastics, but once again, it's a printed circuit

7    board, USB connector on it.  Here is the radio module, and

8    there's some passive parts on one side for handling the USB

9    communication.  This is what we call a USB dongle, and you plug

10   into your laptop or your computer, and you can make this into an

11   active gateway device.

12   Q    You can use that to transmit wirelessly?

13   A    That's correct.

14   Q    And is that what you won the award for from Microsoft?

15   A    That and the fact that the software we wrote, we took the

16   Windows environment, implemented a Bluetooth stack within the PC

17   that wasn't available at the time.  We put the hooks into it

18   that would take the data in through that port on the USB port,

19   and packetize it, send it out on the other side through the

20   internet through either 10/100 ethernet -- it's a cable you

21   connect to your internet with, or your dial-up at that time was

22   popular.  So, Microsoft was pretty impressed that we got working

23   through their operating system a piece of software that make

24   this all happen, the fact that you could install it on a CD.

25   You ship the client a CD, and then install the software.

16-cv-2052-JLK    MARK KRAMER - Direct    03-21-2024

1    Q    So, the award was for both the hardware and the software?

2    A    Correct.

3    Q    And what could you -- what business purpose, or what were

4    you trying to do for business with this USB dongle?

5    A    Well, because Bluetooth was a new emerging technology, so

6    we were going after the legacy market.  Everybody already had a

7    computer but didn't want to go spend thousands of dollars to buy

8    a new computer to get wireless.  So, they would buy this dongle,

9    plug it in with the software we support, and they could be

10   coming to a piconet, which means a local wireless network,

11   communicate with printers and other devices in the home, your

12   phone, and make that into a home gateway.  That's before Wi-Fi

13   was even on the market and selling in the home, the home gateway

14   technology at that time.

15   Q    All right.  And at this point, we're 2005, 2006 time

16   period.  What types of -- we can go ahead and take that down.

17   What types of customers was BlueRadios developing in addition to

18   these medical device companies?

19   A    The automotive industry, we were Chrysler, General Motors,

20   all the big name ones at that time.  I think we had four

21   different contracts or four different automotive manufacturers.

22   I think we sold some developer stuff to Mercedes-Benz, but it

23   didn't go anywhere for that company.

24   Q    Now, you mentioned, and I'm familiar with my iPhone and

25   hooking up my Bluetooth headset to that.  That's only if maybe

16-cv-2052-JLK    MARK KRAMER - Direct    03-21-2024

1    it will operate, I don't know, 10, 20 feet.  How far were you

2    getting Bluetooth to operate?

3    A    Well, because I come from the radio frequency RF, and been

4    doing wireless for decades, I understood the technology.  I

5    understood the requirements for the Federal Communications

6    Commission, because I worked with them a lot.  There's two ways

7    to communicate further.  And I use voice as example.  And if you

8    talk louder, people -- you can transmit further; correct?  Now,

9    if you don't want to use all your energy yelling, you have to

10   listen very closely or clearer.  So, we designed the technology

11   where we can listen at low level sensitivity and get a further

12   distance, and with the combination of that and transmitting

13   higher power, talking louder, we got our wireless Bluetooth to

14   work over a mile.

15   Q    Over a mile for Bluetooth?

16   A    Over a mile.

17   Q    And were you -- you know, I use my headphones with -- my

18   AirPods with my iPhone.  I'm just listening.  I'm just hearing

19   sound.  Were you able to transmit data for a mile?

20   A    Yes.  Data and video.

21   Q    And how did you figure that out?

22   A    Well, the fact that our goal was we want to get rid of

23   those expensive wires and cables in buildings and homes, and for

24   video, it's too expensive coming after the fact to start drawing

25   cables through a home or office building.  So, we wanted good

323

16-cv-2052-JLK    MARK KRAMER - Direct    03-21-2024

1    coverage, and then we decided to go after this market of video.

2    So, we had to do a lot of other things besides the power and

3    transmission rates and the received sensitivity to get the

4    distance.  We also had to do data suppression packetization,

5    optimization, things like quality of service.  All that stuff

6    plays into the transmission of data.  When I say data, data can

7    be video.  It can be audio.  It can be anything.  It can be raw

8    packet data.

9    Q    And in terms of the packetization and the other things you

10   mentioned, were you developing all that expertise in-house at

11   BlueRadios?

12   A    Yes.

13   Q    At some point, did you look at trying to do your technology

14   in security cameras or security systems?

15   A    Yeah.  Because that was the target -- excuse me -- target

16   market was they call them CCTVs, closed-circuit television

17   cameras.  And then you would have that camera, you plug the

18   input into one of those BNC jacks.  These are pretty common

19   back -- your stereo equipment, BNC is a standard, and you would

20   input the camera signal here, and it will go wirelessly out this

21   side to a remote unit a mile away.  That would be the received

22   information.  Decompress it and put it out into another format.

23   Q    So, let me try to understand that.  Were you able to -- so,

24   you have the video camera a mile away from -- they've got the

25   big property.  I want to have video cameras on my perimeter for

16-cv-2052-JLK    MARK KRAMER - Direct    03-21-2024

1    security.  Were you able to transmit that video wirelessly all

2    the way back to the building where someone could sit in a

3    security office and watch?

4    A    That's correct.

5    Q    And can you describe how you were able to get that to work.

6    A    Well, it was a lot of engineering, both in hardware,

7    software, and the printed circuit board.  That's what came out

8    of the patent, the Kramer patent.  That technique of what we did

9    in the pieces around it -- not all the pieces, but the majority

10   of the pieces came out of that patent, the underlying

11   technology.

12   Q    We will get into the patent later, but you had a lot of

13   this in 2006?

14   A    Correct.  We had a -- we were running testing in our

15   offices.  We put a camera up -- one of the conference room

16   windows, monitoring the traffic, people walking by.  And we were

17   testing, doing simulations of things we were trying to debug in

18   normal integration testing that we do.

19   Q    All right.  And I think you have Exhibit 1655 for

20   demonstrative purposes, the BlueVideo board.  Maybe we can show

21   the picture of that at the same time.  You were holding that up,

22   and we put pictures up so that the jury can follow along.  Can

23   you describe, first of all, is this the board that would do the

24   transmission from the camera to the person in security for

25   purposes of receiving and transmitting the video of the security

16-cv-2052-JLK    MARK KRAMER - Direct    03-21-2024

1   camera?

2   A    That's correct.

3   Q    So, where would this be placed?  This board.

4   A    Well, the one board, the transmitter you want as close to

5   the camera as possible, because the camera is going to have like

6   a three-foot cable or six-inch cable, so you want this close to

7   the camera.  And then as far as you want to go up to maybe a

8   mile away, the transceiver device or receiver could be remotely

9   somewhere else, near, like you said the office location or, you

10  know, we also had a repeater, further distances.  So, we

11  designed a board that didn't have all the other connectors on

12  it.  It would take the signal, receive it, and boost it, and

13  send it further.  So we can actually do -- daisy chain data even

14  further.

15  Q    So, looking at the printed circuit board itself -- and

16  maybe it's easiest to look at the screen, since that's what the

17  jurors can see easier.  Can you describe sort of going from left

18  to right on the screen, what we're looking at on the top

19  picture.

20  A    Once again, those are those BNC connectors.  You will see

21  video in on the top, the red one.  There's a power jack powering

22  the boards.  Then on the others, they will send the data out

23  wireless through an RF connector.

24  Q    I think actually I said we might not use the pencil to draw

25  on it, but maybe it's worthwhile to just draw on that to show

326

16-cv-2052-JLK    MARK KRAMER - Direct    03-21-2024

1    us.   You might need some help here.

2    A    Is it activated?

3    Q    Can I do it with my finger, or do I need the pencil?

4    A    I still think it might be better using the board, because I

5    can't see certain things on the picture.

6    Q    Just wait one minute.

7        (Pause in the proceedings.)

8    Q    Thank you very much.  So, if we can go ahead and from left,

9    starting on the left side of the top picture, maybe you can

10   describe what we're seeing.

11   A    Well, the easiest one here is we have some DC voltage

12   coming in.  That's typically -- I think this ran at 12 volts DC

13   through a power supply jack to the wall outlet for power.  Then

14   this would be your video in feed from the camera.  And then all

15   the components on here are the -- in this case is the Da Vinci,

16   it does -- it's the processor.  You got memory.  It's like

17   processor here.  You got memory devices.  You got other

18   miscellaneous components.

19        Then on the other side here, you don't see it.  There's

20   an RF jack.  You normally would have an antenna here, and that

21   would radiate out.  RF signal.  And then the -- the other device

22   here would collect it, and be an antenna on this side that's not

23   shown on this picture.

24   Q    All right.  So, the top device, is that the camera?

25   A    Well, you see the camera.  The camera is off to the left

327

1    here.  The camera would be out here somewhere.  There's no

2    picture of the camera on this one.

3    Q    Fair enough.  I think that explains it for us.  And so

4    we're looking at the printed circuit board itself?

5    A    Correct.  And the associated parts on it.

6    Q    And would this also have the software and the board support

7    package?

8    A    That's correct.

9    Q    And do you have an estimate of how many hours and resources

10   it took for BlueRadios to create this?

11   A    Well, if you're combining in previous work to get to this

12   point, you're talking thousands of engineering hours to get

13   something like this put together.  You just don't find it posted

14   on the internet.  You had to create it from scratch, most of

15   this.

16   Q    And did it take years?

17   A    Correct.  Yes.

18   Q    And at this time, were you aware of any other device on the

19   market that could do anything like this?

20   A    No.

21   Q    How did you maintain the confidentiality of this?

22   A    All our work goes on a secure engineering server that

23   doesn't have only local network connections.  So, we didn't even

24   put it on the network for the cloud, so you can't access it

25   remotely.  Then only the engineers have access to the

16-cv-2052-JLK    MARK KRAMER - Direct    03-21-2024

1   engineering server where this design files are stored on.  Even

2   me as the -- I didn't even have access to it.  I didn't want to,

3   because I had access to the accounting finance software servers,

4   and I didn't want somebody breaking in that site, corrupting the

5   data.  So, those two servers were even isolated for what we had

6   for accounting software and finance for the engineering.  I

7   didn't even have access to the engineering servers.

8   Q    Why did you take such precautions in terms of

9   confidentiality?

10  A    We didn't want the information getting out to our

11  competitors and give them a competitive advantage to get to

12  market without spending the time and doing the research and

13  development and time and expense and learning from our work.

14  Q    And in terms of this device itself, it was for Bluetooth.

15  With the expertise that you were developing and the printed

16  circuit board and the board support package, would those also

17  work with other forms of wireless technology?

18  A    That's correct.  So, if you --

19  Q    Why is that?

20  A    Because we looked at it as a transport medium.  It's no

21  different than if you call somebody up, took a ride in a car,

22  and you put yourself in the car.  We didn't care about the

23  transport.  We were more concerned about the technique of

24  compressing the data.  The algorithms we were using, and then

25  the transport wireless is just a medium for us.  So, like I

16-cv-2052-JLK    MARK KRAMER - Direct    03-21-2024

1  said, you do it ultra-wideband, Bluetooth, or Wi-Fi depending

2  what the customers' needs were.

3  Q    And that technology was part of what you had developed at

4  BlueRadios at this point in time?

5  A    Yeah.  That's correct.  And even on the Wi-Fi, we tried to

6  expand the patents claims by adding Wi-Fi specifically in the

7  patent, and notified HBSR of that, and also Kopin.

8  Q    We will get to the patents later.  I want to keep this in

9  order.  But this was something that would be equally applicable

10  to other wireless?

11  A    That's correct.

12        MR. GIBSON:  Your Honor, this may be a good time to

13  stop for the day.

14        THE COURT:  Is this a good time?

15        MR. GIBSON:  Yes, Your Honor.

16        THE COURT:  All right.  We're going to recess now.

17  It's been a long day, and we will be more efficient in the

18  coming days.  Mr. Kramer will finish his testimony.  Probably

19  not tomorrow after the cross exam, but going into Monday.  And

20  then there will be other witnesses, and we will try to keep this

21  going a little faster than it has up until now.

22        I have to -- I know you already know this, but I'm

23  required by law to tell you that you cannot discuss the case or

24  let anyone discuss it with you or do any kind of outside

25  research on what's going on.  What you -- what's happening here

Kevin P. Carlin, RMR, CRR

16-cv-2052-JLK    MARK KRAMER - Direct    03-21-2024

1   stays here.  And you go away, and have a nice evening, and come

2   back, and we will start again.  That's the most informal way I

3   can comply with that law.

4        (Jury out at 4:30 p.m.)

5            THE COURT:  We'll be in recess until 9:00 a.m.

6   tomorrow morning.

7        (Proceedings concluded at 4:33 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Kevin P. Carlin, RMR, CRR

1                          REPORTER'S CERTIFICATE

2

3

4          I, KEVIN P. CARLIN, Official Court Reporter for the

5   United States District Court for the District of Colorado, a

6   Registered Merit Reporter and Certified Realtime Reporter, do

7   hereby certify that I reported by machine shorthand the

8   proceedings contained herein at the time and place

9   aforementioned and that the foregoing pages constitute a full,

10  true, and correct transcript.

11          Dated this 9th day of April, 2024.

12

13

14

15

16  _____
    Kevin P. Carlin, RMR, CRR
17  Official Court Reporter

18

19

20

21

22

23

24

25

                    Kevin P. Carlin, RMR, CRR